UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                                            :
BAKARY TOURE,                                               :
                                                            :
                                                            :  Civil Action No.:  17-cv-00657 (PK)
                            Plaintiff,                       :
                                                            :
             -- against --                                  :
                                                            :
THUNDER LUBE INC, ABKO ASSOCIATES                           :
INC and HAGAY KEREN,                                        :
                                                            :
                            Defendants.                     :
                                                            :
------------------------------------------------------------x

## NOTICE OF DEFENDANTS' MOTION TO COMPEL
## ARBITRATION AND DISMISS PLAINTIFF'S COMPLAINT

SERVED ON MARCH 8, 2018

**PLEASE TAKE NOTICE**, that upon the Declaration of David H. Hartheimer, dated March 8,

2018; the Declaration of Dror Hershowitz dated March 8, 2018; the Declaration of Hagay Keren

dated March 8, 2018;  the accompanying Memorandum of Law and supporting papers, and all

the papers and pleadings hereto for had here in, Defendants Thunder Lube Inc., ABKO

Associates Inc. and Hagay Keren, (collectively the 'Defendants"), by their undersigned

attorneys, shall move this Court on April 19, 2018, at 10:00 A.M. or as soon thereafter as counsel

can be heard before the Hon. Dora L. Irizarry, at the United States District Court, Eastern District

of New York, located at 225 Cadman Plaza East, Brooklyn, New York, for an order (1) pursuant

to the FAA, dismissing or staying the Complaint in the above-captioned matter and compelling

arbitration; (2) awarding reasonable costs and attorney fees to Defendants for being compelled to

seek arbitration as required pursuant to the Arbitration Agreement; (3) in the alternative,

pursuant to F.R.C.P. 12(c), dismissing the entire Complaint with prejudice; (4) pursuant to

F.R.C.P. 12(c), whether or not this case is stayed or dismissed in order to compel arbitration, first

dismissing Defendant Hagay Keren with prejudice; and (5) granting such other and further relief as this Court deems just and equitable.

Dated:  New York, New York
        March 8, 2018

                                        Respectfully Submitted,

                                        MAYERSON & HARTHEIMER, PLLC

                                        By:  */s/ David H. Hartheimer*
                                                Sandra E. Mayerson, Esq.
                                                David H. Hartheimer, Esq.
                                                845 Third Avenue
                                                New York, New York 10022
                                                Telephone: (646) 778-4380
                                                E-mail: Sandy@mhlaw-ny.com
                                                *Attorneys for Defendants*

To:     Abdul K. Hassan, Esq.
        215-28 Hillside Avenue
        Queens Village, New York 11427
        Telephone: (718) 740-1000
        E-mail: abdul@abdulhassan.com
        *Attorney for Plaintiff*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Bakary Toure, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| -v- | ) |
| | ) |
| Thunder Lube Inc., | ) |
| Abko Associates Inc., and | ) |
| Hagay Keren, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

Civ. Action #: 17-CV-00657
(DLI) (PK)

## DECLARATION OF DAVID H. HARTHEIMER

I, David H. Hartheimer, am an attorney duly admitted to practice law before the courts of the State of New York and the Eastern District of New York and hereby affirm the following to be true and correct under penalty of perjury:

1. I am a member of the law firm Mayerson & Hartheimer, PLLC ("M&H"), counsel to the Defendants in this case. I make this declaration in support of Defendants' Motion to Compel Arbitration, Dismiss Complaint and to Dismiss Defendant Hagay Keren (the "Dismissal Motion").

2. M&H was substituted in as counsel for the Defendants on or about August 28, 2017. Upon taking over as counsel, M&H immediately went to the Defendants' place of business to review the Plaintiff's personal file. There, M&H discovered an existing arbitration agreement between the Plaintiff and Defendant Abko Associates Inc. ("Abko") dated April 1, 2015 (the "Arbitration Agreement"). A true and correct copy of the Arbitration Agreement is attached hereto as Exhibit I.

3. Promptly upon this discovery, M&H sent a copy of the Arbitration Agreement to Plaintiff's lawyer and requested voluntary withdrawal of the case. M&H received no response from counsel.

4. Several weeks later, M&H contacted Plaintiff's counsel again. On November 20, 2017, Plaintiff's counsel finally responded that the Arbitration Agreement did not apply "at this stage."

5. On the same day, M&H filed a letter with this Court requesting a pre-motion conference on this motion to stay or dismiss the proceedings and to compel arbitration.

6. At the time of this request, very little had taken place in this case: no fact discovery had been exchanged, no depositions had been taken, and Plaintiff had not yet provided his initial Rule 26 disclosures.

7. Plaintiff filed a response on November 28, 2017, indicating that he would oppose any motion to dismiss the case and to compel arbitration.

8. This court subsequently entered an order indicating that before it would entertain a dispositive motion, the parties must attend at least one settlement conference before Magistrate Judge Kuo.

9. Because the dispositive motion would not be heard immediately, Defendants, believing strongly that this matter should be moved to arbitration, then filed a motion to stay all discovery and to extend the discovery deadlines accordingly (the "Stay Motion"). This Stay Motion was filed in order to contain costs until the motion to dismiss and to compel arbitration was resolved.

10. The Stay Motion was heard before Magistrate Judge Kuo on December 12, 2017. At the hearing, Magistrate Judge Kuo indicated that she felt that some initial fact discovery

would help both parties to crystallize their positions prior to a settlement conference. Accordingly, she set a deposition schedule and new discovery deadlines. Magistrate Judge Kuo scheduled the settlement conference for January 10, 2018, and denied the Stay Motion.

11. After some initial discovery, the settlement conference was held on January 10, 2018. The parties met for several hours but were unable to reach a settlement.

12. At the conclusion of the settlement conference, Magistrate Judge Kuo granted Defendants' Stay Motion and stayed any further discovery.  She indicated that the Defendants should proceed with their dispositive motion.

13. Prior to bringing this Dismissal Motion, M&H informed counsel to the Plaintiff on multiple occasions of what M&H viewed as deficiencies in the pleadings, including the lack of any information concerning the alleged commission structure. Counsel to the Plaintiff chose not to amend his pleadings.

14. On December 7, 2017, counsel to that Plaintiff took the deposition of Defendant Hagay Keren, which I attended. Attached hereto as Exhibit II is a true and correct copy of the transcript provided to us by Plaintiff's counsel.

15. On December 28, 2017, counsel to the Defendants took the deposition of Plaintiff Bakary Toure, which I attended. Attached hereto as Exhibit III is a true and correct copy of the transcript of that deposition.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge and understanding.

Dated: 8 March 2018

David H. Hartheimer

# EXHIBIT I

Bakari

# ARBITRATION AGREEMENT

## THIS ARBITRATION AGREEMENT SUPERCEDES ANY AND ALL ARBITRATION AGREEMENTS

THIS IS AN AGREEMENT TO ARBITRATE ALL CLAIMS. READ THE FOLLOWING ARBITRATION PROVISIONS CAREFULLY. IT LIMITS YOUR RIGHTS, INCLUDING THE RIGHT TO MAINTAIN A COURT ACTION OR ADMINISTRATIVE PROCEEDING.

1. I, the undersigned ("UNDERSIGNED"), hereby agrees to arbitrate any and all claims, disputes and or controversies, including but not limited to, all statutory claims and any and all state and or federal claims, that may arise out of or relate in any way to my work and or performance of services for **ABKO ASSOCIATES INC.** ("**Abko" or "Company**") and any other existing corporation, including but not limited to claims, disputes and or controversies involving their predecessors, successors, assigns, parents, subsidiaries, affiliates, officers, trustees, directors, shareholders, partners, employees, agents, heirs, administrators, executors and attorneys, past and present. ["UNDERSIGNED" as defined herein shall include any and all persons who worked or performed services for **Abko**, including but not limited to part-time employees, full-time employees, temporary employees, independent contractors, and or seasonal employees].

2. By agreeing to arbitration, UNDERSIGNED understands and agrees that they are waiving their rights to maintain other available resolution processes, such as a court action or administrative proceedings, to resolve their disputes. The UNDERSIGNED also agrees to (i) waive any right to pursue any claims arising under this agreement including statutory, state and or federal claims, as a class action or class action arbitration, or (ii) to have an arbitration under this agreement consolidated with any other arbitration or proceeding.

3. In the event of a dispute, controversy or claim arising out of or relating in any way to UNDERSIGNED's work or performance of any services for **Abko** the UNDERSIGNED must first notify **Abko** in writing thereof, explaining in detail the nature of their claim. Within thirty (30) days of such notice, both Parties shall meet at **Abko** (**or a location selected by Abko**) in an initial attempt to resolve the dispute in good faith. Should the dispute not be resolved within thirty (30) days after such meeting, the UNDERSIGNED ("Complaining Party") shall seek remedies exclusively through arbitration as provided for herein. A written demand for arbitration must be made within sixty (60) days of the Complaining Party's first notification, and in no event shall it be made after one (1) year from when the Complaining Party knew or should have known of the controversy, claim, dispute or breach. UNDERSIGNED's failure to specifically adhere to these notice provisions and procedures as provided for herein, hereby results in a waiver by UNDERSIGNED of any and all claims against **Abko**, and their predecessors, successors, assigns, parents, subsidiaries, affiliates, officers, trustees, directors, shareholders, partners, employees, agents, heirs, administrators, executors and attorneys, past and present. All notices should be sent to: **ABKO ASSOCIATES INC., 488 CONEY ISLAND AVE., BROOKLYN, NEW YORK 11218** via regular and certified mail return receipt requested.

4. This agreement to arbitrate shall be specifically enforceable. **Abko** may apply to any court with jurisdiction for interim or conservatory relief, including without limitation a proceeding to compel arbitration. If **Abko** prevails, it shall be entitled to reasonable attorney's fees and costs.

5. The arbitration shall be conducted by one (1) arbitrator. If the Parties are not able to agree upon the selection of the arbitrator, within thirty (30) days of commencement of an arbitration proceeding by service of a demand for arbitration, the arbitrator shall be selected by **Abko** from: (a) the list of arbitrators provided by the U.S. District Court for the Southern District of New York, the State Court of New York, or the New York State Bar Association if the arbitration is held in New York; or (b) from the list of arbitrators provided by the U.S. District Court of New Jersey, the State Court of New Jersey, or the New Jersey State Bar Association if the arbitration is held in New Jersey; or (c) a retired Judge. The arbitrator shall have at least ten (10) years of legal experience and be either an attorney or retired Judge, within a fifty (50) mile radius of **Abko**. The arbitrator shall have no authority to award punitive, consequential, special, or indirect damages. The arbitrator shall not be entitled to issue injunctive and other equitable relief. The arbitration will be held at **Abko's** attorney's office or a location chosen by **Abko**.

1

6.      The laws of the State of New York shall be applied if the arbitration proceedings are held in New York, without regard to principles of conflict of laws. The laws of the State of New Jersey shall be applied if the arbitration proceedings are held in New Jersey, without regard to principles of conflict of laws. Company reserves the exclusive right to select the location of the arbitration proceedings and choice of law applied. Barring extraordinary circumstances, arbitration proceedings will be concluded within one hundred and twenty (120) days from the date the arbitrator is appointed. The arbitrator may reasonably extend this time limit in the interests of justice. Failure to adhere to this time limit shall not constitute a basis for challenging the award.

7.      Except as may be required by law, UNDERSIGNED nor its representatives, assigns and or heirs cannot disclose the existence and content of this arbitration agreement, or results of this arbitration agreement and or any arbitration hereunder without the prior written consent of Abko. This confidentiality provision is a *material clause* of this agreement. Breach of this confidentiality provision by UNDERSIGNED or their representatives, attorneys, assigns and or heirs, will subject the breaching party to forfeiture of any and all damages (including all fees, costs and expenses) or award, if any, that the breaching party may have received, along with reasonable attorney's fees and costs incurred by the non-breaching party in seeking to enforce this confidentiality provision, including court costs and fees, and all arbitration costs and fees incurred by Company.

8.      The Parties shall be entitled to discovery in the arbitration. Each Party shall be entitled to request no more than 500 pages of documents and to take three (3) depositions not to exceed eight (8) hours for each such deposition. Each Party shall be entitled to depose any expert who will testify in the arbitration proceeding. In addition to the foregoing, any Party shall be entitled to take the deposition of any witness who will testify at the arbitration. The Parties shall exchange a copy of all exhibits for the arbitration hearing and shall identify each witness who will testify at the arbitration, with a summary of the anticipated testimony of such witness fourteen (14) days before the arbitration hearing.

9.      Each party shall bear its own costs and their own attorney, expert, and other fees and costs. The cost of any proceeding in court to confirm or to vacate any arbitration award, as applicable (including, without limitation, reasonable attorneys' fees and costs), shall be the responsibility of the unsuccessful party. It is specifically understood and agreed that any party may enforce any award rendered pursuant to the arbitration provisions herein by bringing suit in any court of competent jurisdiction, as identified in paragraph 10. Each party shall pay its own proportionate share of arbitrator fees and expenses, plus the fees and expenses of the arbitrator designated, and the arbitration fees and expenses of the arbitrator designated.

10.     The jurisdiction for all disputes involving this agreement to arbitrate shall be: (1) the U.S. District Court - Eastern District of New York or State of New York courts if the arbitration proceedings are held in New York, without regard to principles of conflict of laws; or (2) the U.S. District Court of New Jersey or State of New Jersey courts if the arbitration proceedings are held in New Jersey, without regard to principles of conflict of laws. Abko reserves the exclusive right to select either jurisdiction and court in New York or New Jersey for all court proceedings relating to this arbitration agreement. If UNDERSIGNED seeks to proceed with court proceedings in relation to this arbitration agreement, UNDERSIGNED must first request permission from Abko as to the jurisdiction, court and venue for all court proceedings.

11      If any part of this arbitration agreement is found to be unenforceable for any reason, the remaining provisions shall remain enforceable. This Arbitration Agreement replaces any and all other arbitration agreements, and shall govern and control. This agreement shall not be construed against the drafter. By signing this agreement, UNDERSIGNED represents that they have read this agreement, and fully understands the provisions provided for herein.

[THIS SECTION IS INTENTIONALLY LEFT BLANK]

2

THIS ARBITRATION PROVISION LIMITS YOUR RIGHTS, INCLUDING YOUR RIGHT TO MAINTAIN A
COURT ACTION OR ADMINISTRATIVE PROCEEDING AGAINST ABKO ASSOCIATES. PLEASE READ
IT CAREFULLY, PRIOR TO SIGNING. UNDERSIGNED MAY SEEK INDEPENDENT LEGAL COUNSEL
PRIOR TO SIGNING THIS AGREEMENT.

Accepted By: _____
                    Authorized Representative of ABKO ASSOCIATES INC.

Date: 4/1/15

Undersigned _____

Undersigned Print Name: Bakari Towe                          Date: 4/1/15

# EXHIBIT II

1   UNITED STATES DISTRICT COURT

2   EASTERN DISTRICT OF NEW YORK

3   -------------------------------------------x

4   BAKARY TOURE,
                       Plaintiff,

5

6          -against-          Civil Action No:
                              17-CV-00657

7

8

9   THUNDER LUBE INC., ABKO ASSOCIATES INC., and
    HAGAY KEREN,

10                      Defendants.

11  -------------------------------------------x

12        EXAMINATION BEFORE TRIAL of Defendant,

13  HAGAY KEREN, taken by the Plaintiff, pursuant

14  to Notice, held at the offices of American

15  Stenographic, LLC, 89-00 Sutphin Boulevard,

16  Suite 305, Jamaica, New York 11435, on December

17  7, 2017, at 1:00 p.m., before a Notary Public

18  of the State of New York.

19  ********************************************

20              AMERICAN STENOGRAPHIC, LLC
                 89-00 Sutphin Boulevard

21                    Suite 305
                 Jamaica, NY 11435

22                 Ph-718-291-6600
                  Fax-718-291-6603

23                  855-US-STENO

24

25

1    A P P E A R A N C E S:

2

3    ABDUL HASSAN LAW GROUP, PLLC
              Attorneys for Plaintiff
4             215-28 Hillside Avenue
              Queens Village, New York 11427
5    BY:    ABDUL K. HASSAN, ESQ.

6

7

8

     MAYERSON & HARTHEIMER, PLLC
9             Attorneys for Defendants
              845 Third Avenue, 11th Floor
10            New York, New York 10022

11   BY:    DAVID H. HARTHEIMER, ESQ.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          S T I P U L A T I O N S

2

3          IT IS HEREBY STIPULATED AND AGREED by

4    and between the attorneys for the respective

5    parties herein, that filing, sealing and

6    certification be and the same are hereby

7    waived.

8          IT IS FURTHER STIPULATED AND AGREED

9    that all objections, except as to the form of

10   the question shall be reserved to the time of

11   the trial.

12         IT IS FURTHER STIPULATED AND AGREED

13   that the within deposition may be signed and

14   sworn to before any officer authorized to

15   administer an oath, with the same force and

16   effect as if signed and sworn to before the

17   Court and that a copy of this examination shall

18   be furnished without charge to the attorney

19   representing the witness testifying herein.

20

21

22

23

24

25

1

2              MR. HASSAN:  I will read

3      something for the camera and then the

4      court reporter will swear the witness

5      in.

6              This is a deposition of

7      defendant, Hagay Keren, in the case of

8      Bakary Toure versus Thunder Lube, Abko

9      Associates and Hagay Keren, currently

10     pending in a U.S. District Court for the

11     Eastern District of New York, before

12     District Judge Dora Irizarry and

13     Magistrate Judge Peggy Kuo.  The Civil

14     Action No., 17-CV-00657.  The deposition

15     will be conducted before Ms. Teraza

16     Conway, a court reporter and notary

17     public from American Stenographic.  Mr.

18     Abdul Hassan counsels plaintiff, Mr.

19     Bakary Toure.  Also present along with

20     the deponent is defense counsel, Mr.

21     David Hartheimer.

22              Today is Thursday, December 7,

23     2017 and the time is approximately 1:05

24     p.m.

25              MR. HARTHEIMER:  Good afternoon,

```
1                      HAGAY KEREN
2          my name is Dave Hartheimer.  I represent
3          all of the defendants, including Mr.
4          Keren, who is here with me today.
5                  I would like to state for the
6          record, that this deposition was not
7          noticed until Sunday, December 3rd, and
8          even then, was not noticed properly.  We
9          have tried, none-the-less, to
10         accommodate the plaintiff by making our
11         witness available.  But the schedule has
12         been difficult because Mr. Hassan does
13         not timely respond to e-mails or also
14         phone calls.  The witness is here today
15         under very short notice and under
16         protest, and we reserve all of our
17         rights with respect to the untimely
18         notice.
19                 I would also like to state for
20         the record, that the defendants have not
21         yet delivered documents or interrogatory
22         responses to the plaintiff, which we
23         expect to do in the near future.
24         Accordingly, we have offered Mr. Hassan
25         that he could take this witness's
```

```
 1                    HAGAY KEREN
 2          deposition after the close of fact
 3          discovery so that he would have an
 4          opportunity to receive and review the
 5          documentary discovery prior to the
 6          deposition.
 7               Mr. Hassan declined our offer
 8          and insisted the witness appear today.
 9          He, therefore, has waived any right to
10          recall this witness after he receives
11          the documentary discovery.  Thank you.
12               MR. HASSAN:  I disagree with
13          Counsel's representation of the facts,
14          his interpretation of the law.  Most of
15          what was said was incorrect and untrue.
16          However, he made a statement for the
17          record.  We will proceed with the
18          deposition.
19
20     H A G A Y   K E R E N, the witness herein,
21     having been first duly sworn by a Notary Public
22     of the State of New York, was examined and
23     testified as follows:
24     EXAMINATION BY
25     MR. HASSAN:
```

```
 1                    HAGAY KEREN
 2   Q.     State your name for the record, please?
 3   A.     Hagay Keren.
 4   Q.     State your address for the record,
 5   please.
 6   A.     985 Washington Avenue, Plainview, New
 7   York 11803.
 8   Q.     Mr. Keren, to recap the process of the
 9   deposition, I will be outlining certain
10   procedures.  First, I will be asking the
11   questions on behalf of the plaintiff and you
12   are required to answer them.  Please allow me
13   to finish my question before you begin to
14   answer because it's difficult for the court
15   reporter to record what we have said if we are
16   both speaking at the same time.  Also for the
17   court reporter, please speak loud enough and
18   clear enough so that we can hear and understand
19   what you are saying.
20          If you don't understand my question, you
21   may ask for it to be repeated, and it will be
22   repeated or clarified.
23          If you don't recall a part of the
24   question or the whole of a question, you may
25   ask for it to be repeated, and it will be
```

```
 1                    HAGAY KEREN
 2    repeated or clarified.
 3           If you would like to take a break,
 4    please let us know.  I would ask that you allow
 5    me to finish my question and that you finish
 6    your answer before taking a break.
 7           Your counsel has a right to object as to
 8    the form of any question that I ask.  If your
 9    attorney objects, the practice is to note the
10    objection on the record, and you will be asked
11    to testify, except under certain objections
12    such as privileges.  Mr. Keren, do you
13    understand that you are under oath?
14    A.     Yes.
15    Q.     Do you understand your duty to testify
16    honestly and completely?
17    A.     Yes.
18    Q.     Have you testified in a deposition
19    before?
20    A.     Yes.
21    Q.     When was the last time you testified in
22    a deposition?
23    A.     I cannot recall.
24    Q.     More than five years ago?
25    A.     It might be.
```

```
 1                    HAGAY KEREN
 2    Q.      How many times have you testified in a
 3    deposition?
 4    A.      Once.
 5    Q.      Do you remember what type of case it
 6    was?
 7    A.      I think it was a car accident.
 8    Q.      Were you a party in that case?
 9    A.      Yes.
10    Q.      Were you the defendant or the plaintiff
11    or some other party?
12    A.      I was the plaintiff.
13    Q.      And how was that case resolved;
14    settlement, judgment?
15    A.      Settlement.
16    Q.      Now in terms of competence as a witness,
17    I have to ask you several questions.
18            Are you taking any prescription
19    medication?
20    A.      No.
21    Q.      Have you consumed alcohol in the last 24
22    hours?
23    A.      No.
24    Q.      Do you suffer from any mental or
25    physical handicaps that would prevent you from
```

```
 1                    HAGAY KEREN
 2   testifying accurately and completely?
 3   A.     No.
 4   Q.     Have you reviewed any documents in
 5   preparation for your deposition today?
 6   A.     No.
 7   Q.     Did you speak with anyone other than
 8   your attorney in preparation for your
 9   deposition today?
10   A.     No.
11   Q.     Did you speak with your attorney prior
12   to your deposition today?
13               MR. HARTHEIMER:  Objection.
14          Don't answer that question.
15   Q.     You don't have to tell me what was said.
16               MR. HARTHEIMER:  That calls for
17          attorney/client privilege.  I'm going to
18          ask my client not to answer that
19          question.
20               MR. HASSAN:  We will mark it for
21          a ruling.
22               MR. HARTHEIMER:  Thank you.
23   Q.     In terms of your educational background,
24   did you attend high school?
25   A.     Yes.
```

1                      HAGAY KEREN
2    Q.      Which high school did you attend?
3    A.      In Israel.
4    Q.      What's the name of the high school?
5    A.      It was for officers, Navy officers.
6    Q.      A Navy officer high school?
7    A.      Yes.
8    Q.      And did you graduate from that high
9    school?
10   A.      Yes.
11   Q.      What city in Israel was the high school
12   in?
13   A.      Akko, A-K-K-O, it might be.
14   Q.      And what is your date of birth?
15   A.      1957.
16   Q.      What year did you finish that high
17   school, graduated from that high school?
18   A.      1976.
19   Q.      Did you specialize in anything, focus in
20   anything, any subject area?
21   A.      Mechanical and electric.
22   Q.      And after you graduated from that high
23   school in 1976, what you did do; did you go to
24   another institution of higher learning?
25   A.      I went to the army.

```
 1                    HAGAY KEREN
 2    Q.      How long did you spend in the army?
 3    A.      Three years.
 4    Q.      What position did you have in the army?
 5    A.      Electrical and mechanical work.
 6    Q.      So you left the army around 1979?
 7    A.      Yes.
 8    Q.      Were you honorably discharged; what were
 9    the circumstances of your separating from the
10    army?
11    A.      I finished it.
12    Q.      And after you left the army, did you
13    attend any institution of higher learning?
14    A.      Yes.
15    Q.      What is it?
16    A.      Technion Israel, T-E-C-H-N-I-O-N, it
17    might be.
18    Q.      What does that mean, is that technical?
19    A.      A technical school.
20    Q.      What did you study in that technical
21    school?
22    A.      Physics.
23    Q.      How long did you attend that school for?
24    A.      Two years.
25    Q.      And you graduated from that school with
```

```
 1                     HAGAY KEREN
 2    some type of degree in physics?
 3    A.      Yes.
 4    Q.      And by the way, while you were in the
 5    technical school, were you working anywhere?
 6    A.      Yes.
 7    Q.      Where were you working?
 8    A.      In the post office.
 9    Q.      What position did you have in the post
10    office?
11    A.      Night shift.
12    Q.      Was there a title, like mail sorter?
13    A.      I answered phones.
14    Q.      And then -- so after the technical
15    school, did you attend any other higher
16    institution of higher learning?
17    A.      No.
18    Q.      Did you start working somewhere after
19    you left technical school?
20    A.      Yes.
21    Q.      Where?
22    A.      Gruman, G-R-U-M-A-N {sic}.
23    Q.      Is that the defense manufacturer; is
24    that the company that makes weapons and other
25    stuff?
```

1                    HAGAY KEREN

2    A.      Yes.

3    Q.      And how long have you worked for

4    Grumman?

5    A.      About a year.

6    Q.      And what position did you hold there?

7    A.      Engineer.

8    Q.      And what were the circumstances of your

9    separation from Grumman; were you fired, did

10   you quit, laid off?

11   A.      The company closed.

12   Q.      Did you work somewhere else after

13   Grumman?

14   A.      No.

15   Q.      What happened after you left Grumman?

16   A.      I came to the United States.

17   Q.      What year did you come to the United

18   States?

19   A.      1984.

20   Q.      Are you married?

21   A.      Yes.

22   Q.      Do you have children?

23   A.      Yes.

24   Q.      How many children?

25   A.      Two.

```
  1                     HAGAY KEREN
  2   Q.      So in 1984 you came here, did you -- at
  3   some point, did you become employed here in the
  4   states?
  5   A.      Yes.
  6   Q.      How long after you came did you become
  7   employed?
  8   A.      About a year.
  9   Q.      So around 1985, you became employed?
 10   A.      Yes.
 11   Q.      At what job were you employed at first?
 12   A.      A car wash.
 13   Q.      What was your position at the car wash?
 14   A.      Partner.
 15   Q.      Which car wash was it?
 16   A.      Hollywood Car Wash.
 17   Q.      How did you pick the name Hollywood?
 18   A.      It was there.
 19   Q.      The name of the car wash was Hollywood
 20   at the time you bought it?
 21   A.      Yes.
 22   Q.      So someone else owned it under the name
 23   Hollywood Car Wash?
 24   A.      Correct.
 25   Q.      What was the location of the car wash
```

1                          HAGAY KEREN
2    when you bought it?
3    A.      488 Coney Island Avenue.
4    Q.      And at Hollywood Car Wash, did that also
5    have a lube oil change operation attached to
6    it?
7    A.      No.
8    Q.      Was there an oil change operation close
9    to Hollywood Car Wash where people can take
10   their cars in and change the oil?
11   A.      I cannot recall that.
12   Q.      So who were you partners with at
13   Hollywood Car Wash?
14   A.      Steven Bernard.
15   Q.      Can you spell his name?
16   A.      S-T-E-V-E-N, B-E-R-N-A-R-D.
17   Q.      Is that Steven with a "ph" or a "v;" do
18   you know?
19   A.      No, I don't know.
20   Q.      But you know it's Steven?
21   A.      Yes.
22   Q.      And what was the breakdown of the
23   partnership; how much did you own of the
24   business and how much did he own?
25   A.      I was 20 percent.

```
 1                    HAGAY KEREN
 2   Q.      And he was what percentage?
 3   A.      60.
 4   Q.      Who owned the other 20 percent?
 5   A.      Another partner.
 6   Q.      What was his name?
 7   A.      Shlomo Avital, A-V-I-T-A-L.
 8   Q.      When last have you spoken with Steven
 9   Bernard?
10   A.      Three months ago.
11   Q.      And Shlomo Avital, when last did you
12   speak with him?
13   A.      In October 14.
14   Q.      October 2014?
15   A.      No, October 14th.
16   Q.      Oh, of this year?
17   A.      Yes.
18   Q.      So do you still -- is Hollywood Car Wash
19   still in business?
20   A.      Yes.
21   Q.      Do you still own any part of it?
22   A.      Yes.
23   Q.      What part of it do you own currently?
24   A.      27 and a half percent.
25   Q.      And currently, who owns the other
```

1                        HAGAY KEREN
2    portions of that company?
3    A.      Steven Bernard, Shlomo Avital and Dror
4    Hershowitz, D-R-O-R.
5    Q.      And the last name Hershowitz,
6    H-E-R-S-H-O-W-I-T-Z; is that correct?
7    A.      Possible.
8    Q.      How long have you known Dror Hershowitz?
9    A.      For about 15 years.
10   Q.      And how did you come to know him?
11   A.      He was working for me.
12   Q.      So the percentages again, you owned 27,
13   Dror Hershowitz owned how much?
14   A.      I don't know that other breakdown.
15   Q.      How much does Steven own currently?
16   A.      I don't know.
17               MR. HARTHEIMER:  Asked and
18           answered.  Objection.
19   Q.      When did your ownership percentage
20   change, do you know, from 20 to 27?
21   A.      Through the years.
22   Q.      So there are now four owners of
23   Hollywood Car Wash?
24   A.      Correct.
25   Q.      And previously when you started, there

```
 1                      HAGAY KEREN
 2   were three?
 3   A.      Yes, three.
 4   Q.      So you said you have come to know Dror
 5   Hershowitz because he began working for you?
 6   A.      Yes.
 7   Q.      Was that at Hollywood Car Wash?
 8   A.      No.
 9   Q.      Where?
10   A.      Manhattan Bridge Car Wash.
11   Q.      Did he ever have a case together with
12   Manhattan Bridge Car Wash?
13   A.      Possible.
14   Q.      What is the status of Manhattan Bridge
15   Car Wash, is it still in operation?
16   A.      It might be.
17           MR. HARTHEIMER:  If you don't
18           know the answer to the question, just
19           say you don't know.  Don't guess, it
20           doesn't help anybody.
21   Q.      Were you once an owner of Manhattan
22   Bridge Car Wash?
23   A.      Yes.
24   Q.      How long have you owned Manhattan Bridge
25   Car Wash for?
```

```
 1                     HAGAY KEREN
 2   A.      For 12 years.
 3   Q.      And at some point, did your ownership
 4   end at Manhattan Bridge Car Wash?
 5   A.      Yes.
 6   Q.      When did your ownership end?
 7   A.      2007.
 8   Q.      What was the form of the termination;
 9   did you sell it, something else happened?
10   A.      I sold it.
11   Q.      Who did you sell it to?
12   A.      I don't remember the company name.
13   Q.      You don't remember --
14   A.      The company name, no.
15   Q.      Was it a company or a person that you
16   sold it to?
17   A.      A company.
18   Q.      And at the time you owned Manhattan
19   Bridge Car Wash, you also opened Hollywood Car
20   Wash?
21   A.      Yes.
22   Q.      Manhattan Bridge Car Wash, was there a
23   lube operation associated with the car wash?
24   A.      Yes.
25   Q.      And how many people were working in the
```

```
 1                    HAGAY KEREN
 2   lube operation at Manhattan Bridge Car Wash,
 3   let's say, in 2007 when you sold it?
 4   A.      I don't remember.
 5   Q.      Was it more than 20?
 6   A.      No -- I don't know.
 7   Q.      Do you remember if there was a
 8   Department of Labor investigation of Manhattan
 9   Bridge Car Wash?
10   A.      No.
11   Q.      Was there ever a New York State
12   Department of Labor investigation of Manhattan
13   Bridge Car Wash?
14   A.      No.
15   Q.      While you were owner of Manhattan Bridge
16   Car Wash, did they ever reach any settlement
17   with the New York State Department of Labor
18   concerning unpaid wages?
19   A.      No.
20   Q.      How much did you sell Manhattan Bridge
21   Car Wash for?
22   A.      $8,000,000.
23   Q.      Did you own Manhattan Bridge Car Wash
24   with anyone else?
25   A.      Yes.
```

```
 1                    HAGAY KEREN
 2   Q.      Who were your other partners?
 3   A.      Alex Keren and Jeff Stern.
 4   Q.      And what percentages; when it was sold,
 5   what percentage did you own, what percentage
 6   did they own?
 7   A.      I was 55 percent, Alex, 20 percent, and
 8   25 percent, Jeff Stern.
 9   Q.      Did you own any other car washes during
10   the period that you owned Hollywood Car Wash,
11   other than Manhattan Bridge Car Wash?
12   A.      Yes.
13   Q.      What other ones did you own?
14   A.      Medford Car Wash.
15   Q.      Where is that located?
16   A.      178 Route 112 in Medford.
17   Q.      Do you still own that car wash, Medford
18   Car Wash?
19   A.      No.
20   Q.      When did you stop owning that?
21   A.      I don't remember exactly.
22   Q.      More than five years ago?
23   A.      Yes.
24   Q.      More than ten years ago?
25   A.      No.
```

```
 1                        HAGAY KEREN
 2   Q.      How did you stop owning it; did you sell
 3   it, something else?
 4   A.      Yes.
 5   Q.      You sold it?
 6   A.      Yes.
 7   Q.      Who did you sell it to?
 8   A.      Jaguar Corporation.
 9   Q.      How much did you sell it for?
10   A.      I don't remember the exact number.
11   Q.      More than $5,000,000?
12   A.      No.
13   Q.      More than $2,000,000?
14   A.      No.
15   Q.      More than $1,000,000?
16   A.      Yes.
17   Q.      Did you own that, Medford Car Wash, with
18   anyone else?
19   A.      Yes.
20   Q.      Who?
21   A.      Moshir (phonetic).
22   Q.      Moshir who?
23   A.      Kikos, K-I-K-O-S.
24   Q.      What percentage did you own and what
25   percentage did Moshir own?
```

```
 1                    HAGAY KEREN
 2    A.      33 percent.
 3    Q.      You owned 33 percent?
 4    A.      Yes.
 5    Q.      And Moshir owned the remainder?
 6    A.      No.
 7    Q.      What was his percentage?
 8    A.      33 percent.
 9    Q.      And someone else owned the rest?
10    A.      Yes.
11    Q.      Who was that?
12    A.      Steven Bernard.
13    Q.      Any other car washes you owned while you
14    were the owner of Hollywood Car Wash?
15            So now, we have -- the two identified
16    was Manhattan Bridge Car Wash and Medford Car
17    Wash, any other in addition to Hollywood?
18    A.      Yes.
19    Q.      What is that?
20    A.      Mamaroneck High Tech Car Wash.
21    Q.      Now Medford Car Wash, was there a lube
22    operation associated with the car wash?
23    A.      No.
24    Q.      Mamaroneck High Tech Car Wash, was there
25    a lube operation associated with that car wash?
```

```
 1                    HAGAY KEREN
 2   A.      No.
 3   Q.      It was a stand-alone car wash?
 4   A.      Yes.
 5   Q.      So no oil change or anything like that?
 6   A.      No.
 7   Q.      Do you still own Mamaroneck High Tech
 8   Car Wash?
 9   A.      No.
10   Q.      When did you stop owning it?
11   A.      In the early '90s.
12   Q.      Early '90s?
13   A.      Yes.
14   Q.      And did you own it with anyone else?
15   A.      Yes.
16   Q.      Who?
17   A.      Shlomo Avital, Steven Bernard, and I
18   don't remember the other partners.
19   Q.      And what was your percentage of
20   ownership in Mamaroneck High Tech Car Wash?
21   A.      I don't remember.
22   Q.      How much did you sell it for?
23   A.      I don't remember.
24   Q.      Do you remember who you sold it to?
25   A.      It was a company.
```

```
 1                    HAGAY KEREN
 2    Q.      So we have, Mamaroneck High Tech Car
 3    Wash, Manhattan Bridge Car Wash, Medford Car
 4    Wash, any other car washes you owned?
 5    A.      Yes.
 6    Q.      What was the next one?
 7    A.      Bedford High Tech Car Wash in New
 8    Jersey.
 9    Q.      Let's list them and maybe we can go
10    through them.  Bedford in New Jersey.
11    A.      Yes.
12    Q.      What's the other one?
13    A.      Perth Amboy.
14    Q.      And that was the name, Perth Amboy Car
15    Wash?
16    A.      Yes.
17    Q.      And any other car washes that you owned
18    while you were the owner of Hollywood Car Wash?
19    A.      I don't remember any other.
20    Q.      Now Bedford Car Wash, do you still own
21    it?
22    A.      No.
23    Q.      When did you stop owning it?
24    A.      Early '90s.
25    Q.      Who did you own it with, if any?
```

```
 1                    HAGAY KEREN
 2    A.      It was a list of people.
 3    Q.      Was Steven Bernard one of the owners?
 4    A.      Yes.
 5    Q.      Was Avital one of the owners?
 6    A.      No.
 7    Q.      Was Moshir one of the owners?
 8    A.      No.
 9    Q.      Was Dror Hershowitz one of the owners?
10    A.      No.
11    Q.      How about the Perth Amboy Car Wash, do
12    you still own it?
13    A.      No.
14    Q.      When did you stop owning it?
15    A.      Around 2005.
16    Q.      And did you own it with anyone else?
17    A.      Yes.
18    Q.      Who else?
19    A.      Mario DiCosta, Jeff Stern and one other
20    partner, I don't remember his name.
21    Q.      And did you sell that in 2005, the Perth
22    Amboy?
23    A.      Yes.
24    Q.      How much did you sell that for?
25    A.      It was a swap of stocks.
```

```
 1                      HAGAY KEREN
 2   Q.      And who were you swapping stocks with;
 3   another corporation, a person, do you remember
 4   who?
 5   A.      Mario DiCosta.
 6   Q.      So Mario DiCosta continues to be the
 7   owner of Perth Amboy Car Wash?
 8   A.      Yes.
 9   Q.      Now when you closed -- you said Dror
10   Hershowitz was working for you at Manhattan
11   Bridge Car Wash?
12   A.      Correct.
13   Q.      And after you sold that car wash,
14   Manhattan Bridge Car Wash, did he continue to
15   work for you elsewhere?
16   A.      No.
17   Q.      Did he ever work for you at Hollywood
18   Car Wash?
19   A.      Yes.
20   Q.      What period of time did he work for you
21   at Hollywood Car Wash?
22   A.      I don't remember when he started.
23   Q.      How long ago; more than ten years ago --
24   let's do it like this, in 2007 you sold
25   Manhattan Bridge Car Wash?
```

```
 1                    HAGAY KEREN
 2   A.      Correct.
 3   Q.      Did he start working for you after 2007?
 4   A.      No.
 5   Q.      Before 2007?
 6   A.      I don't remember.
 7   Q.      How long did he work for you at
 8   Hollywood Car Wash?
 9   A.      I don't remember how many years.
10   Q.      More than one year?
11   A.      Yes.
12   Q.      More than two years?
13   A.      Yes.
14   Q.      More than five years?
15   A.      Yes.
16   Q.      More than ten years?
17   A.      I cannot recall.
18   Q.      Does he still work for Hollywood Car
19   Wash?
20   A.      Yes.
21   Q.      Do you know the corporate defendants in
22   this case, Thunder Lube and Abko Associates?
23   A.      Yes.
24   Q.      How did you come to know them?
25   A.      I'm partner.
```

```
 1                    HAGAY KEREN
 2   Q.      Let's start with Thunder Lube.  Do you
 3   own part of Thunder Lube?
 4   A.      No.
 5   Q.      You don't own any part of Thunder Lube?
 6   A.      I do.
 7   Q.      What part do you own?
 8   A.      27 and a half.
 9   Q.      Who owns the rest?
10   A.      Dror Hershowitz, Shlomo Avital, Steve
11   Hershowitz.
12   Q.      How much does Dror own?
13   A.      I don't know.
14   Q.      And you said Avital owns?
15   A.      I don't know what is the percentage for
16   each of them.
17   Q.      But the other two are owners of Thunder
18   Lube?
19   A.      Shlomo Avital, Steven Bernard and Dror
20   Hershowitz.
21   Q.      How long has Dror Hershowitz been an
22   owner of Thunder Lube?
23   A.      I don't know.
24   Q.      More than five years?
25   A.      I don't know if it's existing more than
```

```
 1                    HAGAY KEREN
 2   five years; I don't remember.
 3   Q.      Dror Hershowitz, does he also work at
 4   Thunder Lube, like a manager?
 5   A.      He is managing the whole facility.
 6   Q.      He is managing the whole of Thunder
 7   Lube?
 8   A.      Yes.
 9   Q.      In terms of structure -- by the way,
10   where is Thunder Lube located?
11   A.      I don't remember the exact number, but
12   it's also close to Coney Island Avenue, next to
13   the car wash.
14   Q.      Next to Hollywood Car Wash?
15   A.      Correct.
16   Q.      Do they use the same address, 488 Coney
17   Island Avenue?
18   A.      I wouldn't know.
19              MR. HARTHEIMER:  Can I talk to
20          my client for a moment, please?
21              MR. HASSAN:  Sure.
22              (Whereupon, a recess was taken
23          at this time.)
24   Q.      During the break, did you discuss this
25   deposition or this testimony with your
```

```
 1                       HAGAY KEREN
 2    attorney?
 3                 MR. HARTHEIMER:  Objection.  It
 4           calls for attorney/client privilege.  I
 5           will ask my client not to answer that
 6           question.
 7                 MR. HASSAN:  Okay.  We will take
 8           that up later.
 9    Q.     So Thunder Lube, I was asking if it
10    shares the same address --
11                 MR. HASSAN:  After a brief
12           break, we are back on the record.  It's
13           approximately, 1:39 p.m. on December 7, 2017.
14    Q.     Did Thunder Lube and Hollywood Car Wash
15    share the same address or stationary, like
16    envelopes, which is 488 Coney Island Avenue?
17    A.     I wouldn't know.
18    Q.     Did you have an office at Hollywood Car
19    Wash at any time?
20    A.     I never had an office.
21    Q.     How about Thunder Lube, did you have an
22    office at Thunder Lube?
23    A.     No.
24    Q.     Are there offices, like managerial
25    offices at Thunder Lube?
```

1                     HAGAY KEREN

2     A.      I don't know.

3     Q.      Have you ever been to the Thunder Lube

4     location?

5     A.      Yes.

6     Q.      When was the last time that you went to

7     the Thunder Lube location?

8     A.      A few years ago.

9     Q.      And getting back to Dror Hershowitz, he

10    ran the entire Thunder Lube operation?

11    A.      Yes.

12    Q.      Did that include Hollywood Car Wash as

13    well?

14    A.      Yes.

15    Q.      And under him, were there assistant

16    managers under him?

17    A.      I don't know.

18    Q.      How about Abko Associates, you said you

19    know about Abko Associates?

20    A.      About what?

21    Q.      Do you know the company that they call

22    Abko Associates?

23    A.      Yes.

24    Q.      And are you an owner of that company?

25    A.      Yes.

1                        HAGAY KEREN

2    Q.      And the company that I'm referring to is

3    one of the defendants in this case; is that

4    correct?

5    A.      I have no idea.

6    Q.      The one I'm referring to is Abko

7    Associates, in the complaint, Abko Associates,

8    Inc.  When did you acquire ownership in Abko

9    Associates?

10   A.      I don't remember.

11   Q.      More than five years?

12   A.      Maybe.

13   Q.      Do you know how long the company has

14   been in business, Abko Associates?

15   A.      No.

16   Q.      What percentage of Abko Associates do

17   you own?

18   A.      27 and a half.

19   Q.      Who owns the rest?

20   A.      Shlomo Avital, Dror Hershowitz and

21   Steven Bernard.

22   Q.      Is there any difference between Abko

23   Associates and Thunder Lube?

24   A.      As far as?

25   Q.      The operations?

1                     HAGAY KEREN
2     A.      I have no idea.
3     Q.      Where is Abko Associates located, the
4     business?
5     A.      488 Coney Island Avenue.
6     Q.      And is that the same address for Thunder
7     Lube?
8     A.      I have no idea.
9     Q.      What type of business did Thunder Lube
10    engage in?
11    A.      Changing oil.
12    Q.      And what type of business does Abko
13    Associates engage in?
14    A.      Car wash.
15    Q.      Is there a difference between Abko
16    Associates and Hollywood Car Wash?
17    A.      I don't think so.
18    Q.      Is it fair to say that you have been in
19    the lube and car wash business for over 30
20    years?
21    A.      Yes.
22    Q.      And was there anything that drove you to
23    the business initially?  How did you come to
24    get involved with the car wash business?
25    A.      I was working night shift in a car wash

1                        HAGAY KEREN

2    as a student.

3    Q.      Here in America?

4    A.      Yes.

5    Q.      You said you were a student also here in

6    America?

7    A.      Yes.

8    Q.      Where were you a student?

9    A.      I started at New York Tech.

10   Q.      And which car wash were you working in?

11   A.      High Tech Car Wash in Mineola.

12   Q.      Is that the one that you eventually

13   owned or no?

14   A.      No.

15   Q.      So when you worked in the High Tech Car

16   Wash in Mineola, did it also have a lube

17   associated with it, a lube shop?

18   A.      No.

19   Q.      What did you do in the car wash in

20   Mineola?

21   A.      Managing.

22   Q.      You were a manager?

23   A.      Yes.

24   Q.      Now, when you owned Manhattan Bridge Car

25   Wash, you said that had a lube shop associated

1                          HAGAY KEREN

2    with it, right?

3    A.      Yes.

4    Q.      What type of services did the lube shop

5    provide to the public?

6    A.      Oil change.

7    Q.      And when you say "oil change," somebody

8    can take their car in and get an oil change?

9    A.      Yes.

10   Q.      And what did you do with the oil when

11   you take it out, the old oil?

12   A.      I don't know what they do with it

13   exactly -- the used oil, you mean?

14   Q.      Yes.

15   A.      I don't know.

16   Q.      Do you charge people to dispose of the

17   old oil?

18   A.      I don't think so; I don't know.

19   Q.      Now Thunder Lube offered the same type

20   of oil change services like Manhattan Bridge

21   Car Wash?

22   A.      I would assume.

23   Q.      And like Manhattan Bridge, you can take

24   your car into Thunder Lube and they will change

25   your oil?

1                    HAGAY KEREN
2    A.      If you can take it in?
3    Q.      No.  I said like Manhattan Bridge, the
4    lube shop there, you can also take your car
5    into Thunder Lube and the people at Thunder
6    Lube will change the oil?
7                MR. HARTHEIMER:  Objection.
8           That's a compound question; is that
9           right?  Can you ask that question again.
10   Q.      At Thunder Lube, what type of services
11   did they offer to the public?
12   A.      Oil change.
13   Q.      So at Thunder Lube, you can take your
14   car in to change your oil?
15   A.      Yes, correct.
16   Q.      What is the process of oil change?
17   Let's say I bring my car into the shop,
18   somebody greets me first, takes my car; explain
19   that process to me.
20                MR. HARTHEIMER:  That's a
21           compound question.
22   Q.      Do you understand the question?
23   A.      No.
24   Q.      Explain the process by which an oil
25   change is done at Thunder Lube?

```
 1                    HAGAY KEREN
 2   A.      I don't know the process.
 3   Q.      Other than Dror Hershowitz, do you know
 4   any of the managers at Thunder Lube?
 5   A.      There is a guy named Ceela (phonetic).
 6   I think there is a guy named Ceela who is
 7   working with Hershowitz.
 8   Q.      Ceela?
 9   A.      Ceela.
10             MR. HARTHEIMER:  I just want to
11             say something to my client.  If you
12             don't know the answer to a question,
13             just say you don't know.  You should not
14             be guessing.
15             THE WITNESS:  Okay, it's a
16             guess.
17   Q.      Is Thunder Lube still in operation?
18   A.      I have to check it.
19   Q.      Do you attend meetings with your shared
20   partners concerning the business of Thunder
21   Lube?
22   A.      No.
23   Q.      When was the last time you got any money
24   from the Thunder Lube business?
25   A.      Every week.
```

```
 1                  HAGAY KEREN
 2   Q.     And how do you get your money?
 3   A.     With a check.
 4   Q.     And who writes the check?
 5   A.     A check company.
 6   Q.     Who signs it?
 7   A.     Shlomo Avital.
 8   Q.     What is his title in the Thunder Lube
 9   business?
10   A.     I have no idea.
11   Q.     And how do they determine how much money
12   you are entitled to?
13   A.     Dror does it.
14   Q.     Dror Hershowitz?
15   A.     Yes.
16   Q.     And Thunder Lube, do they sell car
17   accessories like windshield wipers, oil
18   filters?
19   A.     I don't know.
20   Q.     At Manhattan Bridge Car Wash, did you
21   sell any car accessories in the lube operation
22   such as windshield wipers, oil filters?
23   A.     In the store?
24   Q.     Did you?
25   A.     Yes.
```

HAGAY KEREN

1

2    Q.     So do you know if you sold it at

3    Manhattan Car Wash in the lube operation?

4    A.     Not in the lube operation, it was a

5    store separate from both of them.

6    Q.     In Manhattan Bridge Car Wash, did you

7    have people called oil change technicians who

8    would actually change the oil when people came

9    in?

10   A.     Can you repeat the question?

11   Q.     In the Manhattan Bridge, in the lube

12   operation, did you have people who would do the

13   oil changes when the people came in?

14   A.     Yes.

15   Q.     How many employees?

16   A.     I don't remember.

17   Q.     When a customer comes in for an oil

18   change, would the technician also sell them

19   other products such as windshield wipers, oil

20   filters?

21   A.     Possibly.

22   Q.     Now the employees -- did you have at

23   Manhattan Bridge Car Wash, a list of items and

24   the prices that customers were charged for

25   things like windshield wipers, oil filters and

1                    HAGAY KEREN

2    so on?

3    A.     Yes.

4    Q.     And that was in the computer?

5    A.     Yes.

6    Q.     And do you keep track of which employees

7    sold which items, such as windshield wipers,

8    oil fitters, other types of accessories?

9    A.     The office used to do it, yes.

10   Q.     And did they keep track in an employee

11   code?

12   A.     I have no idea.

13   Q.     Now at Thunder Lube, did you have a list

14   of items and prices such as oil filters,

15   windshield wipers and the prices for them?

16   A.     I assume.

17   Q.     And they also have a computer system at

18   Thunder Lube?

19   A.     I assume.

20   Q.     When was the last time that you were

21   physically at Thunder Lube?

22   A.     A few years ago.

23   Q.     What year?

24   A.     At least three years ago.

25   Q.     And how about Abko Associates?

```
 1                      HAGAY KEREN
 2    A.      About a year ago.
 3    Q.      And when you went to Thunder Lube three
 4    years ago, what location did you go to?
 5    A.      Next to the car wash.
 6    Q.      Next to Hollywood Car Wash.  And when
 7    you went to Abko Associates, what address did
 8    you go to?
 9    A.      488 Coney Island Avenue.
10    Q.      That's the same address as Hollywood Car
11    Wash?
12    A.      Yes.
13    Q.      When was the last time you reviewed the
14    books, the financials, of Thunder Lube?
15    A.      I never did.
16    Q.      When was the last time you reviewed the
17    financials of Abko Associates?
18    A.      I never did.
19    Q.      Who is in charge of reviewing the
20    financials for Thunder Lube?
21    A.      Dror Hershowitz.
22    Q.      So last week, you received a draw, a
23    commission of your share of the profits from
24    Thunder Lube?
25    A.      Yes, not share, of profit.  It's a
```

1                          HAGAY KEREN

2    salary.

3    Q.      So you are an employee of Thunder Lube?

4    A.      No.

5    Q.      How much was the salary?

6    A.      $2,000, about $2,000.

7    Q.      Did they take out taxes from that, like

8    payroll taxes?

9    A.      Yes.

10   Q.      And Abko Associates, you get a check

11   from that too?

12   A.      Yes.

13   Q.      How much was that check?

14   A.      About $2,000.

15   Q.      Do they take out payroll taxes from that

16   check?

17   A.      Yes.

18   Q.      Did they give you a pay stub showing the

19   deductions?

20   A.      Yes.

21   Q.      Thunder Lube, does it have any bylaws,

22   like rules for the governance of the company?

23   A.      Not that I am aware of.

24   Q.      Have you had any type of shareholder

25   meetings with Thunder Lube?

1                        HAGAY KEREN

2    A.      Never.

3    Q.      And who holds the title Chief Executive

4    Officer of Thunder Lube, if there is such a

5    position there?

6    A.      One of the other partners.

7    Q.      Steven Bernard, does he actively

8    participate in the Thunder Lube operation?

9    A.      No, I don't think so.

10   Q.      Shlomo Avital, does he actively

11   participate?

12   A.      I have no idea.

13   Q.      So at the end of the year, you usually

14   get a W-2 from Thunder Lube?

15   A.      Yes.

16   Q.      And you get a W-2 from Abko Associates?

17   A.      Yes.

18   Q.      And you also get a W-2 from Hollywood

19   Car Wash?

20   A.      It's the same thing.

21   Q.      So Hollywood Car Wash is the same as

22   Abko Associates?

23   A.      I think so, yes.

24   Q.      How about Steven Bernard, does he get a

25   payroll check too from Thunder Lube?

```
 1                    HAGAY KEREN
 2   A.      I think so.
 3   Q.      How about Shlomo Avital, does he get a
 4   payroll check also?
 5   A.      I think so.
 6   Q.      Do you know someone by the name of Moran
 7   Hershowitz?
 8   A.      Yes.
 9   Q.      Who is that person?
10   A.      Dror's wife.
11   Q.      And how long have you known her?
12   A.      I don't remember.
13   Q.      More than then years?
14   A.      I don't know.
15   Q.      Have you known her as long as you have
16   known Dror?
17   A.      No.
18   Q.      Have you known her more than five years?
19   A.      I cannot recall.
20   Q.      When was the last time you spoke with
21   Moran Hershowitz?
22   A.      I would say a month ago.
23   Q.      And what did you speak about?
24   A.      If I received my check.
25   Q.      So she is in charge of sending out
```

1                      HAGAY KEREN

2    checks?

3    A.      Yes.

4    Q.      Where does she work; where is her office

5    located?

6    A.      488 Coney Island Avenue.

7    Q.      And how many other people work there at

8    488 Coney Island Avenue?

9    A.      I think there is another one.

10   Q.      Is there someone by the named of Jessica

11   Benjamin?

12   A.      I know Jessica, but not Benjamin.

13   Q.      So there is another person called

14   Jessica who works in the office with Moran

15   Hershowitz?

16   A.      Yes.

17   Q.      Do you know if Dror Hershowitz has any

18   kids?

19   A.      Yes.

20   Q.      How many kids?

21   A.      I stopped counting after two.

22   Q.      So you think they have more than two

23   kids?

24   A.      I would say so.

25   Q.      Do any of them work there in the car

```
 1                    HAGAY KEREN
 2   wash?
 3   A.      Excuse me?
 4   Q.      Do any of them work in the business?
 5   A.      No.
 6   Q.      How old is Dror Hershowitz?
 7   A.      I don't know exactly.
 8   Q.      Is he in his 40s?
 9   A.      He might be.
10   Q.      And Moran Hershowitz, around the same
11   age?
12   A.      Possibly.
13   Q.      Do you know Elan Coulibili?
14   A.      Who?
15   Q.      Coulibili, C-O-U-L-I-B-I-L-I?
16   A.      No.
17   Q.      Elan Coulibili?
18   A.      No.
19   Q.      Do you know a person by the name of
20   Malik Diallo (phonetic)?
21   A.      It sounds familiar.
22   Q.      Do you know a person by the name of
23   Louis Lopez (phonetic)?
24   A.      No.
25   Q.      Do you know a person by the name of
```

```
 1                    HAGAY KEREN
 2   Mohammed Ekbar (phonetic)?
 3   A.      No.
 4   Q.      Do you know a person by the name of
 5   Nicky Eemma (phonetic)?
 6   A.      No.
 7   Q.      Nicky Eema?
 8   A.      No.
 9   Q.      Do you know a person by the name of
10   Carlos Palasios (phonetic)?
11   A.      No.
12   Q.      Do you know a person by the name of
13   Momtaz Korishi (phonetic)?
14   A.      No.
15   Q.      Do you know a person by the name of Jose
16   Alberto Reyes (phonetic)?
17   A.      No.
18   Q.      Do you know a person by the name of
19   Secuba (phonetic)?
20   A.      No.
21   Q.      Do you know a person by the name of
22   Farhad Yaseen (phonetic)?
23   A.      No.
24   Q.      Do you know a person by the name of --
25   okay, so let me -- do you know someone by the
```

1                         HAGAY KEREN
2     name of Ravish Hershowitz (phonetic)?
3     A.      No.
4     Q.      Do you know someone by the name of Bella
5     Hershowitz?
6     A.      No.
7     Q.      Do you know Miriam Hershowitz?
8     A.      No.
9     Q.      Joseph Hershowitz?
10    A.      No.
11    Q.      Israel Dramie (phonetic); do you know
12    that person?
13    A.      No.
14    Q.      When you were a manger for the car wash
15    that you worked at, did you have any type of
16    computer systems that they used?
17    A.      In what year?
18    Q.      The High Tech Car Wash in Mineola that
19    you were a manager at?
20    A.      It was some sort of computer for the
21    wash.
22    Q.      At Manhattan Bridge Car Wash, did the
23    lube technicians get commission payments?
24    A.      Can you repeat the question?
25    Q.      At Manhattan Bridge Car Wash, did any of

```
 1                    HAGAY KEREN
 2    the technicians get commission payments for
 3    selling things like windshield wipers, oil
 4    filters, and so on.
 5    A.      It's possible.
 6    Q.      At Thunder Lube, did any of the
 7    technicians get commission payments for selling
 8    things like windshield wipers, oil filters, and
 9    so on?
10    A.      I have no idea.
11    Q.      Is there any reason why you think it may
12    have been possible at Manhattan Bridge, but you
13    don't know at Thunder Lube?
14    A.      Correct.
15    Q.      No, I'm saying is there any reason?
16                    MR. HARTHEIMER:  Can you please
17            ask that question again?
18    Q.      Is there any reason why you think it may
19    have been possible for commission payments at
20    Manhattan Bridge Car Wash, but you don't have
21    any idea of commission payments at Thunder
22    Lube?
23    A.      Correct.
24    Q.      Did you ever discuss -- when was the
25    first time you found out about this lawsuit?
```

```
 1                    HAGAY KEREN
 2   A.     A few months ago.
 3   Q.     How did you hear about this lawsuit?
 4   A.     Hershowitz told me, Dror.
 5   Q.     What did he tell you about the lawsuit?
 6   A.     He said there is a lawsuit.
 7   Q.     Anything else?
 8   A.     No.
 9   Q.     How did he tell you; by phone, in
10   person?
11   A.     Phone.
12   Q.     What is your phone number?
13   A.                        .
14   Q.     That's the phone number he called you
15   at?
16   A.     Yes.
17   Q.     What number did he call you from?
18   A.     I don't know from what he called, but I
19   know his number.
20   Q.     Can you check it for me?
21   A.     (Complies).
22             MR. HARTHEIMER:  I would ask if
23          this transcript is going to be put on
24          the docket, that the phone numbers be
25          redacted.
```

```
 1                    HAGAY KEREN
 2            MR. HASSAN:  I have no
 3       objection.
 4    A.                .
 5    Q.      When was the last time you spoke with
 6    Dror Hershowitz?
 7    A.      Yesterday.
 8    Q.      What did you talk about?
 9    A.      About the fact that I'm coming in today.
10    Q.      How long was the conversation yesterday?
11    A.      Five minutes.
12    Q.      What did you discuss, specifically,
13    during those five minutes?
14    A.      He said, "Don't forget to show up."
15    Q.      And it took five minutes?
16    A.      That's the most.
17    Q.      That's all he said in five minutes?
18    A.      That's it; that's all he had to say.
19    Q.      Did Steven Bernard -- when was the last
20    time you spoke with Steven Bernard?
21    A.      A while ago.
22    Q.      How long ago?
23    A.      Three years ago.
24    Q.      Did Dror Hershowitz tell you that you
25    were a defendant in this case?
```

```
 1                      HAGAY KEREN
 2   A.      He told me that I'm a witness, so that's
 3   why I'm here.
 4   Q.      Do you know in this case, the plaintiff
 5   is claiming that he was paid commissions by the
 6   defendants?
 7   A.      Okay.
 8   Q.      Do you know that, yes or no?
 9   A.      You are telling me now.
10              MR. HARTHEIMER:  Did you know
11           that before the deposition today?
12              THE WITNESS:  No.  I know that
13           there is something per labor issues.
14   Q.      Steven Bernard, did you ever discuss
15   this case with Mr. Steven Bernard?
16   A.      No.
17   Q.      Did you ever discuss this case with
18   Shlomo Avital?
19   A.      No.
20   Q.      Did you ever discuss this case with
21   anyone else that works at Thunder Lube?
22   A.      No.
23   Q.      Did you ever discuss this case with
24   anyone that works at Abko Associates?
25   A.      No, except Dror Hershowitz.
```

```
 1                    HAGAY KEREN
 2   Q.      And you said you spoke with him on
 3   October 14th?
 4   A.      Yesterday.
 5   Q.      You mentioned October 14th, who was
 6   that?
 7   A.      Shlomo Avital.
 8   Q.      When you spoke with him on October 14th
 9   of this year, what were you talking about?
10   A.      He was attending the wedding of my kid.
11   Q.      Talking about weddings, is this a
12   picture of Ms. Moran Hershowitz (handing)?
13                    MR. HARTHEIMER:  Can I have a
14           minute to read this please?
15                    MR. HASSAN:  Sure.  Can I please
16           have this marked?
17                    (Whereupon, a photocopied
18           newspaper article was marked as
19           Plaintiff's Exhibit 1, for
20           identification, as of this date.)
21   Q.      I will show you what has been marked for
22   identification as Plaintiff's Exhibit 1; is
23   that Ms. Moran Hershowitz?
24   A.      Yes.
25                    MR. HASSAN:  I have no further
```

```
 1                    HAGAY KEREN
 2        questions for this witness at this time.
 3        Thank you.
 4             MR. HARTHEIMER:  Thank you.  I
 5        have no questions -- did you put this
 6        into evidence or did you just mark this
 7        into evidence (indicating).
 8             MR. HASSAN:  Well, I asked if he
 9        recognized that as Ms. Moran Hershowitz;
10        it will be attached to the transcript.
11             MR. HARTHEIMER:  Just for the
12        record, I'm objecting to that record as
13        no proper foundation.
14
15
16
17             (Continued on the next page
18              to accommodate the jurat.)
19
20
21
22
23
24
25
```

1                    HAGAY KEREN
2              MR. HASSAN:  Okay, your
3        objection is noted.
4              MR. HARTHEIMER:  Thank you.
5              MR. HASSAN:  This concludes the
6        deposition of Mr. Hagay Keren.  It is
7        now 2:13 p.m. on Thursday, December 7,
8        2017.
9              (Time Noted: 2:13 p.m.)
10
11              _____
12                    HAGAY KEREN
13
14   Subscribed and sworn to before me
15   this ____ day of _____, 2017.
16   _____
17   Notary Public
18
19
20
21
22
23
24
25

```
 1                    I N D E X
 2
 3   WITNESS               EXAMINATION BY          PAGE
 4   Hagay Keren           Mr. Hassan                6
 5
 6                  E X H I B I T S
 7
 8   PLAINTIFF'S           DESCRIPTION             PAGE
 9   1                     Newspaper article,       55
10                         photocopy
11
12                  R U L I N G S
13
14   PAGE   LINE    QUESTIONING ATTORNEY
15   10      11     Mr. Hassan
16
17
18
19
20
21
22
23
24
25
```

1                C E R T I F I C A T E

2

3           I, TERAZA CONWAY, hereby certify that

4      the Examination Before Trial of HAGAY KEREN was

5      held before me on the 7th day of December,

6      2017; that said witness was duly sworn before

7      the commencement of his testimony; that the

8      testimony was taken stenographically by myself

9      and then transcribed by myself; that the party

10     was represented by counsel as appears herein;

11          That the within transcript is a true

12     record of the Examination Before Trial of said

13     witness;

14          That I am not connected by blood or

15     marriage with any of the parties; that I am not

16     interested directly or indirectly in the

17     outcome of this matter; that I am not in the

18     employ of any of the counsel.

19          IN WITNESS WHEREOF, I have hereunto set

20     my hand this 16th day of December, 2017.

21

22     _____

23               TERAZA CONWAY

24

25

```
1              ERRATA SHEET
2          AMERICAN STENOGRAPHIC, LLC
3   CASE NAME: BAKARY TOURE v. THUNDER LUBE INC.,
4          ABKO ASSOCIATES INC., and HAGAY KEREN
5
6   DATE OF DEPOSITION:   December 7, 2017
7   WITNESS'S NAME:      HAGAY KEREN
8   PAGE   LINE (S)    CHANGE          REASON
9   ____|_____|_____|_____
10  ____|_____|_____|_____
11  ____|_____|_____|_____
12  ____|_____|_____|_____
13  ____|_____|_____|_____
14  ____|_____|_____|_____
15  ____|_____|_____|_____
16  ____|_____|_____|_____
17  ____|_____|_____|_____
18  ____|_____|_____|_____
19  ____|_____|_____|_____
20                  _____
21                      HAGAY KEREN
22  SUBSCRIBED AND SWORN TO BEFORE ME
23  THIS ____ DAY OF _____, 20__.
24  _____
25  (NOTARY PUBLIC)        MY COMMISSION EXPIRES:
```

**A**

**A-K-K-O** 11:13
**A-V-I-T-A-L** 17:7
**Abdul** 2:3,5 4:18
**Abko** 1:9 4:8 29:22
  33:18,19,22 34:6,7
  34:8,14,16,22 35:3
  35:12,15 42:25 43:7
  43:17 44:10 45:16
  45:22 54:24 60:4
**accessories** 40:17,21
  42:8
**accident** 9:7
**accommodate** 5:10
  56:18
**accurately** 10:2
**acquire** 34:8
**Action** 1:6 4:14
**actively** 45:7,10
**addition** 24:17
**address** 7:4 31:16
  32:10,15 35:6 43:7
  43:10
**administer** 3:15
**afternoon** 4:25
**against-** 1:6
**age** 48:11
**ago** 8:24 17:10 22:22
  22:24 28:23,23 33:8
  42:22,24 43:2,4
  46:22 52:2 53:21,22
  53:23
**AGREED** 3:3,8,12
**Akko** 11:13
**Alberto** 49:16
**alcohol** 9:21
**Alex** 22:3,7
**allow** 7:12 8:4
**Amboy** 26:13,14
  27:11,22 28:7
**America** 36:3,6
**American** 1:14,20
  4:17 60:2
**answer** 7:12,14 8:6
  10:14,18 19:18 32:5
  39:12
**answered** 13:13

18:18
**anybody** 19:20
**appear** 6:8
**appears** 59:10
**approximately** 4:23
  32:13
**area** 11:20
**army** 11:25 12:2,4,6
  12:10,12
**article** 55:18 58:9
**asked** 8:10 18:17
  56:8
**asking** 7:10 32:9
**assistant** 33:15
**associated** 20:23
  24:22,25 36:17,25
**Associates** 1:9 4:9
  29:22 33:18,19,22
  34:7,7,9,14,16,23
  35:3,13,16 42:25
  43:7,17 44:10 45:16
  45:22 54:24 60:4
**assume** 37:22 42:16
  42:19
**attached** 16:5 56:10
**attend** 10:24 11:2
  12:13,23 13:15
  39:19
**attending** 55:10
**attorney** 3:18 8:9
  10:8,11 32:2 58:14
**attorney/client** 10:17
  32:4
**attorneys** 2:3,9 3:4
**authorized** 3:14
**available** 5:11
**Avenue** 2:4,9 7:6
  16:3 31:12,17 32:16
  35:5 43:9 47:6,8
**Avital** 17:7,11 18:3
  25:17 27:5 30:10,14
  30:19 34:20 40:7
  45:10 46:3 54:18
  55:7
**aware** 44:23

**B**

**B** 58:6
**B-E-R-N-A-R-D**
  16:16
**back** 32:12 33:9
**background** 10:23
**Bakary** 1:4 4:8,19
  60:3
**Bedford** 26:7,10,20
**began** 19:5
**behalf** 7:11
**Bella** 50:4
**Benjamin** 47:11,12
**Bernard** 16:14 17:9
  18:3 24:12 25:17
  27:3 30:19 34:21
  45:7,24 53:19,20
  54:14,15
**birth** 11:14
**blood** 59:14
**books** 43:14
**bought** 15:20 16:2
**Boulevard** 1:15,20
**break** 8:3,6 31:24
  32:12
**breakdown** 16:22
  18:14
**Bridge** 19:10,12,14
  19:22,24 20:4,19,22
  21:2,9,13,15,20,23
  22:11 24:16 26:3
  28:11,14,25 36:24
  37:20,23 38:3 40:20
  41:6,11,23 50:22,25
  51:12,20
**brief** 32:11
**bring** 38:17
**business** 16:24 17:19
  34:14 35:4,9,12,19
  35:23,24 39:20,24
  40:9 48:4
**bylaws** 44:21

**C**

**C** 2:1 59:1,1
**C-O-U-L-I-B-I-L-I**
  48:15
**call** 33:21 52:17

**called** 41:7 47:13
  52:14,18
**calls** 5:14 10:16 32:4
**camera** 4:3
**car** 9:7 15:12,13,15
  15:16,19,23,25 16:4
  16:9,13 17:18 18:23
  19:7,10,12,15,22,25
  20:4,19,19,22,23
  21:2,9,13,16,21,23
  22:9,10,11,14,17,18
  23:17 24:13,14,16
  24:16,20,21,22,24
  24:25 25:3,8,20
  26:2,3,3,4,7,14,17
  26:18,20 27:11 28:7
  28:11,13,14,18,21
  28:25 29:8,18 31:13
  31:14 32:14,18
  33:12 35:14,16,19
  35:24,25 36:10,11
  36:15,19,24 37:8,21
  37:24 38:4,14,17,18
  40:16,20,21 41:3,6
  41:23 43:5,6,10
  45:19,21 47:25
  50:14,18,22,25
  51:20
**Carlos** 49:10
**cars** 16:10
**case** 4:7 9:5,8,13
  19:11 29:22 34:3
  53:25 54:4,15,17,20
  54:23 60:3
**Ceela** 39:5,6,8,9
**certain** 7:9 8:11
**certification** 3:6
**certify** 59:3
**change** 16:5,8,10
  18:20 25:5 37:6,7,8
  37:20,24 38:6,12,14
  38:16,25 41:7,8,18
  60:8
**changes** 41:13
**Changing** 35:11
**charge** 3:18 37:16
  43:19 46:25

**charged** 41:24
**check** 39:18 40:3,4,5
 44:10,13,16 45:25
 46:4,24 52:20
**checks** 47:2
**Chief** 45:3
**children** 14:22,24
**circumstances** 12:9
 14:8
**city** 11:11
**Civil** 1:6 4:13
**claiming** 54:5
**clarified** 7:22 8:2
**clear** 7:18
**client** 10:18 31:20
 32:5 39:11
**close** 6:2 16:8 31:12
**closed** 14:11 28:9
**code** 42:11
**come** 14:17 18:10
 19:4 29:24 35:23
**comes** 41:17
**coming** 53:9
**commencement** 59:7
**commission** 43:23
 50:23 51:2,7,19,21
 60:25
**commissions** 54:5
**company** 13:24 14:11
 18:2 20:12,14,15,17
 25:25 33:21,24 34:2
 34:13 40:5 44:22
**competence** 9:16
**complaint** 34:7
**completely** 8:16 10:2
**Complies** 52:21
**compound** 38:8,21
**computer** 42:4,17
 50:16,20
**concerning** 21:18
 39:20
**concludes** 57:5
**conducted** 4:15
**Coney** 16:3 31:12,16
 32:16 35:5 43:9
 47:6,8
**connected** 59:14

**consumed** 9:21
**continue** 28:14
**Continued** 56:17
**continues** 28:6
**conversation** 53:10
**Conway** 4:16 59:3,23
**copy** 3:17
**corporate** 29:21
**corporation** 23:8
 28:3
**correct** 15:24 18:6,24
 28:12 29:2 31:15
 34:4 38:15 51:14,23
**Coulibili** 48:13,15,17
**counsel** 4:20 8:7
 59:10,18
**Counsel's** 6:13
**counsels** 4:18
**counting** 47:21
**court** 1:1 3:17 4:4,10
 4:16 7:14,17
**currently** 4:9 17:23
 17:25 18:15
**customer** 41:17
**customers** 41:24

**D**

**D** 58:1
**D-R-O-R** 18:4
**date** 11:14 55:20 60:6
**Dave** 5:2
**David** 2:11 4:21
**day** 57:15 59:5,20
 60:23
**December** 1:16 4:22
 5:7 32:13 57:7 59:5
 59:20 60:6
**declined** 6:7
**deductions** 44:19
**defendant** 1:12 4:7
 9:10 53:25
**defendants** 1:10 2:9
 5:3,20 29:21 34:3
 54:6
**defense** 4:20 13:23
**degree** 13:2
**delivered** 5:21

**Department** 21:8,12
 21:17
**deponent** 4:20
**deposition** 3:13 4:6
 4:14 5:6 6:2,6,18
 7:9 8:18,22 9:3 10:5
 10:9,12 31:25 54:11
 57:6 60:6
**DESCRIPTION** 58:8
**determine** 40:11
**Diallo** 48:20
**DiCosta** 27:19 28:5,6
**difference** 34:22
 35:15
**difficult** 5:12 7:14
**directly** 59:16
**disagree** 6:12
**discharged** 12:8
**discovery** 6:3,5,11
**discuss** 31:24 51:24
 53:12 54:14,17,20
 54:23
**dispose** 37:16
**District** 1:1,2 4:10,11
 4:12
**docket** 52:24
**documentary** 6:5,11
**documents** 5:21 10:4
**Dora** 4:12
**Dramie** 50:11
**draw** 43:22
**Dror** 18:3,8,13 19:4
 27:9 28:9 30:10,12
 30:19,21 31:3 33:9
 34:20 39:3 40:13,14
 43:21 46:16 47:17
 48:6 52:4 53:6,24
 54:25
**Dror's** 46:10
**drove** 35:22
**duly** 6:21 59:6
**duty** 8:15

**E**

**E** 2:1,1 6:20,20 58:1
 58:6 59:1,1
**e-mails** 5:13

**early** 25:11,12 26:24
**Eastern** 1:2 4:11
**educational** 10:23
**Eema** 49:7
**Eemma** 49:5
**effect** 3:16
**Ekbar** 49:2
**Elan** 48:13,17
**electric** 11:21
**Electrical** 12:5
**employ** 59:18
**employed** 15:3,7,9,11
**employee** 42:10 44:3
**employees** 41:15,22
 42:6
**engage** 35:10,13
**Engineer** 14:7
**entire** 33:10
**entitled** 40:12
**envelopes** 32:16
**ERRATA** 60:1
**ESQ** 2:5,11
**eventually** 36:12
**evidence** 56:6,7
**exact** 23:10 31:11
**exactly** 22:21 37:13
 48:7
**examination** 1:12
 3:17 6:24 58:3 59:4
 59:12
**examined** 6:22
**Excuse** 48:3
**Executive** 45:3
**Exhibit** 55:19,22
**existing** 30:25
**expect** 5:23
**EXPIRES** 60:25
**explain** 38:18,24

**F**

**F** 59:1
**facility** 31:5
**fact** 6:2 53:9
**facts** 6:13
**fair** 35:18
**familiar** 48:21
**far** 34:24

Farhad 49:22
Fax-718-291-6603
  1:22
filing 3:5
filters 40:18,22 41:20
  41:25 42:14 51:4,8
financials 43:14,17
  43:20
finish 7:13 8:5,5
  11:16
finished 12:11
fired 14:9
first 6:21 7:10 15:11
  38:18 51:25
fitters 42:8
five 8:24 22:22 29:14
  30:24 31:2 34:11
  46:18 53:11,13,15
  53:17
Floor 2:9
focus 11:19
follows 6:23
force 3:15
forget 53:14
form 3:9 8:8 20:8
found 51:25
foundation 56:13
four 18:22
furnished 3:18
further 3:8,12 55:25
future 5:23

**G**

G 6:20 58:12
G-R-U-M-A-N 13:22
getting 33:9
give 44:18
go 11:23 26:9 43:4,8
going 10:17 52:23
Good 4:25
governance 44:22
graduate 11:8
graduated 11:17,22
  12:25
greets 38:18
GROUP 2:3
Gruman 13:22

Grumman 14:4,9,13
  14:15
guess 19:19 39:16
guessing 39:14
guy 39:5,6

**H**

H 2:11 6:20 58:6
H-E-R-S-H-O-W-I...
  18:6
Hagay 1:9,13 4:7,9
  5:1 6:1 7:1,3 8:1 9:1
  10:1 11:1 12:1 13:1
  14:1 15:1 16:1 17:1
  18:1 19:1 20:1 21:1
  22:1 23:1 24:1 25:1
  26:1 27:1 28:1 29:1
  30:1 31:1 32:1 33:1
  34:1 35:1 36:1 37:1
  38:1 39:1 40:1 41:1
  42:1 43:1 44:1 45:1
  46:1 47:1 48:1 49:1
  50:1 51:1 52:1 53:1
  54:1 55:1 56:1 57:1
  57:6,12 58:4 59:4
  60:4,7,21
half 17:24 30:8 34:18
hand 59:20
handicaps 9:25
handing 55:12
happened 14:15 20:9
Hartheimer 2:8,11
  4:21,25 5:2 10:13
  10:16,22 18:17
  19:17 31:19 32:3
  38:7,20 39:10 51:16
  52:22 54:10 55:13
  56:4,11 57:4
Hassan 2:3,5 4:2,18
  5:12,24 6:7,12,25
  10:20 31:21 32:7,11
  53:2 55:15,25 56:8
  57:2,5 58:4,15
hear 7:18 52:3
held 1:14 59:5
help 19:20
hereunto 59:19

Hershowitz 18:4,5,8
  18:13 19:5 27:9
  28:10 30:10,11,20
  30:21 31:3 33:9
  34:20 39:3,7 40:14
  43:21 46:7,21 47:15
  47:17 48:6,10 50:2
  50:5,7,9 52:4 53:6
  53:24 54:25 55:12
  55:23 56:9
high 10:24 11:2,4,6,8
  11:11,16,17,22
  24:20,24 25:7,20
  26:2,7 36:11,15
  50:18
higher 11:24 12:13
  13:15,16
Hillside 2:4
hold 14:6
holds 45:3
Hollywood 15:16,17
  15:19,23 16:4,9,13
  17:18 18:23 19:7
  20:19 22:10 24:14
  24:17 26:18 28:17
  28:21 29:8,18 31:14
  32:14,18 33:12
  35:16 43:6,10 45:18
  45:21
honestly 8:16
honorably 12:8
hours 9:22

**I**

idea 34:5 35:2,8
  40:10 42:12 45:12
  51:10,21
identification 55:20
  55:22
identified 24:15
include 33:12
including 5:3
incorrect 6:15
indicating 56:7
indirectly 59:16
initially 35:23
insisted 6:8

institution 11:24
  12:13 13:16
interested 59:16
interpretation 6:14
interrogatory 5:21
investigation 21:8,12
involved 35:24
Irizarry 4:12
Island 16:3 31:12,17
  32:16 35:5 43:9
  47:6,8
Israel 11:3,11 12:16
  50:11
issues 54:13
items 41:23 42:7,14

**J**

Jaguar 23:8
Jamaica 1:16,21
Jeff 22:3,8 27:19
Jersey 26:8,10
Jessica 47:10,12,14
job 15:11
Jose 49:15
Joseph 50:9
Judge 4:12,13
judgment 9:14
jurat 56:18

**K**

K 2:5 6:20
K-I-K-O-S 23:23
keep 42:6,10
Keren 1:9,13 4:7,9
  5:1,4 6:1 7:1,3,8 8:1
  8:12 9:1 10:1 11:1
  12:1 13:1 14:1 15:1
  16:1 17:1 18:1 19:1
  20:1 21:1 22:1,3
  23:1 24:1 25:1 26:1
  27:1 28:1 29:1 30:1
  31:1 32:1 33:1 34:1
  35:1 36:1 37:1 38:1
  39:1 40:1 41:1 42:1
  43:1 44:1 45:1 46:1
  47:1 48:1 49:1 50:1
  51:1 52:1 53:1 54:1

55:1 56:1 57:1,6,12
58:4 59:4 60:4,7,21
**kid** 55:10
**kids** 47:18,20,23
**Kikos** 23:23
**know** 8:4 16:18,19,20
18:10,14,16,20 19:4
19:18,19 21:6 29:21
29:24 30:13,15,23
30:25 31:18 32:17
33:2,17,19,21 34:13
37:12,15,18 39:2,3
39:12,13 40:19 41:2
46:6,14 47:12,17
48:7,13,19,22,25
49:4,9,12,15,18,21
49:24,25 50:4,7,11
51:13 52:18,19 54:4
54:8,10,12
**known** 18:8 46:11,15
46:16,18
**Korishi** 49:13
**Kuo** 4:13

**L**

**L** 3:1 58:12
**labor** 21:8,12,17
54:13
**laid** 14:10
**law** 2:3 6:14
**lawsuit** 51:25 52:3,5
52:6
**learning** 11:24 12:13
13:16
**left** 12:6,12 13:19
14:15
**let's** 21:3 26:9 28:24
30:2 38:17
**LINE** 58:14 60:8
**list** 26:9 27:2 41:23
42:13
**LLC** 1:15,20 60:2
**located** 22:15 31:10
35:3 47:5
**location** 15:25 33:4,7
43:4
**long** 12:2,23 14:3

15:6 18:8 19:24
28:23 29:7 30:21
34:13 46:11,15
53:10,22
**Lopez** 48:23
**loud** 7:17
**Louis** 48:23
**lube** 1:9 4:8 16:5
20:23 21:2 24:21,25
29:22 30:2,3,5,18
30:22 31:4,7,10
32:9,14,21,22,25
33:3,7,10 34:23
35:7,9,19 36:16,17
36:25 37:4,19,24
38:4,5,6,10,13,25
39:4,17,21,24 40:8
40:16,21 41:3,4,11
42:13,18,21 43:3,14
43:20,24 44:3,21,25
45:4,8,14,25 50:23
51:6,13,22 54:21
60:3

**M**

**Magistrate** 4:13
**mail** 13:12
**making** 5:10
**Malik** 48:20
**Mamaroneck** 24:20
24:24 25:7,20 26:2
**manager** 31:4 36:22
50:19
**managerial** 32:24
**managers** 33:16 39:4
**managing** 31:5,6
36:21
**manger** 50:14
**Manhattan** 19:10,12
19:14,21,24 20:4,18
20:22 21:2,8,12,15
21:20,23 22:11
24:16 26:3 28:10,14
28:25 36:24 37:20
37:23 38:3 40:20
41:3,6,11,23 50:22
50:25 51:12,20

**manufacturer** 13:23
**Mario** 27:19 28:5,6
**mark** 10:20 56:6
**marked** 55:16,18,21
**marriage** 59:15
**married** 14:20
**matter** 59:17
**MAYERSON** 2:8
**mean** 12:18 37:13
**mechanical** 11:21
12:5
**Medford** 22:14,16,17
23:17 24:16,21 26:3
**medication** 9:19
**meetings** 39:19 44:25
**mental** 9:24
**mentioned** 55:5
**Mineola** 36:11,16,20
50:18
**minute** 55:14
**minutes** 53:11,13,15
53:17
**Miriam** 50:7
**Mohammed** 49:2
**moment** 31:20
**Momtaz** 49:13
**money** 39:23 40:2,11
**month** 46:22
**months** 17:10 52:2
**Moran** 46:6,21 47:14
48:10 55:12,23 56:9
**Moshir** 23:21,22,25
24:5 27:7

**N**

**N** 2:1 3:1 6:20 58:1
58:12
**name** 5:2 7:2 11:4
15:17,19,22 16:15
17:6 18:5 20:12,14
26:14 27:20 46:6
48:19,22,25 49:4,9
49:12,15,18,21,24
50:2,4 60:3,7
**named** 39:5,6 47:10
**Navy** 11:5,6
**near** 5:23

**never** 32:20 43:15,18
45:2
**New** 1:2,16,18 2:4,10
2:10 4:11 6:22 7:6
21:11,17 26:7,10
36:9
**newspaper** 55:18
58:9
**Nicky** 49:5,7
**night** 13:11 35:25
**none-the-less** 5:9
**notary** 1:17 4:16 6:21
57:17 60:25
**note** 8:9
**noted** 57:3,9
**notice** 1:14 5:15,18
**noticed** 5:7,8
**number** 23:10 31:11
52:12,14,17,19
**numbers** 52:24
**NY** 1:21

**O**

**O** 3:1
**oath** 3:15 8:13
**object** 8:7
**objecting** 56:12
**objection** 8:10 10:13
18:18 32:3 38:7
53:3 57:3
**objections** 3:9 8:11
**objects** 8:9
**October** 17:13,14,15
55:3,5,8
**offer** 6:7 38:11
**offered** 5:24 37:19
**office** 13:8,10 32:18
32:20,22 42:9 47:4
47:14
**officer** 3:14 11:6 45:4
**officers** 11:5,5
**offices** 1:14 32:24,25
**Oh** 17:16
**oil** 16:5,8,10 25:5
35:11 37:6,7,8,10
37:11,13,17,20,25
38:6,12,14,16,24

40:17,22 41:7,8,13
41:17,19,25 42:8,14
51:3,8
**okay** 32:7 39:15
49:25 54:7 57:2
**old** 37:11,17 48:6
**once** 9:4 19:21
**ones** 22:13
**opened** 20:19
**operation** 16:5,8
19:15 20:23 21:2
24:22,25 33:10
39:17 40:21 41:3,4
41:12 45:8
**operations** 34:25
**opportunity** 6:4
**outcome** 59:17
**outlining** 7:9
**owned** 15:22 17:4
18:12,13 19:24
20:18 22:10 24:3,5
24:9,13 26:4,17
36:13,24
**owner** 19:21 21:15
24:14 26:18 28:7
30:22 33:24
**owners** 18:22 27:3,5
27:7,9 30:17
**ownership** 18:19
20:3,6 25:20 34:8
**owning** 22:20 23:2
25:10 26:23 27:14
**owns** 17:25 30:9,14
34:19

**P**

**P** 2:1,1 3:1
**p.m** 1:17 4:24 32:13
57:7,9
**page** 56:17 58:3,8,14
60:8
**paid** 54:5
**Palasios** 49:10
**part** 7:23 17:21,23
30:3,5,7
**participate** 45:8,11
**parties** 3:5 59:15

**partner** 15:14 17:5
27:20 29:25
**partners** 16:12 22:2
25:18 39:20 45:6
**partnership** 16:23
**party** 9:8,11 59:9
**pay** 44:18
**payments** 50:23 51:2
51:7,19,21
**payroll** 44:8,15 45:25
46:4
**Peggy** 4:13
**pending** 4:10
**people** 16:9 20:25
27:2 37:16 38:5
41:7,8,12,13 47:7
**percent** 16:25 17:4
17:24 22:7,7,8 24:2
24:3,8
**percentage** 17:2
18:19 22:5,5 23:24
23:25 24:7 25:19
30:15 34:16
**percentages** 18:12
22:4
**period** 22:10 28:20
**person** 20:15 28:3
46:9 47:13 48:19,22
48:25 49:4,9,12,15
49:18,21,24 50:12
52:10
**Perth** 26:13,14 27:11
27:21 28:7
**ph** 16:17
**Ph-718-291-6600**
1:22
**phone** 5:14 52:9,11
52:12,14,24
**phones** 13:13
**phonetic** 23:21 39:5
48:20,23 49:2,5,10
49:13,16,19,22 50:2
50:11
**photocopied** 55:17
**photocopy** 58:10
**physical** 9:25
**physically** 42:21

**physics** 12:22 13:2
**pick** 15:17
**picture** 55:12
**plaintiff** 1:4,13 2:3
4:18 5:10,22 7:11
9:10,12 54:4
**Plaintiff's** 55:19,22
58:8
**Plainview** 7:6
**please** 7:2,5,12,17 8:4
31:20 51:16 55:14
55:15
**PLLC** 2:3,8
**point** 15:3 20:3
**portions** 18:2
**position** 12:4 13:9
14:6 15:13 45:5
**possible** 18:7 19:13
51:5,12,19
**Possibly** 41:21 48:12
**post** 13:8,9
**practice** 8:9
**preparation** 10:5,8
**prescription** 9:18
**present** 4:19
**prevent** 9:25
**previously** 18:25
**prices** 41:24 42:14,15
**prior** 6:5 10:11
**privilege** 10:17 32:4
**privileges** 8:12
**procedures** 7:10
**proceed** 6:17
**process** 7:8 38:16,19
38:24 39:2
**products** 41:19
**profit** 43:25
**profits** 43:23
**proper** 56:13
**properly** 5:8
**protest** 5:16
**provide** 37:5
**public** 1:17 4:17 6:21
37:5 38:11 57:17
60:25
**pursuant** 1:13
**put** 52:23 56:5

**Q**

**Queens** 2:4
**question** 3:10 7:13,20
7:24,24 8:5,8 10:14
10:19 19:18 32:6
38:8,9,21,22 39:12
41:10 50:24 51:17
**QUESTIONING**
58:14
**questions** 7:11 9:17
56:2,5
**quit** 14:10

**R**

**R** 2:1 6:20 58:12 59:1
**ran** 33:10
**Ravish** 50:2
**reach** 21:16
**read** 4:2 55:14
**reason** 51:11,15,18
60:8
**recall** 6:10 7:23 8:23
16:11 29:17 46:19
**recap** 7:8
**receive** 6:4
**received** 43:22 46:24
**receives** 6:10
**recess** 31:22
**recognized** 56:9
**record** 5:6,20 6:17
7:2,4,15 8:10 32:12
56:12,12 59:12
**redacted** 52:25
**referring** 34:2,6
**remainder** 24:5
**remember** 9:5 20:12
20:13 21:4,7 22:21
23:10 25:18,21,23
25:24 26:19 27:20
28:3,22 29:6,9 31:2
31:11 34:10 41:16
46:12
**repeat** 41:10 50:24
**repeated** 7:21,22,25
8:2
**reporter** 4:4,16 7:15
7:17

represent 5:2
representation 6:13
represented 59:10
representing 3:19
required 7:12
reserve 5:16
reserved 3:10
resolved 9:13
respect 5:17
respective 3:4
respond 5:13
responses 5:22
rest 24:9 30:9 34:19
review 6:4
reviewed 10:4 43:13
  43:16
reviewing 43:19
Reyes 49:16
right 6:9 8:7 37:2
  38:9
rights 5:17
Route 22:16
rules 44:22
ruling 10:21

**S**

S 2:1 3:1,1 58:6,12
  60:8
S-T-E-V-E-N 16:16
salary 44:2,5
saying 7:19 51:15
schedule 5:11
school 10:24 11:2,4,6
  11:9,11,17,17,23
  12:19,21,23,25 13:5
  13:15,19
sealing 3:5
Secuba 49:19
sell 20:9,11 21:20
  23:2,7,9 25:22
  27:21,24 40:16,21
  41:18
selling 51:3,7
sending 46:25
separate 41:5
separating 12:9
separation 14:9

services 37:4,20
  38:10
set 59:19
settlement 9:14,15
  21:16
share 32:15 43:23,25
shared 39:19
shareholder 44:24
shares 32:10
SHEET 60:1
shift 13:11 35:25
Shlomo 17:7,11 18:3
  25:17 30:10,19
  34:20 40:7 45:10
  46:3 54:18 55:7
shop 36:17,25 37:4
  38:4,17
short 5:15
show 53:14 55:21
showing 44:18
sic 13:22
signed 3:13,16
signs 40:6
sold 20:10,16 21:3
  22:4 23:5 25:24
  28:13,24 41:2 42:7
somebody 37:7 38:18
sort 50:20
sorter 13:12
sounds 48:21
speak 7:17 10:7,11
  17:12 46:23
speaking 7:16
specialize 11:19
specifically 53:12
spell 16:15
spend 12:2
spoke 46:20 53:5,20
  55:2,8
spoken 17:8
stand-alone 25:3
start 13:18 29:3 30:2
started 18:25 28:22
  36:9
state 1:18 5:5,19 6:22
  7:2,4 21:11,17
statement 6:16

states 1:1 14:16,18
  15:4
stationary 32:15
status 19:14
Stenographic 1:15,20
  4:17 60:2
stenographically
  59:8
Stern 22:3,8 27:19
Steve 30:10
Steven 16:14,17,20
  17:8 18:3,15 24:12
  25:17 27:3 30:19
  34:21 45:7,24 53:19
  53:20 54:14,15
STIPULATED 3:3,8
  3:12
stocks 27:25 28:2
stop 22:20 23:2 25:10
  26:23 27:14
stopped 47:21
store 40:23 41:5
structure 31:9
stub 44:18
student 36:2,5,8
study 12:20
stuff 13:25
subject 11:20
Subscribed 57:14
  60:22
suffer 9:24
Suite 1:16,21
Sunday 5:7
Sure 31:21 55:15
Sutphin 1:15,20
swap 27:25
swapping 28:2
swear 4:4
sworn 3:14,16 6:21
  57:14 59:6 60:22
system 42:17
systems 50:16

**T**

T 3:1,1 58:6 59:1,1
T-E-C-H-N-I-O-N
  12:16

take 5:25 8:3 16:9
  32:7 37:8,11,23
  38:2,4,13 44:7,15
taken 1:13 31:22 59:8
takes 38:18
talk 31:19 53:8
talking 55:9,11
taxes 44:7,8,15
Tech 24:20,24 25:7
  25:20 26:2,7 36:9
  36:11,15 50:18
technical 12:18,19,20
  13:5,14,19
technician 41:18
technicians 41:7
  50:23 51:2,7
Technion 12:16
tell 10:15 52:5,9
  53:24
telling 54:9
ten 22:24 28:23 29:16
Teraza 4:15 59:3,23
termination 20:8
terms 9:16 10:23
  31:9
testified 6:23 8:18,21
  9:2
testify 8:11,15
testifying 3:19 10:2
testimony 31:25 59:7
  59:8
Thank 6:11 10:22
  56:3,4 57:4
thing 45:20
things 41:25 51:3,8
think 9:7 35:17 37:18
  39:6 45:9,23 46:2,5
  47:9,22 51:11,18
Third 2:9
three 12:3 17:10 19:2
  19:3 42:24 43:3
  53:23
Thunder 1:9 4:8
  29:22 30:2,3,5,17
  30:22 31:4,6,10
  32:9,14,21,22,25
  33:3,7,10 34:23

35:6,9 37:19,24
38:5,5,10,13,25
39:4,17,20,24 40:8
40:16 42:13,18,21
43:3,14,20,24 44:3
44:21,25 45:4,8,14
45:25 51:6,13,21
54:21 60:3
**Thursday** 4:22 57:7
**time** 3:10 4:23 7:16
8:21 15:20 20:18
28:20 31:23 32:19
33:6 39:23 42:20
43:13,16 46:20
51:25 53:5,20 56:2
57:9
**timely** 5:13
**times** 9:2
**title** 13:12 40:8 45:3
**today** 4:22 5:4,14 6:8
10:5,9,12 53:9
54:11
**told** 52:4 54:2
**Toure** 1:4 4:8,19 60:3
**track** 42:6,10
**transcribed** 59:9
**transcript** 52:23
56:10 59:11
**trial** 1:12 3:11 59:4
59:12
**tried** 5:9
**true** 59:11
**two** 12:24 14:25
24:15 29:12 30:17
47:21,22
**type** 9:5 13:2 35:9,12
37:4,19 38:10 44:24
50:15
**types** 42:8

**U**

**U** 3:1 58:12
**U.S** 4:10
**understand** 7:18,20
8:13,15 38:22
**United** 1:1 14:16,17
**unpaid** 21:18

**untimely** 5:17
**untrue** 6:15
**use** 31:16
**usually** 45:13

**V**

**v** 16:17 60:3
**versus** 4:8
**Village** 2:4

**W**

**W-2** 45:14,16,18
**wages** 21:18
**waived** 3:7 6:9
**want** 39:10
**wash** 15:12,13,15,16
15:19,23,25 16:4,9
16:13 17:18 18:23
19:7,10,12,15,22,25
20:4,19,20,22,23
21:2,9,13,16,21,23
22:10,11,14,17,18
23:17 24:14,16,17
24:20,21,22,24,25
25:3,8,20 26:3,3,4,7
26:15,18,20 27:11
28:7,11,13,14,18,21
28:25 29:8,19 31:13
31:14 32:14,19
33:12 35:14,16,19
35:24,25 36:10,11
36:16,19,25 37:21
40:20 41:3,6,23
43:5,6,11 45:19,21
48:2 50:14,18,21,22
50:25 51:20
**washes** 22:9 24:13
26:4,17
**Washington** 7:6
**way** 13:4 31:9
**weapons** 13:24
**wedding** 55:10
**weddings** 55:11
**week** 39:25 43:22
**went** 11:25 33:6 43:3
43:7
**WHEREOF** 59:19

**wife** 46:10
**windshield** 40:17,22
41:19,25 42:7,15
51:3,8
**wipers** 40:17,22
41:19,25 42:7,15
51:3,8
**witness** 3:19 4:4 5:11
5:14 6:8,10,20 9:16
39:15 54:2,12 56:2
58:3 59:6,13,19
**witness's** 5:25 60:7
**work** 12:5 14:12
28:15,17,20 29:7,18
31:3 47:4,7,25 48:4
**worked** 14:3 36:15
50:15
**working** 13:5,7,18
18:11 19:5 20:25
28:10 29:3 35:25
36:10 39:7
**works** 47:14 54:21,24
**wouldn't** 31:18 32:17
**writes** 40:4

**X**

**x** 1:3,11 58:1,6

**Y**

**Y** 6:20
**Yaseen** 49:22
**year** 11:16 14:5,17
15:8 17:16 29:10
42:23 43:2 45:13
50:17 55:9
**years** 8:24 12:3,24
18:9,21 20:2 22:22
22:24 28:23 29:9,12
29:14,16 30:24 31:2
33:8 34:11 35:20
42:22,24 43:4 46:13
46:18 53:23
**yesterday** 53:7,10
55:4
**York** 1:2,16,18 2:4
2:10,10 4:11 6:22
7:7 21:11,17 36:9

**Z**

**0**

**1**

**1** 55:19,22 58:9
**1,000,000** 23:15
**1:00** 1:17
**1:05** 4:23
**1:39** 32:13
**10** 58:15
**10022** 2:10
**11** 58:15
**112** 22:16
**11427** 2:4
**11435** 1:16,21
**11803** 7:7
**11th** 2:9
**12** 20:2
**14** 17:13
**14th** 17:15 55:3,5,8
**15** 18:9
**16th** 59:20
**17-CV-00657** 1:6
4:14
**178** 22:16
**1957** 11:15
**1976** 11:18,23
**1979** 12:6
**1984** 14:19 15:2
**1985** 15:9

**2**

**2,000** 44:6,6,14
**2,000,000** 23:13
**2:13** 57:7,9
**20** 16:25 17:4 18:20
21:5 22:7 60:23
**2005** 27:15,21
**2007** 20:7 21:3 28:24
29:3,5
**2014** 17:14
**2017** 1:17 4:23 32:13
57:8,15 59:6,20
60:6
**215-28** 2:4
**24** 9:21

**25** 22:8
**27** 17:24 18:12,20
   30:8 34:18

---
**3**

**30** 35:19
**305** 1:16,21
**33** 24:2,3,8
**3rd** 5:7

---
**4**

**40s** 48:8
**488** 16:3 31:16 32:16
   35:5 43:9 47:6,8

---
**5**

**5,000,000** 23:11
**55** 22:7 58:9

---
**6**

**6** 58:4
**60** 17:3

---
**7**

**7** 1:17 4:22 32:13
   57:7 60:6
**7th** 59:5

---
**8**

**8,000,000** 21:22
**845** 2:9
**855-US-STENO** 1:23
**89-00** 1:15,20

---
**9**

**90s** 25:11,12 26:24
**985** 7:6

# EXHIBIT III

1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

---------------------------------------x

BAKARAY TOURE,

                        Plaintiff,

             -against-

THUNDER LUBE INC., ABKO ASSOCIATES INC.,

and HAGAY KEREN,


                        Defendants.


---------------------------------------x



                    845 Third Avenue
                    New York, New York
                    December 28, 2017
                    11:03 a.m.



     EXAMINATION BEFORE TRIAL of BAKARAY TOURE,

the Plaintiff herein, taken by the Defendant,

before a Notary Public of the State of New York,

pursuant to Notice.

```
 1                                                          2

 2

 3

     A p p e a r a n c e s :

 4

 5

 6       ABDUL K. HASSAN, ESQ.
              Attorney for Plaintiff
 7            215-28 Hillside Avenue
              Queens Village, New York 11427

 8

         BY: JAMES DiCARLO III, ESQ., of Counsel

 9

10       MAYERSON & HARTHEIMER, PLLC
              Attorneys for Defendants
11            845 Third Avenue, 11th Floor
              New York, New York 10022

12

         BY: SANDRA E. MAYERSON, ESQ.

13            DAVID HARTHEIMER, ESQ.

14

     Also Present:

15

              Alain Coulibaly
16            Abou Traore, Bambara Interpreter

17

18

19

20

                              o0o

21

22

23

24

25
```

```
 1                                                      3

 2

 3

 4                 S T I P U L A T I O N S

 5

 6

 7          IT IS HEREBY STIPULATED AND AGREED by

 8   and between the attorneys for the respective

 9   parties herein that the sealing, filing and

10   certification of the within deposition be waived;

11   that such deposition may be signed and sworn to

12   before any officer authorized to administer an

13   oath, with the same force and effect as if signed

14   and sworn to before a Judge of this Court.

15          IT IS FURTHER STIPULATED AND AGREED that

16   all objections, except as to form, are reserved

17   to the time of the trial.

18          IT IS FURTHER STIPULATED AND AGREED by and

19   between the attorneys for the respective parties

20   hereto that a copy of this examination shall be

21   furnished to the attorneys for said witness,

22   without charge.

23

24

25
```

```
 1                                           4
 2           (Abou Traore, the Interpreter, was duly
 3      sworn by Michael T. Rehfield, a Notary Public for
 4      the State of New York, to translate the questions
 5      into Bambara and the answers into English.)
 6                              o0o
 7      B A K A R Y   T O U R E   ,   having been duly
 8              sworn by a Notary Public of the State of
 9              New York, was examined and testified as
10              follows:
11      EXAMINATION BY
12      MS. MAYERSON:
13           Q      State your name and address for the
14      record, please.
15           A      Bakary Toure, 2546 Seventh Avenue,
16      apartment 7, New York, New York.  I don't know
17      the zip code.
18                  MS. MAYERSON:  This is the deposition
19              held upon notice by the defendants of the
20              plaintiff Bakary Toure in the case of Bakary
21              Toure v Thunder Lube Inc., Abko Associates
22              Inc. and Hagay Keren, currently pending in
23              the U.S. District Court for the Eastern Dis-
24              trict of New York before the Honorable Dora
25              Irizarry and the Honorable Peggy Kuo and
```

```
 1                    Toure                    5

 2         styled Civil Action No. 17-CV-00657.

 3              This deposition will be conducted be-

 4         fore Michael Rehfield, a court reporter from

 5         Deitz Reporting; also with us today at the

 6         plaintiff's request is an official interpre-

 7         eter in Bambara provided by Eiber Transla-

 8         tions.  The interpreter's name is Abou D.

 9         Traore.

10              Mr. Toure is accompanied today by his

11         counsel, James DiCarlo.  I am Sandra Mayer-

12         son of the firm of Mayerson & Hartheimer.

13         Accompanying me today are my partner, David

14         Hartheimer, and a representative of the

15         defendants, Mr. Alain Coulibaly.

16              Today is Thursday, December 28th,

17         2017.  The time is approximately 11:06 a.m.

18         The witness and the interpreter have been

19         sworn in by the court reporter.

20         Q    Mr. Toure, is it correct that you

21    have asked for an interpreter in Bambara to be

22    present here today?

23         A    Yes, I do.

24         Q    And do you acknowledge for the record

25    that there is an interpreter in Bambara here?
```

```
 1                      Toure                    6

 2        A      Yes.

 3        Q      Mr. Toure, it is very important that

 4   you understand the questions and that I under-

 5   stand your answers.

 6        A      Okay, yes.

 7        Q      Accordingly, the interpreter is happy

 8   to interpret anything that I say.

 9        A      Mm-hmm.

10        Q      If you understand my question in En-

11   glish, you are welcome to answer, but you are en-

12   titled to have everything I say interpreted prior

13   to your answer.  Your answer may be in English or

14   Bambara.  If it is in Bambara, we will pause

15   while the interpreter translates your answer for

16   me.  Do you understand all that?

17        A      Yes, I understand.

18        Q      In addition to Bambara, do you also

19   speak French?

20        A      No.

21        Q      Do you speak any other languages be-

22   sides Bambara and English?

23             MR. DiCARLO:  Just note an objection

24        to form.  He can answer.

25        A      I speak Sarakole.  They call it
```

```
 1                      Toure                    7
 2   Sarakole or Soninke, that's the same language.
 3        Q      What language do you speak normally
 4   on a day-to-day basis?
 5        A      I speak Soninke, Sarakole.
 6        Q      Now, let's talk a little about the
 7   deposition process.  As I said, it is very impor-
 8   tant that you understand the questions and that I
 9   can rely on your answers.  I will be asking you
10   questions on behalf of the defendants in the
11   case, and you are required to answer them, but
12   please do not answer a question unless you under-
13   stand the question.  Okay?
14        A      (In English) Yes.
15        Q      If you do not understand the question
16   or if it is a long question and you do not remem-
17   ber everything I said, please ask me to repeat or
18   clarify the question.  Also, the court reporter
19   can always read a question back to you.
20               Okay?  Do we understand that?
21        A      Yes, I understand.
22        Q      It is also very important that you
23   let me finish asking my question --
24        A      (In English) Yes.
25        Q      -- or let the interpreter finish in-
```

1                           Toure                        8

2    terpreting the question before you answer.

3         A      Okay.

4         Q      If two people are talking at the same

5    time, it makes it very hard for the court report-

6    er to record everything accurately.

7         A      Okay.

8         Q      Also, I see you nodding your head a

9    lot.  It's very important that all of your an-

10   swers be verbal.  The court reporter can't record

11   you nodding your head, so you have to say some-

12   thing.

13        A      Okay.

14        Q      Now, your counsel may object to some

15   of my questions.  If he does, his objection will

16   be noted, but you will still be expected to an-

17   swer the question unless certain privileges are

18   involved in the objection.

19        A      Okay.

20        Q      Do you understand all that?

21        A      Yes, I understand.

22        Q      Now, we want you to be comfortable;

23   this is not a marathon.  Any time you need to

24   take a break for any reason, you just need to ask

25   to take a break.  All I ask is that if a question

```
 1                      Toure                    9
 2    is pending, you answer the question before we
 3    take a break.  Do you understand that?
 4         A     Yes, I understand.
 5         Q     Now, as I said, I need to rely on
 6    your answers.
 7               Do you understand that you're under
 8    oath here today?
 9         A     Yes.
10         Q     Do you understand that you have a
11    duty to testify honestly and completely?
12         A     Yes.
13         Q     Can I count on you to do that?
14         A     Yes.
15         Q     Now, I am required to ask a few ques-
16    tions as to your competence to testify.  I don't
17    mean to offend you but these are important ques-
18    tions for the record.
19               Have you consumed any alcohol in the
20    last 24 hours?
21         A     No.  I don't drink alcohol.
22         Q     Have you taken any drugs, prescrip-
23    tion or otherwise, in the last 24 hours?
24         A     No.  I don't use drugs, I didn't take
25    any prescription.
```

```
 1                    Toure                    10

 2       Q      So you don't regularly take any drugs

 3   which could affect your memory or thought pro-

 4   cess.

 5       A      No, I don't.

 6       Q      Do you suffer from any mental or

 7   physical handicap that would prevent you from

 8   testifying correctly and completely?

 9       A      No.

10       Q      Are you aware of anything that would

11   prevent you from testifying truthfully and com-

12   pletely today?

13       A      No, nothing.

14       Q      Have you reviewed any documents in

15   preparation for your deposition today?

16       A      To review a document?

17       Q      Yes.

18       A      Before coming here?

19       Q      Yes.

20       A      No.

21       Q      At any time.

22       A      No.

23       Q      Did you speak with anyone other than

24   your attorney in preparation for your deposition

25   today?
```

```
 1                    Toure                  11
 2        A      No.
 3        Q      Did you speak with your attorney
 4   prior to your deposition today?
 5        A      Yes.
 6        Q      Have you ever testified at a deposi-
 7   tion before?
 8        A      No, I have never done that before.
 9        Q      Have you ever testified at a trial
10   before?
11        A      No, I have never done that.
12        Q      Now, let's speak a little bit about
13   your background.  Where were you born?
14        A      Mali.
15        Q      And how long did you live in Mali?
16        A      I was born in Mali.
17        Q      And did you live there after you were
18   born?
19        A      Yes.
20        Q      And how long did you live there?
21        A      I don't know how long.  I don't know.
22        Q      Well, what year were you born in?
23        A      (In English) 1991.
24        Q      And did there come a time when you
25   left Mali?
```

```
 1                          Toure                    12
 2        A        (In English) 1971, I'm sorry.  1971.
 3        Q        Did there come a time when you left
 4   Mali?
 5        A        I have not left Mali until the year
 6   1998.
 7        Q        So from 1971 to 1998 you lived in
 8   Mali.
 9        A        Yes, yes.
10        Q        And when you left Mali in 1998, where
11   did you go?
12        A        I went to Niger to try to come to the
13   U.S.
14        Q        And how long did you live in Niger?
15        A        Nine months.
16        Q        Did you eventually leave Niger?
17        A        I left Niger to come here.
18        Q        Was that in 1998 or 1999?
19        A        I came to U.S. in December 1998.
20        Q        And where in the U.S. did you come
21   to?
22        A        New York.
23        Q        Have you lived in New York since
24   1998?
25        A        Yes, I live.
```

```
 1                       Toure                    13
 2        Q        Have you worked in the United States?
 3        A        Yes.
 4        Q        What kind of visa did you come in on?
 5        A        Commercial visa.  Commercial.
 6        Q        Have you ever received a green card
 7   or a citizenship in the United States?
 8        A        I have a green card.
 9        Q        Did there come a time when you needed
10   a letter from your employer to get your green
11   card or your visa?
12        A        No.  I was married, I got married.
13        Q        Did Dror Hershowitz ever write a let-
14   ter to help you get a visa or a green card?
15        A        No.
16        Q        Now, let's talk about your education
17   for a while.  Were you initially educated in
18   Mali?
19        A        No.
20        Q        Where did you get your education?
21        A        I didn't do it -- study in Mali, only
22   when I got here, I tried to go to school some-
23   time, little by little.
24        Q        Can you read and write?
25        A        No.
```

```
 1                        Toure                    14
 2        Q       So you never attended school at all.
 3        A       No.
 4        Q       Now, let's talk about your employ-
 5   ment.  How old were you when you got your first
 6   job?
 7        A       Maybe 25 years old.
 8        Q       So how did you support yourself from
 9   the time you were born until 25?
10        A       You talking about the U.S. or before
11   coming to --
12                MS. MAYERSON:  From the time he was
13        born, when was his first job?
14        A       I was doing some trade in Mali.  Here
15   I work for -- my first job was in the U.S.
16        Q       So how did you support yourself in
17   Mali?
18        A       I was selling things, yeah.
19        Q       What kind of things?
20        A       I had a store; I was selling sugar,
21   soup.  Like a grocery store.
22        Q       When you left Mali and went to Niger,
23   did you work in Niger?
24        A       No, I did not work, but I went there
25   to look for a visa to come to the U.S.
```

```
 1                        Toure                      15
 2         Q       And how did you support yourself
 3  while you lived in Niger for nine months?
 4         A       So I have three brothers living in
 5  France, they were the ones providing me with some
 6  money to get to -- to get food and to pay for my
 7  visa to come to the U.S.
 8         Q       Now, when you got to the U.S., what
 9  was your first job?
10         A       My very first job was a car wash.
11         Q       What car wash?
12         A       A car wash in the Bronx.
13         Q       Do you remember the name of the car
14  wash?
15         A       No.
16         Q       When did you work at that car wash?
17         A       From 2000 to 2001.
18         Q       And do you know who owned that car
19  wash?
20         A       It was a Portuguese person but I
21  don't know the name.
22         Q       What were your job duties at the car
23  wash?
24         A       When the car comes out of the car
25  wash, I try to dry out the car using some cloths.
```

```
 1                        Toure                    16
 2          Q       Did you get paid by the hour at the
 3   car wash?
 4          A       Yes.
 5          Q       And was that by check or by cash?
 6          A       Cash.
 7          Q       Did you get overtime pay at that job?
 8          A       At that time I didn't know the dif-
 9   ference.
10          Q       So you received cash for each hour
11   that you worked or for each car that you dried?
12          A       I was paid by hour but they would pay
13   at the end of the week.
14          Q       In cash.
15          A       Yes.
16          Q       And did you get a W-2 statement each
17   year saying how much cash you had received?
18          A       At that time I didn't have a work
19   authorization so I was not filing taxes.
20          Q       Was the cash characterized as salary?
21          A       Could you explain?
22          Q       Was the cash payment for each hour or
23   was some of the cash a bonus or a tip or a com-
24   mission?
25          A       They don't give anything else except
```

```
 1                      Toure                    17
 2   from your salary, your pay.
 3        Q       Did you get tips at the car wash?
 4        A       Yes.
 5        Q       Were you allowed to keep the tips?
 6        A       Yes.
 7        Q       When you left the car wash in 2001,
 8   what was your next job?
 9        A       I went to the oil change.  At that
10   time they were not paying me, because I was like
11   a learner, I'm training.  They were not paying at
12   that time.
13        Q       Who was not paying?
14        A       So I would learn oil change at the
15   car wash I was working before.
16        Q       So let's go back to the car wash.
17   You left the car wash in the Bronx in 2001; is
18   that correct?
19        A       So I worked from 2001 to 2003, and I
20   left there to go for oil change 2004.
21        Q       So previously you said you worked at
22   the car wash in the Bronx from 2000 to 2001; cor-
23   rect?
24        A       Yes.
25        Q       So did you work there until 2003 or
```

```
 1                        Toure                    18
 2   you went to a different car wash from 2001 to
 3   2003?
 4        A      So at that location, the owner wanted
 5   to fix the location, he send me to different
 6   place, I was working as a security guard.
 7        Q      Where was the place that you were
 8   working as a security guard?
 9        A      In the Bronx, but from the same own-
10   er.
11        Q      And was that also a car wash or was
12   it a different kind of business?
13        A      They were trying to have a new car
14   wash, so I was there as a security guard before
15   they finished the work.
16        Q      And do you remember the name of the
17   new car wash?
18        A      No, I didn't stay there too long.
19        Q      And was that also in the Bronx?
20        A      Yeah, it was in the Bronx.
21        Q      And when did you leave there?
22        A      I left there something like 2004 to
23   go for oil change.
24        Q      Did you leave there voluntarily or
25   were you fired?
```

```
 1                        Toure                    19

 2       A       I left there voluntarily.

 3       Q       From the time you started at the sec-

 4  ond location in 2001 until 2004, did you work as

 5  a security guard that whole time?

 6       A       Yes.  So I was working with the owner

 7  at night, then when I get off in the morning, I

 8  go to learn the oil change.

 9       Q       And where did you go to learn the oil

10  change?

11       A       It was from the same owner, so after

12  when I finished the car wash, I go like down-

13  stairs to learn the oil change.

14       Q       Did you get paid for the time you

15  spent learning the oil change?

16       A       I was not getting paid, I was just

17  getting paid for the car wash.

18       Q       You were getting paid for being a se-

19  curity guard for the car wash; is that correct?

20       A       Yes.

21       Q       And were you paid by check or by

22  cash?

23       A       The time I working at the car wash, I

24  didn't have any work authorization, so I was not

25  getting paid by check, so I would get my work
```

Case 1:17-cv-00657-DLI-PK   Document 36   Filed 04/19/18   Page 100 of 251 PageID #: 248

```
 1                    Toure                  20
 2   authorization in 2004.
 3        Q      What happened in 2004?
 4               THE INTERPRETER:  I get my work
 5        authorization card in 2004.
 6        Q      And before that you were always paid
 7   in cash.
 8        A      Mm-hmm.
 9        Q      And you were paid by the hour.
10        A      Yes.
11        Q      So in 2004, you said you left the car
12   wash voluntarily.  Where did you go to work next?
13        A      I went to 92nd, and I working with
14   Coulibaly in that location.
15        Q      And what was the name of that busi-
16   ness?
17        A      Amoco.
18        Q      Was that a gas station, a car wash or
19   a lube operation?
20        A      It was a lube.
21        Q      What was your job at the lube?
22        A      I was changing oil.
23        Q      Generally at a lube shop, there's
24   people that work downstairs and upstairs.  Was
25   that the situation there?
```

Case 1:17-cv-00657-DLI-PK   Document 36   Filed 04/19/18   Page 101 of 251 PageID #: 249

```
 1                     Toure                   21
 2              MR. DiCARLO:  Just note an objection
 3        to form.  You can answer.
 4        A      Yes.
 5        Q      And were you working downstairs or
 6   upstairs?
 7        A      I was working downstairs.  2004, I
 8   working downstairs.
 9        Q      Did that ever change while you worked
10   there?
11        A      What kind of change?
12        Q      Did your job responsibilities ever
13   change during the years you worked there?
14        A      I don't understand that part.
15        Q      Did you work downstairs the whole
16   time you worked at the Amoco?
17        A      Yes, I was working downstairs.
18        Q      And you changed oil the whole time
19   you worked there.
20        A      Yes.
21        Q      And you never started doing anything
22   else.
23        A      No.
24        Q      And how long did you work there?
25        A      I didn't stay there long.  After
```

Case 1:17-cv-00657-DLI-PK   Document 36   Filed 04/19/18   Page 102 of 251 PageID #: 250

```
 1                        Toure                   22
 2    about one year, they closed the place.
 3         Q      Do you remember the exact name of the
 4    place?
 5         A      I know the place by Amoco.  They say
 6    92nd.
 7         Q      And do you know who owned it?
 8         A      I don't know the owner, but he's the
 9    one who hired me (indicating).
10         Q      Were you paid by cash or check there?
11         A      I was getting paid cash.
12         Q      And were you paid by the hour or some
13    other way?
14         A      By hour.
15         Q      Did you receive any cash in addition
16    to the payments for the hours?
17         A      Yes, they were giving me some other
18    money.
19         Q      What did they give you money for?
20         A      They were saying commission.
21         Q      And what was the commission based on?
22         A      I don't know that.
23         Q      How often did you receive a commis-
24    sion?
25         A      So the commission were working, that
```

```
 1                    Toure                   23
 2  the way that if the car come in, and then after
 3  that, the money they make, you get some kind of
 4  commission on that.
 5       Q     Is there more than one person that
 6  works on a car when you get a lube job?
 7       A     More generally two persons, one per-
 8  son is upstairs and another person is downstairs.
 9       Q     And do they both get a commission?
10       A     Yes.
11       Q     How did the Amoco track what commis-
12  sion you were entitled to?
13       A     So they were writing on an envelope,
14  that's -- they putting a commission on an enve-
15  lope.
16       Q     But how did they know how much to
17  pay?
18       A     I don't know how they operate.  What
19  they do is, at the end of the week, they put --
20  start your pay and then put some part that's a
21  commission.
22       Q     And when you say commission, what is
23  your understanding of what that word means?
24             MR. DiCARLO:  Just objection to form.
25       You can answer.
```

Case 1:17-cv-00657-DLI-PK   Document 36   Filed 04/19/18   Page 104 of 251 PageID #: 252

```
1                      Toure                    24

2       A       I don't know, they just say commis-

3   sion.  I don't know how to explain that.

4       Q       So it was cash that you got in addi-

5   tion to your hourly pay.

6       A       It was done in a way that the hourly

7   pay will come in a check and the commission would

8   be in cash.

9       Q       But you just testified that you got

10  paid exclusively in cash.

11      A       I'm talking about the other place,

12  not where I'm working now.

13      Q       We're talking about Amoco.

14      A       So Amoco, they would put the differ-

15  ence between the pay and the commission.

16      Q       And what was your understanding of

17  the difference between the pay and the total you

18  got, what was that based on?

19              MR. DiCARLO:  Note my earlier objec-

20      tion.  You can answer.

21      A       So they were putting it in a way that

22  they would mention that this is your pay by hour,

23  and if you have 200 a week for the commission,

24  they would put 200 for commission.

25      Q       What you're calling a commission,
```

```
 1                      Toure                    25
 2  what was that paid for?
 3              MR. DiCARLO:  Objection to form.
 4       A       So they were paying in the way that
 5  sometimes you take care of a car, like you clean
 6  the inside, they could pay you five dollar com-
 7  mission on that part, or sometime seven dollar
 8  commission, so at the end of the week, the total,
 9  they say the commission per week.
10       Q       So it was up to them how much they
11  felt like paying for each car?
12              MR. DiCARLO:  Objection to form.  You
13        can answer.
14       A       So we didn't know exactly how it
15  work.  They told us that sometime it depends on
16  the car or if you, you pay five dollars commis-
17  sion, or sometimes seven, and at the end of the
18  week, they add the money together and say that's
19  the total money for commission for the week.
20       Q       So it was like a bonus based on how
21  much work you did.
22              MR. DiCARLO:  Objection to form.
23       A       I don't know if it was a bonus, but I
24  know that they say it's a commission, that's what
25  I know.
```

```
 1                         Toure                    26

 2        Q      And who is they?

 3        A      The bosses.

 4        Q      And what was the name of your boss?

 5        A      Which boss?

 6        Q      The boss that said it was a commis-

 7   sion.

 8        A      He's my boss (indicating).

 9        Q      And he told you that it was a commis-

10   sion?

11        A      Yes, he's the one.

12               MS. MAYERSON:  And let the record re-

13        flect that he pointed to Mr. Coulibaly when

14        he said he.

15               MR. DiCARLO:  Thank you.

16        Q      Did you keep track of the number of

17   cars you worked on each week?

18        A      No.

19        Q      So you had no way to check if they

20   were really paying you five dollars a car.

21               MR. DiCARLO:  Objection to form.

22        A      I didn't know the difference, I don't

23   know how they work.  You calculating the whole

24   thing.  Sometimes they tell us a certain amount

25   of money doing some kind of work is one dollar or
```

```
 1                      Toure                    27

 2   five dollar per car, and at the end of the week,

 3   they add together.  I don't have no control over

 4   that.

 5        Q      And did you get cash every week?

 6        A      Where I used to work before, yes.

 7        Q      At the Amoco we're talking about.

 8        A      I was working, I was getting paid by

 9   cash.  As I say, I didn't have the work authori-

10   zation card at that time.

11        Q      Okay, as I understood your testimony,

12   you got your work authorization card in 2004.

13        A      I got the Social Security card in

14   2004, and my green card, I get my green card in

15   2012.

16        Q      So you previously testified that you

17   got your work authorization in 2004 and were paid

18   by check after that; is that correct?

19        A      Yes, and I was working at Amoco, and

20   after that I was getting a check for my hourly

21   pay and then a cash for the commission.

22        Q      The whole time you were at Amoco you

23   got a check for your hourly pay and cash for the

24   rest of it.

25        A      Yes.
```

```
 1                         Toure                    28
 2        Q       Did you get overtime pay while you
 3   were at Amoco?
 4        A       No.
 5        Q       Did you work more than 40 hours a
 6   week while you were at Amoco?
 7        A       I was working every week 60 hours.
 8        Q       But you got the same pay for every
 9   hour.
10        A       I was getting paid four or five dol-
11   lars an hour.
12        Q       But the question is, did you get paid
13   the same hourly rate for each of the 60 hours or
14   did you get a different hourly rate over 40
15   hours?
16        A       No, they were not adding anything.
17        Q       And none of the cash was for over-
18   time.
19        A       No.
20        Q       Am I correct that the Amoco closed
21   sometime in 2004?
22        A       I don't know exactly which month they
23   was closed in 2004.
24        Q       You left when it closed, you worked
25   there until it closed?
```

```
 1                      Toure                    29
 2        A       It did not close at 2004, I started
 3   working at Amoco in 2004.
 4        Q       And when did it close?
 5        A       So it was closed in 2007.
 6        Q       And were you still working there when
 7   it closed?
 8        A       Yes.
 9        Q       After it closed, where did you go
10   work?
11        A       So I went to work in the Bronx but
12   not for a long time.  Everywhere he goes, he
13   would call me to go -- to follow him.
14        Q       Who is he?
15        A       Coulibaly.
16        Q       So he was working at the Amoco in
17   2007 when it closed?
18        A       Yes, he was.
19        Q       And when it closed, he went one place
20   and you went to the Bronx someplace different.
21        A       We went together to -- after Amoco,
22   we went together to another place, then after,
23   when he went to Brooklyn, he called me to join
24   him in Brooklyn.
25        Q       So what is the first place that you
```

```
 1                       Toure                      30
 2    went to after the Amoco?
 3         A       We went somewhere in the Bronx they
 4    call Dye (sic) Avenue.
 5         Q       Dye, D-y-e?
 6         A       Dye Avenue in the Bronx.
 7         Q       And what kind of company was that?
 8         A       The same job.
 9         Q       So was this exclusively a lube or was
10    it a car wash and a lube or a gas station and a
11    lube?
12         A       It was car wash and lube.
13         Q       And your job was to change oil.
14         A       Yes.
15         Q       And you worked upstairs or down-
16    stairs?
17         A       I was start from working downstairs,
18    and when he called me to go to the Bronx, I was
19    working upstairs.
20         Q       We're only talking about Dyre Avenue
21    right now.
22         A       I was working downstairs.  We didn't
23    stay there too long, maybe one month.
24         Q       You were there one month.
25         A       Yes.
```

1                        Toure                    31

2      Q      And were you paid in cash or by check

3   when you were there?

4      A      At that time they were not paying me

5   by check, it was only cash.

6      Q      And you received an hourly salary?

7      A      Yes.

8      Q      And did you get anything in addition

9   to the hourly salary?

10     A      Yeah, commission.

11     Q      And how was the commission calcu-

12  lated?

13     A      The only thing I know, they make a

14  difference between your hourly pay and the com-

15  mission.

16     Q      So that amount of money could have

17  been for anything.

18            MR. DiCARLO:  Objection to form.

19     A      Yes.

20     Q      And why did you leave there?

21     A      In the Bronx?

22     Q      No, Dyre Avenue.

23     A      So he left, he was working somewhere

24  in Brooklyn.

25     Q      Who is he?

```
 1                     Toure                    32
 2          A      Coulibaly went somewhere in Brooklyn
 3    as a manager, so he called me to join him.
 4          Q      And you voluntarily left the car wash
 5    at Dyre Avenue to go to Brooklyn because Mr. Cou-
 6    libaly was there.
 7          A      Yes.
 8          Q      So you have worked with Mr. Coulibaly
 9    for a long time.
10          A      Yes.
11          Q      So you must think he's a pretty good
12    boss.
13                 MR. DiCARLO:  Objection.
14          A      Yes.  He's good.
15          Q      Is he a fair person?
16                 MR. DiCARLO:  Objection.
17          A      Yes, he is.
18          Q      So what was the name of the place you
19    went to in Brooklyn?
20          A      Lube.
21          Q      What was the name of it?
22          A      Lube.
23          Q      Just lube, that was the name of it?
24          A      Spill Lube.
25          Q      S-p-i-l-l?
```

```
 1                    Toure                    33
 2        A       Yeah, lube.
 3        Q       Spill Lube?
 4        A       They say lube.  I don't know the, I
 5   don't know the company.
 6        Q       And this was in Brooklyn?
 7        A       I was working with him over there.
 8        Q       I would really appreciate it if you
 9   could say names instead of saying him so that we
10   have a clear record.
11        A       I was working with Coulibaly at
12   that --
13        Q       Thank you.
14        A       (In English) Sorry.
15        Q       It's okay.
16                Now, you went there in 2007; is that
17   right?
18        A       Yes.
19        Q       And how long did you work there?
20        A       From 2007 to January 2017.
21        Q       So this is the company that you're
22   suing now, this is where we're talking about?
23        A       Yes.
24        Q       And when you started working there,
25   was it called Abko Associates?
```

```
 1                      Toure                    34
 2        A       Yes.
 3        Q       And when you left, what was it
 4   called?
 5        A       They were calling it lube.
 6        Q       Thunder Lube, perhaps?
 7        A       Thunder Lube, yeah.
 8        Q       Those were two different companies,
 9   so you worked for one, and then when the business
10   changed, you worked for the other one; is that
11   correct?
12             MR. DiCARLO:  Objection to form.  You
13        can answer.
14        A       It's the same company.  They changed
15   the name of the company.
16        Q       But you were never working for two
17   different companies, you were always working for
18   just one company.
19        A       You talking about Brooklyn.  You
20   talking about Brooklyn?
21        Q       Yes.
22        A       It's the one company, they just
23   changed the name.
24        Q       Actually, that's not the case, but
25   what I'm asking is, you were only ever working
```

Case 1:17-cv-00657-DLI-PK   Document 36   Filed 04/19/18   Page 115 of 251 PageID #: 263

```
 1                        Toure                    35
 2    for one company at a time, there was never a time
 3    where you were working for both Abko and Thunder
 4    Lube.
 5         A     So I was working for one company.
 6    The name change had nothing to do with me.  I
 7    didn't work for two different companies.
 8         Q     So when we talk about this company,
 9    when I say the company, we will understand that
10    we mean whichever name it was at that time, okay?
11         A     Okay.
12         Q     And when you arrived at the company,
13    what was your job?
14         A     I would do oil change.  I was working
15    upstairs doing oil change.
16         Q     From the very beginning you were
17    working upstairs?
18         A     Yes.
19         Q     Now, you're suing that company now;
20    is that right?
21         A     Yes.
22         Q     And in your own words, can you tell
23    me what the lawsuit is about?
24              MR. DiCARLO:  Just note my objection.
25         You can answer.
```

```
 1                        Toure                   36
 2         A       They're not paying me overtime.  So
 3    even if they pay some commission, they're not
 4    paying overtime.
 5         Q       So you're saying you worked more than
 6    40 hours a week and didn't get paid for that?
 7              MR. DiCARLO:  Objection to form.
 8         A       Every week I work 60 hours, not 40.
 9         Q       And how many hours did you get paid
10    for?
11         A       I don't know.  They give me a check
12    and a commission.
13         Q       How many hours did you get paid for?
14         A       They pay 60 hours.
15         Q       They paid for 60 hours.  And for the
16    hours over 40 hours, were you paid more than you
17    were paid for the first 40 hours?
18         A       No, I don't, I don't know the differ-
19    ence, but they were paying me some -- my hourly
20    work -- pay in a check and they giving me some
21    commission on the side.
22         Q       I'm talking just about the check now.
23    In the check, were you paid one rate for the
24    first 40 hours and a different rate for the next
25    20 hours?
```

```
1                        Toure                      37
2          A       So they were paying me the first 40
3    hours a different rate and the next 20 hours a
4    different rate.
5          Q       And was the next 20 hours a higher
6    rate?
7          A       I don't know the difference.
8          Q       So why are you saying they did not
9    pay you overtime if they paid you for the 20
10   hours over the first 40 hours?
11                MR. DiCARLO:  Objection to form.
12         A       So the commission they're paying me,
13   they're supposed to add that to my check.
14   They're not adding the commission to the check.
15         Q       But you did receive the commission in
16   cash; correct?
17         A       Yes, they were giving me the commis-
18   sion in cash.
19         Q       So you're not denying that you re-
20   ceived cash that you call a commission.
21                MR. DiCARLO:  Objection to form.  You
22         can answer.
23         A       Yes.
24         Q       But you think somehow you were not
25   paid overtime; is that your complaint?
```

Case 1:17-cv-00657-DLI-PK   Document 36   Filed 04/19/18   Page 118 of 251 PageID #: 266

```
 1                        Toure                    38

 2       A       So I'm not saying that they were not

 3   paying overtime, my complaint is they're supposed

 4   to add the commission to my check.  They were not

 5   doing that.

 6       Q       When did you become aware that you

 7   had a problem with how they were paying you?

 8       A       How I happened to know the difference

 9   is at the end of a year, you will see the differ-

10   ence on the pay, but I have an argument with

11   somebody, and when I went to check, I found out

12   they were not doing properly.

13       Q       So at the end of what year?

14       A       It was some years ago, I don't remem-

15   ber exactly, but I went to Africa and came back,

16   and when I checked, I found out they were taking

17   some money from my pay.

18       Q       Who was taking money from your pay?

19       A       My boss.

20       Q       He was taking money out of your pay?

21       A       So I'm not saying he taking the

22   money, but the commission they were giving me was

23   not the exact commission.

24       Q       And why do you think it was not the

25   exact commission?
```

1                          Toure                    39

2        A      I check it, because I have a piece of

3   paper, I was writing down every work I do during

4   the week, so at the end of a week, when I look at

5   what I wrote down and then they pay, I see there

6   was a discrepancy between what I have and what

7   they pay me for.

8        Q      So the discrepancy was in the number

9   of hours?

10       A      The money.

11       Q      And what was the discrepancy?

12       A      So for example, if I'm supposed to

13   have 300 a week, they pay me 200, and I don't

14   see -- the 100 would be, like, nowhere.

15       Q      So your salary was 300 and you only

16   got 200, is that what you're saying?

17       A      It's not about my pay, it's about the

18   commission, I'm talking about the commission.

19       Q      So isn't it possible that it wasn't a

20   commission, it was just a bonus?

21            MR. DiCARLO:  Objection.  Calls for

22       speculation.

23       A      So I know this is a commission be-

24   cause they themself write down on the envelope

25   commission.

```
 1                     Toure                    40

 2       Q      Okay, we'll get back to that.

 3              So what was the commission?  If you

 4   could calculate that it was wrong, you must know

 5   what the alleged commission was.

 6              MR. DiCARLO:  Objection to form.

 7       A      As I said before, the commission they

 8   calculated in such a way that it depend on what

 9   you do on the car.  If I do engine flush, that

10   would pay you seven dollars, so I would write on

11   the piece of paper, if I do something like engine

12   flush, I put engine flush, seven dollars, and at

13   the end of a week, I know the different kind of

14   work I did.

15       Q      So can you tell me the entire commis-

16   sion structure, what you thought you were sup-

17   posed to be paid for each item?

18       A      Yes, I could say everything.

19       Q      Please tell us.

20       A      Engine flush is for seven dollars;

21   they say transmission, they say you have nine

22   dollars; antifreeze is nine dollars; air filter

23   is one dollar.

24       Q      One dollar?

25       A      Yeah.  That's what they say, one
```

```
1                    Toure                    41
2   dollar.  Wiper blade, one dollar.
3        Q      Anything else?
4        A      If you sell oil, you have one dollar
5   or two dollars.
6        Q      If you're doing an oil change,
7   doesn't that always involve oil?
8        A      There are two kind of oil.  The oil
9   at the pump, you don't get any money from that.
10  So with the regular oil by the bottle, you have
11  one dollar or two dollars for synthetic oil.  The
12  regular oil is one dollar, synthetic oil you have
13  two dollars.
14       Q      Anything else?
15       A      There are many, but that's what I re-
16  member.
17       Q      Now, where did you get your under-
18  standing that you would receive these amounts?
19       A      So I find out because I was writing
20  down everything I was doing during the week if
21  it's the different kind of work.  At the end of
22  the week, if I see there is a difference, that's
23  how I know that I'm not getting paid properly.
24       Q      So it's your testimony that if you
25  used this amount for each of these items, you did
```

```
 1                          Toure                    42
 2    not get paid what you should get.
 3         A      So I had my suspicions, that's why I
 4    got the piece of paper, and I was recording on
 5    the paper everything I -- work I do during the
 6    week, and when I check it, I find out they were
 7    not paying me properly.
 8         Q      So you were not getting these
 9    amounts.
10         A      No.
11         Q      Did you sometimes get more than these
12    amounts?
13         A      So the commission I mentioned, you're
14    talking about that, or --
15         Q      You said you didn't get what this
16    would have added up to.  Did you always get less
17    or did you sometimes get more than what it added
18    up to?
19         A      Always I was getting less, I was get-
20    ting less.
21         Q      And where did you get your under-
22    standing that you were supposed to be paid the
23    amounts you just said?
24         A      I learn it about two years ago, and
25    then that's why I start trying to have my own
```

```
1                        Toure                      43
2  record about it.
3         Q      So in about 2015 you learned that you
4  should be paid this.
5         A      Yes.
6         Q      From 2007 to 2015, when you received
7  cash, what did you think that was for?
8         A      Before 2015, I have no idea what the
9  difference, what -- if I -- what I'm supposed to
10 get or not.  From 2015, when I find out, that's
11 why I get a piece of paper to try to write down
12 everything, every work I do during the week, and
13 to compare with the money I get paid at the end
14 of the week.
15        Q      So before 2015, you thought they were
16 just giving you extra cash.
17               MR. DiCARLO:  Objection to form.
18        A      It's my commission, it's not like
19 something they were giving me like free money or
20 giving away.
21        Q      So you said you found out that these
22 were the amounts in 2015.  How did you find out
23 these were amounts?
24        A      So I was losing money, that's the
25 reason why I start to investigate and find out
```

```
 1                    Toure                    44
 2   that I'm not going to pay -- I'm not getting paid
 3   accordingly.
 4            MR. DiCARLO:  I'm trying to clarify
 5        the question because I don't think he's
 6        understanding the question.
 7            MS. MAYERSON:  Could you do it on the
 8        record?
 9            MR. DiCARLO:  Yes.
10            She's asking you how you learned the
11        schedule.
12            THE WITNESS:  Oh, okay, okay.  Couli-
13        baly is the one who told me.  Coulibaly here
14        (indicating).
15        Q    He told you that amount.
16        A    So when he asked me to come to work
17   with him, he told me that there will be commis-
18   sion.
19        Q    And did he --
20        A    So he specified all kind of work you
21   do and the amount of money you make when you do
22   it.  He's the one who told me exactly everything.
23        Q    If he told you that when you came to
24   work in 2007, why didn't you know it until 2015?
25            MR. DiCARLO:  Objection to form.  You
```

Case 1:17-cv-00657-DLI-PK   Document 36   Filed 04/19/18   Page 125 of 251 PageID #: 273

```
 1                     Toure                    45
 2        can answer.
 3        A       So I did not know before, and I trust
 4   him.  I didn't know that I was losing money.
 5   When I start finding out that I was losing money,
 6   that's what I start to be checking, to be check-
 7   ing every piece of paper and check my work and
 8   the amount I'm making.
 9        Q       When you came to work in 2007, did he
10   tell you you would get cash in addition to your
11   paycheck?
12        A       Yeah, he told me -- so he told me.
13   He didn't say like I'm going to add some money to
14   your pay but he say commission.
15        Q       He used the exact word commission.
16        A       Yes, that's what he told me.
17        Q       Did he ever use the word bonus?
18        A       No, he did not say no bonus.
19        Q       When you learned, according to you,
20   that you were not getting what you were entitled
21   to, what did you do about it?
22        A       So I told him, when I see that there
23   was a problem, I went to tell him, he say --
24   every time I say there's a problem, he will say I
25   will check.  They are the one who say the amount
```

```
 1                    Toure                    46
 2   of money they were paying for work, per job, and
 3   I would have no control over that, but when I
 4   fond out there was a problem, I told him and he
 5   say he will check.
 6          Q      Who is him?
 7          A      Coulibaly.
 8          Q      Please use names.  It's very impor-
 9   tant that you don't say him.
10                 So in 2015, you told Mr. Coulibaly
11   that there were problems.
12          A      Before, before even 2015.  Every time
13   I found out that I'm getting paid less, I go and
14   tell him, he say I will check it, and he never
15   check it.
16          Q      So why did you stay working there?
17          A      Yeah, because we have been working
18   together for long time, and then I find out he's
19   getting too much and that's why I have com-
20   plained.
21          Q      You're getting too much --
22          A      I'm losing a lot more money, so
23   that's why I complained.
24          Q      And what happened when you com-
25   plained?
```

```
 1                      Toure                    47

 2        A       All the time he tells me I will check

 3   it, but he never get back to me.

 4        Q       And these pieces of paper that you

 5   wrote it down on, did you keep the pieces of

 6   paper?

 7        A       No, I did not.  I didn't keep it.

 8        Q       Did you keep any record of how much

 9   you think you didn't get paid?

10        A       No, I didn't.  So after the week,

11   when I get my pay, when I find out there is a

12   problem and I go tell him, he say I will check

13   it, so I just throw the paper away.

14        Q       But after months of that, didn't you

15   want to know what was happening?

16                MR. DiCARLO:  Objection to form.

17        A       So I find out every time at the end

18   of the week, even if you get less money, even if

19   you tell them, they're not going to get that

20   money back.

21        Q       So you never received the amount of

22   money that you felt would add up to what you were

23   entitled to on the numbers you gave us for each

24   process.

25        A       No, I didn't.  So the way they pay is
```

```
1                    Toure                    48
2    not like they will tell you how much the commis-
3    sion is paid for, like the work you do during the
4    week.  We mentioned, we told me them to write
5    down the different job you do for the total of
6    the commission.  They're not doing that.
7        Q      So the money wasn't exactly calcu-
8    lated per item?
9        A      So I find out like sometimes if I'm
10   supposed to get 300, it's only -- I get 200, or
11   if it's 300, sometimes they gave 250, and you
12   don't get the rest of the money.
13       Q      What did you do when you didn't get
14   the rest of the money?
15       A      So what can I do?  If I go and I com-
16   plain, I say my money is not accurate, so they
17   don't do anything about it.  What else can I do?
18       Q      So did you have any written treatment
19   that you would get this money?
20       A      No.
21       Q      Was it at the discretion of the man-
22   agement?
23              MR. DiCARLO:  Just objection to form.
24       A      So normally we are just workers, so
25   we -- when we have problem, we talk to the man-
```

```
 1                    Toure                    49
 2   ager who is supposed to go to the office and ex-
 3   plain or fix the problem.  If they don't do it,
 4   what else can we do?
 5        Q      But that didn't answer my question.
 6   So if you got money that was not the amount of
 7   the commission, and that happened over and over
 8   again and you couldn't do anything about it, was
 9   the cash that you received just at the discretion
10   of the management?
11             MR. DiCARLO:  Objection to form.  You
12        can answer.
13        A      Yes.
14        Q      And there was no contract to give you
15   anything over your hourly amount.
16        A      I have not seen something written on
17   a contract.
18        Q      So you just took what they gave you.
19        A      Yes.
20             MR. DiCARLO:  Objection to form.
21        Q      Let's go back to your employment.
22   You said your employment ended in January 2017;
23   is that correct?
24        A      Yes.
25        Q      And did you leave voluntarily or in-
```

```
 1                       Toure                    50
 2   voluntarily?
 3        A      I did not leave voluntarily, they
 4   fired me.
 5        Q      Who fired you?
 6        A      Drew (sic).
 7        Q      Drew who?
 8        A      Coulibaly knows him.
 9        Q      It's Dror.  Why did Dror fire you?
10        A      So every year, every January, they
11   raise the pay, and Dror call us in January 2017
12   and say that they cannot pay all the overtime now
13   because the pay rate has gone up.  So when he
14   told us that, the rest of the people agreed, and
15   I say I'm going to think about it.  So when I
16   come the next morning and I start working, and I
17   was always sitting down, waiting for my manager
18   to come.  So then Dror ask again, what I told you
19   guys the other day, everybody accept that, agree
20   with what I say?  I'm not going to be able to pay
21   the overtime normally.  I said no, I did not
22   agree, I have not tell you -- decided yet.
23              So he told me again, he asked me
24   again, second time.  I say no, I don't agree with
25   what you say, because if you pay me -- like I
```

1                              Toure                        51

2    work 60 hours, you pay me 60 hours regular, I'm

3    losing money, so I'm not ready to accept that.

4    So then he told me, okay, you could go, you're

5    fired.  So I was already working on a car when he

6    told me to go home, I didn't -- I did not stop

7    working, and I was waiting for my manager to

8    come.

9                So when Coulibaly came, he went --

10   Dror talked to him and told him that I was fired.

11   So then when Coulibaly came towards me, he say

12   he's going to -- he told me what Dror told him

13   and he say he going to -- not to go yet, he would

14   call Dror, call Dror on the phone.  Dror did not

15   pick up the phone.  So I was still waiting, and

16   after two hours, or more than two hours, and then

17   I was even helping to -- the oil came, delivery,

18   so I went to fix that, and after went I home,

19   they say -- Coulibaly say they're going to call

20   me.  I went home, three weeks they did not call

21   me, and when I called, even Coulibaly was not

22   picking up the phone.

23        Q      Now, you said that after Dror fired

24   you, Coulibaly came in and he went and talked to

25   Dror and Dror told him that you were fired.

```
 1                     Toure                    52
 2        A      You did not understand what I said.
 3   I said that Dror fired me.  Before Coulibaly got
 4   to work, he called Coulibaly on the phone and
 5   told him that I was fired.
 6        Q      And how do you know what Dror said to
 7   Coulibaly on the phone?
 8        A      When Coulibaly got to work, he told
 9   me Dror called him already to tell him that I'm
10   fired.
11        Q      And did you have a big fight with
12   Dror that day?
13        A      He told me that I'm fired, he tell me
14   to go home, and then I didn't say anything, I
15   just sat down and wait for Coulibaly.
16        Q      And did he tell you to go home or did
17   he tell you that you were fired?
18        A      Dror told me I was fired.  If I was
19   not fired, how can you go sit home three weeks
20   and you calling the company and they don't pick
21   up the phone?
22        Q      Isn't it true that you had a big
23   fight with Dror and you just went home?
24              MR. DiCARLO:  Objection to form.
25        A      We did not even argue, I didn't say
```

```
 1                    Toure                    53
 2  anything to him.  He told me I'm fired, I just
 3  sat down, I was waiting for Coulibaly.
 4       Q       After the three weeks, did you find a
 5  job somewhere else?
 6       A       I found another job, and the two gen-
 7  tlemen went to the -- three time to the new job
 8  and tell the manager to fire me.  Tell my new
 9  boss to fire me.
10       Q       Who went?
11       A       Dror went, Coulibaly went.
12       Q       Who is your new boss?
13       A       He's an Indian guy.
14       Q       And where was the company?
15       A       I have a copy of a check.
16               MR. DiCARLO:  Leave a blank in the
17       record.
18               MS. MAYERSON:  You could look at it
19       and refresh his memory.
20               THE WITNESS:  (Handing.)
21       A       They went three times, three times to
22  my new job and tell my boss to fire me because
23  I'm suing them.
24       Q       Okay, let's just start at the begin-
25  ning.  When did you get the new job?
```

Case 1:17-cv-00657-DLI-PK   Document 36   Filed 04/19/18   Page 134 of 251 PageID #: 282

```
 1                      Toure                    54

 2        A      So after the three weeks, I have been

 3  calling them, they're not picking up the phone.

 4  I talk with a friend of mine who are working at a

 5  place who tell me to come.

 6        Q      Where is that place?

 7               THE WITNESS:  I give you the address.

 8               MR. DiCARLO:  They're asking you

 9         where it's located.  If you don't remember,

10         just tell them you don't remember.

11               THE WITNESS:  Okay.

12               MR. DiCARLO:  You got to --

13        A      I don't -- I don't remember.

14        Q      Do you have any documents that would

15  refresh your memory?

16        A      I could call somebody to tell me.

17        Q      What is the name of the company?

18        A      I don't know the name.  I don't know

19  the name of the company.

20        Q      What was the name of your boss?

21        A      (In English) My boss name Sakou.

22        Q      Do you have any checks or other docu-

23  ments that would show the name of the employer?

24        A      No.

25        Q      What did you just show your attorney?
```

```
 1                      Toure                      55

 2        A       I show him a check.

 3        Q       So you do have a check that would

 4   show the name of the employer.

 5        A       You want me to show you his check?

 6              MS. MAYERSON:   I would ask that you

 7        supplement your document discovery with a

 8        copy of the check.

 9              MR. DiCARLO:   Noted, and we ask that

10        any requests be followed up in writing.

11        Q       So when did you start at this new

12   job?

13        A       After spending three weeks not work-

14   ing, I started the work over there January 2017.

15        Q       And what did you do there?

16        A       The same job.

17        Q       And this was a lube or a car wash or

18   a gas station?

19        A       Only lube.

20        Q       Do you still work there?

21        A       Yes.

22        Q       Do you get paid in cash or by check?

23        A       Getting paid by check.

24        Q       And do you get any cash?

25        A       Yes.  They're adding everything to
```

```
 1                      Toure                    56
 2   the check.
 3        Q       So there is no cash.
 4        A       No.
 5        Q       You've alleged that people came and
 6   told your boss to fire you; is that correct?
 7        A       So they went there once before when I
 8   was off, and then the next time when they came I
 9   was there, so Dror has a big argument with me and
10   my new boss told me that next time when he show
11   up, to call the police.
12        Q       So your testimony is that it was Dror
13   who came to your new place?
14        A       Dror and Coulibaly, both of them.
15        Q       They came together to your new place.
16        A       The first time Coulibaly went alone,
17   the second time both of them went there.
18        Q       And was there a third time?
19        A       So the boss said they should not come
20   there anymore, go there anymore.  If they come, I
21   should call the police.
22        Q       But that does not answer my question.
23   Was there a third time?
24        A       He went three times.
25        Q       Don't use the word he.
```

```
 1                      Toure                    57
 2         A       Coulibaly went three time.  He went
 3    with Dror once.
 4         Q       So your testimony is that Dror and
 5    Coulibaly were there together once and Coulibaly
 6    was there two more times.
 7         A       Coulibaly went twice by himself and
 8    then he went once with Dror.
 9         Q       And did you see them on all three
10    occasions?
11         A       The first time Coulibaly went, I was
12    off; when I came, my boss told me.  The second
13    time they were together, so I saw both of them.
14         Q       The first time, what did your boss
15    tell you was the purpose of Coulibaly's visit?
16         A       So the boss told me that he came
17    down, Coulibaly came and sat down and told him
18    what happened with them and I'm suing them now,
19    and if he keeps me, I'm going to do the same
20    thing to him, so he should fire me.
21         Q       And when was this?
22         A       In the same month, January.  So when
23    they went there the second time and I was there,
24    they told me that he's going to destroy my work-
25    ing life in New York, I will not get a job in New
```

```
1                        Toure                    58

2     York.

3         Q      So we're still talking about the

4     first time.  That was in January 2017; is that

5     correct?

6         A      It may be January or February, I'm

7     not quite sure.

8         Q      And what was your boss's reaction to

9     the visit?

10        A      So my boss reaction was that he was

11    looking for me to come to work with him for some

12    years, and now that I'm working with them, they

13    come and tell him stories, they should not go

14    there anymore or I should call the police.

15        Q      And was he concerned that you were

16    suing your former employer?

17        A      Yeah, he was kind of concerned, be-

18    cause I find that after the visit, he was saying

19    Dror would call him every day to tell him to

20    fire, so he was concerned about what they told

21    him.  I know for sure it was a concern.

22        Q      And when was the second visit?

23        A      So Coulibaly went twice by himself,

24    and the third time he went there with Dror.

25        Q      And when was Coulibaly's second
```

```
 1                        Toure                      59
 2   visit.
 3        A      So the second time when Coulibaly
 4   came, he came straight to me and he told me that
 5   you know what you did is not right, so we're go-
 6   ing to make your life miserable, you're not going
 7   to get a job in New York at all.
 8        Q      And when was that?
 9        A      I think in February.
10        Q      And between the first visit and the
11   second visit, you said that Dror was calling your
12   boss every day?
13        A      My boss told me that he was calling
14   him every day.
15        Q      And when was the third visit?
16        A      So when they came the third time,
17   they came together, Dror and Coulibaly, and Dror
18   came to me straight and said that they're going
19   to fuck me up, so then after that, he went inside
20   to talk to the boss.  So Dror was so aggressive,
21   even though he went to the boss to talk to him,
22   he almost want to attack me in the office.  It's
23   Coulibaly who just tried to prevent him from at-
24   tacking me.
25        Q      And how do you know what Dror said to
```

```
1                    Toure                    60
2    your boss?
3         A     My boss told me, because my boss
4    didn't know that I was suing them.  They went and
5    told my boss and my boss told me exactly what
6    they told him.
7         Q     So this was all because of the law-
8    suit?
9         A     Yes.
10        Q     This isn't the first time you've sued
11   your employer, is it?
12              MR. DiCARLO:  Objection to form.
13        A     This is the first time.  The first
14   one was the place was closed.
15        Q     When we talk about the place that was
16   closed, you're referring to the Amoco?
17        A     Yes.
18        Q     And that was called Uptown Lube; is
19   that correct?
20        A     Yes, Uptown Lube.
21        Q     So you sued Uptown Lube?
22        A     I was not alone, those were all the
23   workers.
24        Q     But you did sue Uptown Lube.
25        A     Yes.
```

```
1                         Toure                      61

2        Q       And what did you sue them for?

3        A       So we had been working there for some

4   years.  If they were planning to close the place,

5   they should have told us before; they did not.

6   The day they were going to close, they work up to

7   11 a.m. and they said they're going to close the

8   place at 2 p.m., so all the workers get together

9   to sue them.

10       Q       And you sued them only because they

11  didn't tell you they were going to close?

12       A       Yeah, that's what it is.

13       Q       You didn't claim that they didn't pay

14  you overtime?

15       A       That's part of it too.

16       Q       What else was part of the suit?

17       A       The closing and the overtime.

18       Q       What about the spread for hours?

19       A       That's the part I didn't know.

20       Q       And who was your lawyer in that suit?

21       A       The same lawyer.

22       Q       How did you find the lawyer?

23       A       I have a friend who know the lawyer.

24       Q       Did you get money from that lawsuit?

25       A       Yes.
```

| | | |
|---|---|---|
| 1 | | Toure                                            62 |
| 2 | Q | How much? |
| 3 | A | Everybody didn't get the same amount |

of money, so some people get maybe ten thousand,
some people five thousand.

6      Q      And how much did you get?

7      A      I got five thousand.

8      Q      And was there a trial in that case?

9      A      No.

10      Q      Did you have to give a deposition in
11 that case?

12      A      No.

13      Q      Was the settlement approved by the
14 court?  If you know.

15      A      I don't know.

16      Q      Did you ever sue any other employer?

17      A      No.

18      Q      What about have you ever been in
19 arbitration with an employer?

20      A      I don't know.  This is my very first
21 time even to do something like that since I been
22 in this country.

23      Q      So you sued your previous employer
24 and this employer and that's the only two times
25 you've been involved in a formal dispute.

```
 1                        Toure                    63
 2                   MR. DiCARLO:  Objection to form.  You
 3          can answer.
 4          A       No.
 5          Q       No, it's not the only two times?
 6          A       Only those two times.  As I say, the
 7   first time was -- I never done something like
 8   that, what they call deposition, so didn't sit
 9   down and talk about it like this.
10                   MS. MAYERSON:  Off the record.
11                   (Discussion off the record.)
12                       (Short recess.)
13                   MS. MAYERSON:  We're back on the rec-
14          ord at 1:13.
15          Q       Now, Mr. Toure, I never asked about
16   your family background.  Are you married?
17          A       Yes.
18          Q       And how long have you been married?
19          A       Since 2012.
20          Q       And do you have any children?
21          A       Yes.
22          Q       How many?
23          A       Two.
24          Q       Boys or girls?
25          A       Girls and boy.
```

```
 1                        Toure                    64
 2          Q       And how old are they?
 3          A       One is two years, one is less than a
 4    year.
 5          Q       Oh, that's nice, congratulations.
 6                  All right, let's talk about Thunder
 7    Lube.  Now, tell me again what your job descrip-
 8    tion was.
 9          A       I was doing oil change.
10          Q       Did you start out downstairs when you
11    started in 2007?
12          A       I started upstairs at that place.
13          Q       You never got trained downstairs?
14          A       2004 I was -- I start from downstairs
15    and then --
16          Q       2004 was at another company.
17          A       Where I'm working now, I have been
18    working upstairs, not downstairs.
19          Q       Okay.  And can you describe what hap-
20    pens when someone comes in for a oil change?
21          A       So when somebody comes for oil
22    change, we go and say hello, good morning or good
23    afternoon to the person, and say what are you
24    here for?  If they say oil change, so we say
25    okay, we're going to move the car inside.  So we
```

```
 1                        Toure                    65
 2   take the customer -- the car from the customer
 3   and the customer goes to an office and sit down.
 4   We take the car and evaluate what the customer
 5   needs and come and tell him what he needs, and
 6   they will say how much.  So when we tell the cus-
 7   tomer how much it costs, some people will say
 8   okay, some people will say no, not today.
 9        Q      And who would tell the customer,
10   would you tell the customer?
11        A      Yes.
12        Q      In what language did you speak to the
13   customer?
14        A      In English, yes.
15        Q      Your English was good enough to an-
16   swer any questions that the customers had?
17        A      Yes.
18        Q      Did you have instructions to try to
19   sell the customers more than what they came in
20   for or you just let the customers decide what
21   they want?
22        A      So we try to sell the customer more,
23   because we get commission on what we sell.
24        Q      And so how would you do that?
25        A      So when there is a problem with the
```

1                    Toure                    66

2    transmission or we need an engine flush, we will

3    tell the customer.  If they say okay, so we do

4    it, we get something out of the sale.  If he say

5    no, so we don't do it.

6         Q     When you say we do it, it's the peo-

7    ple downstairs that actually do the work?

8         A     So the person downstairs show the

9    oil.

10        Q     Show the oil or change the oil?

11        A     They tell us how it is upstairs, they

12   show us, and then we do it upstairs.

13        Q     So you actually change the oil up-

14   stairs.

15        A     So they open the oil downstairs and

16   we change it upstairs.  We put the oil in up-

17   stairs.

18        Q     So you would physically change the

19   oil.

20        A     I put the oil inside.

21        Q     And if they needed a transmission

22   changed or an air filter changed, did you do that

23   or did the people downstairs?

24        A     So the person downstairs is the one

25   who opens the transmission line; for the air

```
 1                      Toure                    67
 2   filter, the person upstairs does that.
 3        Q      How does the cashier know what to
 4   charge the customer when you are finished?
 5        A      So it's the same computer system
 6   where you use with the cashier.  Once you do the
 7   work and you put in the system, it goes to the
 8   cashier.
 9        Q      So when a customer comes in and you
10   greet the customer and they tell you what they
11   want, you put that in the computer?
12        A      Yes.
13        Q      And did you have trouble putting the
14   information in the computer?
15        A      No.
16        Q      Didn't you usually have to have some-
17   one help you put information in the computer?
18              MR. DiCARLO:  Objection to form.
19        A      No, nobody was helping me.
20        Q      So I think you testified earlier that
21   you cannot read or write, so how were you able to
22   put stuff in the computer?
23        A      So reading and writing something on
24   the paper is different from the computer.  Once
25   the customer comes with a car and you put the
```

```
 1                    Toure                    68
 2    number of the car, and if the car has been there
 3    before, it would show the whole thing.
 4         Q       So when you say the number of the
 5    car, you mean the license plate of the car?
 6         A       Yes.
 7         Q       But what if it is a new customer?
 8         A       So the first-time customer, you tell
 9    the customer how -- the year of the car.  Once
10    they tell you the year of the car and you put in
11    the license plate, all the information will come
12    down.
13         Q       What is the information that comes
14    up?
15         A       So if you put the license plate and
16    the year of the car and the mark of the car, you
17    get all the information concerning the car.
18         Q       What is that information, what does
19    it tell you?
20         A       So what you do, you put the mark of
21    the car, the year of the car and the license
22    plate, it will give you all the information con-
23    cerning the car on the computer.  You have to put
24    the mark of the car.
25                 MS. MAYERSON:  I keep hearing him say
```

```
 1                   Toure                    69
 2        Honda Accord and I'm not hearing you say
 3        Honda Accord, so what is he saying that
 4        you're not telling me?
 5        A      The name Honda, Honda Accord and the
 6   Honda Sienna, so you put that information on the
 7   computer, so you get all the -- everything that
 8   concerns the car.
 9        Q      So when you say everything that con-
10   cerns the car, what is the information that comes
11   up?
12        A      So after I put in the mark of the
13   car, the year and the license plate number, when
14   you get -- the information you get is like the
15   transmission, about the transmission, everything
16   that concern the brake, and then you look at if
17   there is a problem here, you tell the customer,
18   and if the customer agrees to do the job, you
19   tell the customer to go inside the office and sit
20   down and you do the job.
21        Q      How does the computer know just from
22   the make of car if there's a problem with the
23   brakes?
24        A      It's not like the computer is telling
25   you what's wrong with the brake or this part of
```

```
 1                         Toure                    70
 2    the car.  You look at it and you are the one who
 3    evaluate and tell that there is a problem here
 4    and you tell the customer.
 5         Q      And then do you have to put into the
 6    computer what the problem is?
 7         A      You don't put that, that on the com-
 8    puter, you just show the price, depending on the
 9    thing that you going to do, the job you going to
10    do, and if the person agrees, you do the job.
11         Q      So you input what job you are going
12    to do; is that correct?
13         A      Yes.
14         Q      And how do you write that in the com-
15    puter if you can't read and write?
16              MR. DiCARLO:  Objection to form.  You
17         can answer.
18         A      So it's not that I have to write
19    something, there is some kind of design that say
20    Combo 1, Combo 2, Combo 3, depending on what is
21    the job you're going to do.  Once you touch that,
22    it shows the whole thing.
23         Q      And when you put stuff into the com-
24    puter, do you also put in which employee worked
25    on the car?
```

```
 1                        Toure                    71

 2        A       Yeah, the worker -- every worker has

 3   a code.  You have to put your code.  The person

 4   downstairs put a code and you upstairs put your

 5   code.

 6        Q       And what is your code?

 7        A       Where I was working before, my code

 8   was BT.

 9        Q       And what is the purpose of putting

10   your code in?

11        A       You put your code so that -- because

12   you could get the commission from the work.

13        Q       Is it also so the company can see who

14   worked on which car if there's a problem?

15                MR. DiCARLO:  Objection to form.

16        A       Yes.

17        Q       And did you ever get a report from

18   which you could see commissions?

19        A       No, no.

20        Q       So the company is mainly using the

21   information to see who worked on the car.

22                MR. DiCARLO:  Objection to form.

23        A       Yes.

24                MS. MAYERSON:  Now, I want to show

25        you a document.  We're going to mark it as
```

```
 1                       Toure                      72
 2          Defendant's Exhibit 1.
 3                    (Witness list was marked Defendant's
 4          Exhibit 1 for Identification.)
 5          Q       Now, this is a list of people that
 6   work at the lube that you used to work at?  Do
 7   you know Malick Diallo?
 8          A       Yes, I know him.
 9          Q       And what did he do there?
10          A       He was doing the same job as me.
11          Q       And have you been in touch with him
12   since you left the company?
13          A       No.
14          Q       What about Louis Lopez?
15          A       No.
16          Q       You don't know him?
17          A       Yeah.
18          Q       You know him?
19          A       Yeah.
20          Q       Have you stayed in touch with him
21   since you left the company?
22          A       Since I left this place I have no
23   contact with any of them.
24          Q       Have you talked with any of them
25   about this lawsuit?
```

```
 1                     Toure                    73
 2      A      No.
 3      Q      Have you asked any of them to be wit-
 4   nesses in the lawsuit?
 5      A      No.
 6      Q      And you haven't talked to anybody in
 7   the company since you left.
 8      A      Since I left the place I called --
 9             THE INTERPRETER:  I'm telling him
10      don't say him.
11      A      Coulibaly.  He didn't pick up the
12   phone; I didn't call again.
13      Q      And you haven't talked to anyone
14   else.
15             So when you were at the company, who
16   was your immediate boss?
17      A      Hagay was the big boss.
18      Q      Who, who was your immediate boss, who
19   did you talk to every day?
20      A      Coulibaly.
21      Q      And who did he talk to?
22      A      He was talking to Hagay.
23      Q      So he didn't talk to Dror?
24      A      Hagay is the big boss.  The person
25   who was my boss at the place on the job is Mr.
```

```
 1                       Toure                    74
 2    Coulibaly.
 3         Q       And what about Dror?
 4         A       So Dror was like the boss of the car
 5    wash.  I don't know if Dror is Coulibaly's boss,
 6    but I don't know that.
 7         Q       So your testimony is that Dror was
 8    the manager of the car wash and not of the lube?
 9         A       Yes.  Coulibaly is the boss, was the
10    boss of lube department.  If Dror is the boss of
11    Coulibaly, I don't know that.  I don't know.
12         Q       So did you see Dror on a day-to-day
13    basis at the lube?
14         A       So any time he comes and he see he
15    we're sitting, he will say just sweep that place
16    or do that, we do it.
17         Q       So if Dror wasn't the manager of the
18    lube, how did he have the ability to fire you?
19         A       I don't know that, because that's the
20    reason why when he told me I was fired, I sat
21    down and wait for Coulibaly, because he's the one
22    who hire me.
23         Q       So Coulibaly hired you.
24         A       Yes, Coulibaly is the one who hired
25    me.
```

```
1                        Toure                        75
2        Q        And you say that Hagay was the big
3   boss.
4        A        Yes.
5        Q        How do you know that?
6        A        So I know it because when he showed
7   up at the workplace, they always say that he's
8   the big boss, and that he has another place where
9   Malick you mentioned was working.
10       Q        And how often did he show up?
11       A        (In English) Maybe a year ago I don't
12  see him.  Maybe a year, two years ago I don't see
13  him.  Sometime before he come.  One week every
14  week he come.  I don't see him now year ago.
15  Yeah, year ago.
16       Q        So you said he hasn't been there in a
17  year or two.
18       A        I have not seen him for about a year.
19       Q        So do you think he's still the big
20  boss?
21       A        The time I was there, he was the big
22  boss.
23       Q        And what were his responsibilities?
24       A        So his job was like, every week, he
25  would come and look at the place and go.
```

```
 1                     Toure                    76
 2        Q       And when did he stop coming every
 3   week?
 4        A       About a year now I have not seen him.
 5        Q       And did he fire people?
 6        A       I don't know that, because he did not
 7   fire me, Dror is the one who fired me.
 8        Q       So you're not aware of anybody that
 9   Hagay fired.
10        A       I don't know.
11        Q       Other than coming and looking at the
12   business once a week, does he have any other
13   responsibilities?
14        A       I don't know, because even if he
15   comes, he talks to Coulibaly, I see him talking
16   to Coulibaly, he doesn't talk to me.  So he come,
17   he talks to Coulibaly, he has nothing to tell no
18   workers outside.
19        Q       So he didn't interact with the work-
20   ers.
21        A       No.
22        Q       Did Coulibaly interact with the work-
23   ers?
24        A       Yes, Coulibaly interacts with the
25   workers, and generally he comes, say good morn-
```

Case 1:17-cv-00657-DLI-PK Document 36 Filed 04/19/18 Page 157 of 251 PageID #: 305

1                           Toure                       77

2    ing, we say good morning, and if there is job

3    that need to be done, he tell us to do and then

4    we do it.

5         Q       Did he have the ability to hire peo-

6    ple?

7         A       Yes, because he's the one who hired

8    me, told me to come to work, yes.

9         Q       And did he have the ability to fire

10   people?

11        A       I think that's all, because somebody

12   who could hire me could fire you too.

13        Q       Was Dror at the lube on a day-to-day

14   basis?

15        A       Every day.

16        Q       And did he have the ability to hire

17   people?

18        A       Yeah, because he fired me, and I

19   heard that he has some power, so if he, he has

20   some power and he was able to fire me, so he

21   could hire and fire people too.

22        Q       So would it be correct to say that on

23   a day-to-day basis, it was Coulibaly and Dror

24   that ran the business?

25        A       Yes.

```
 1                         Toure                    78
 2              MS. MAYERSON:  I want to show you an-
 3         other exhibit.  This has been Bates stamped
 4         plaintiff's 001 and 002.
 5              You want to mark these as Defendant's
 6         2?
 7              (Photocopy of posters was marked De-
 8         fendant's Exhibit 2 for Identification.)
 9              MR. DiCARLO:  I'd just like to note
10         that these copies are almost completely
11         illegible.
12         Q     I don't need you to read them, I just
13    want to ask you if there were posters like these
14    hanging in the workplace when you were there.
15         A     I don't know.  I didn't check that.
16         Q     Do you recall that there was a bulle-
17    tin board in the shop?
18         A     I don't know.  I didn't check that.
19         Q     Now, you indicated that you were paid
20    for 60 hours a week; is that correct?
21         A     Yes.
22         Q     And did you work 60 hours every week?
23         A     Yes.
24         Q     And you were paid for 60 hours every
25    week.
```

```
 1                        Toure                      79
 2         A        Yes.
 3         Q        How did you record your hours?
 4         A        It's on the check.  It's on the
 5    check.
 6         Q        But did you punch a time clock?
 7         A        Yes.
 8         Q        You did punch a time clock.
 9         A        We have a card we punch, yes.
10         Q        And did you do that every day?
11         A        Yes.
12         Q        And were your hours kept track of any
13    other way?
14         A        No.
15         Q        Did the manager write down your
16    hours?
17         A        We punched the card.
18         Q        You punched the card.
19         A        Yeah.
20         Q        And did you ever have any trouble
21    with the time clock?
22         A        So there were two devices; if one has
23    a problem, we use the other one.
24         Q        And are they both punch cards or is
25    one a biometric time clock?
```

```
1                        Toure                    80
2          A       It's the same, same thing, both of
3    them are punch.
4          Q       Did you always work the full 60 hours
5    that you were paid for?
6          A       Yes.  Yes.
7          Q       Did you leave early sometimes and
8    they paid you for 60 hours anyway?
9                  MR. DiCARLO:  Objection to form.
10         A       No, that never happened, because even
11   if you -- whatever you punch in your hours,
12   that's what they pay you for, they don't pay you
13   more or less.
14         Q       Did there come a time when you were
15   sick and needed to have your blood tested every
16   other day at the hospital?
17         A       Yes, I was doing that, but they don't
18   pay me for -- whatever hour I work, that's what I
19   get paid for.
20         Q       So you didn't leave early on the days
21   you had to go to the hospital?
22                 MR. DiCARLO:  Objection to form.
23         A       So if I did have to go to the hospi-
24   tal, like if I go Thursday at five, I have to
25   come back early on Saturday to catch up to make
```

```
 1                    Toure                    81
 2   the 60 hours.  Saturday or Sunday, I have to try
 3   to get the extra hours to complete the hour to
 4   60.
 5        Q      And what were your normal working
 6   hours?
 7        A      Eight in the morning to six p.m.
 8        Q      On what days?
 9        A      Monday through Friday.  Monday I get
10   off at five, I go to the hospital.  Saturday I
11   work from 8 a.m. to 8 p.m. so to catch up the
12   time I lose going to the hospital.
13        Q      So how many days a week did you work
14   normally when you didn't have to go to the hospi-
15   tal?
16        A      Six days a week.
17        Q      And which were those six days?
18        A      Monday, Tuesday, Wednesday I'm off,
19   and Thursday I'm off -- I'm off Wednesday, I work
20   Thursday, I work Friday, I work Saturday, I work
21   Sunday.
22        Q      So you work every day except Wednes-
23   day from eight to six.
24        A      Monday I go to -- Monday and Friday I
25   go to the hospital.
```

```
 1                         Toure                      82
 2        Q       In what year were you going to the
 3   hospital?
 4        A       It started 2012.
 5        Q       And when did it continue to?
 6        A       Up to now.
 7        Q       So when you leave early on Monday,
 8   you make that hour up when?
 9        A       Saturday.
10        Q       And you always worked exactly 60
11   hours.
12        A       Exceptionally there is a rain,
13   sometimes they tell us to go home, otherwise I
14   work 60 hours every week.
15        Q       And when they told you to go home,
16   did you get paid for 60 hours or less?
17        A       So when you go home, they pay you the
18   hour you worked.
19        Q       So if you went home early, you would
20   not get paid for 60 hours?
21        A       No.
22                MS. MAYERSON:  I'm going to show you
23           another exhibit.  This is what has been
24           Bates stamped plaintiff's 008.
25                Can you mark this as Exhibit 3.
```

```
 1                    Toure                      83
 2                    (Signature report was marked Defen-
 3          dant's Exhibit 3 for Identification.)
 4          Q       Do you recognize this document?
 5          A       What is this?  I don't know.
 6          Q       Do you recognize this line as having
 7   your signature (indicating)?  I'm pointing to the
 8   second to the last line?
 9          A       Yes.
10          Q       Is that your signature?
11          A       Yes.
12          Q       How did you receive your pay when you
13   received it?
14          A       So they call you, it's inside an en-
15   velope, and when they give it to you, you sign.
16          Q       So someone would hand you an enve-
17   lope?
18          A       Yes.
19          Q       Who would hand you the envelope?
20          A       Coulibaly is the one who gives the
21   envelope.
22          Q       And what day of the week was that?
23          A       Every week.
24          Q       It was every week?  On what day?
25          A       Tuesdays.
```

```
 1                       Toure                    84
 2          Q       And when he gave it to you, you
 3    signed that you received the envelope.
 4          A       Yes.
 5          Q       And would this be a weekly report
 6    where you signed that you received the envelope?
 7          A       Yes.
 8          Q       And what would be in the envelope?
 9          A       A check and your commission.
10          Q       So there would be a check and cash in
11    the envelope?
12          A       Yes.
13          Q       And would there be a pay stub in the
14    envelope?
15          A       You have your check, paycheck, and
16    the money, and they put commission on the money.
17          Q       So when you signed this document,
18    you're signing that you received an envelope that
19    had a check and cash in it; correct?
20          A       Yes.
21                  MS. MAYERSON:  I'm going to show you
22          a document which has been Bates stamped
23          plaintiff's 041.
24                  You want to mark that?
25
```

```
 1                    Toure                 85

 2              (Personal earnings statement was

 3         marked Defendant's Exhibit 4 for Identifi-

 4         cation.)

 5         Q      Now, this is something that your at-

 6    torney provided to me as your pay stubs.  Would

 7    you get a report like this in every envelope with

 8    your check?

 9         A      Yes.

10         Q      So this shows your regular pay; cor-

11    rect?

12         A      Mm-hmm.

13         Q      The hours you worked; correct?  You

14    can't nod, you have to say it out loud.

15         A      Yes.

16         Q      Your overtime pay.

17         A      Yes.

18         Q      The hours you worked overtime.

19         A      Yes.

20         Q      It shows your gross pay.

21         A      Yes.

22         Q      It shows all the deductions; correct?

23         A      Yes.

24         Q      And it shows your net pay.

25         A      Yes.
```

```
 1                        Toure                    86
 2        Q      And it shows year-to-date for your
 3   gross pay and your deductions; correct?
 4        A      Yes.
 5        Q      And you got a report like this every
 6   week when you got your check; correct?
 7        A      Yes.
 8        Q      Now, you worked at Thunder Lube for
 9   10 years; is that right?
10        A      Yes.
11        Q      Was Thunder Lube a good employer?
12               MR. DiCARLO:  Objection.
13        A      Yes.
14        Q      When you took leaves of absences to
15   go to Africa, did they give you money when you
16   came back?
17               MR. DiCARLO:  Just note my objection.
18        A      So they didn't give me money.  There
19   is a cash money for one week when I go on vaca-
20   tion, that's what they give me.
21        Q      So when you came back in January 2017
22   from Africa, they didn't give you a thousand dol-
23   lars?
24        A      Yes, it's my cash money.
25        Q      What do you mean it was your cash
```

```
 1                      Toure                    87
 2    money?
 3         A      So sometimes they should pay you one-
 4    week vacation every year, so sometime I take one,
 5    two, three, three years we weren't taking any va-
 6    cation.  When I go on vacation and come back,
 7    that's the money they give to me, my vacation
 8    money.
 9         Q      So you believe the thousand dollars
10    was for several years of vacation pay?
11         A      Yes.  So if you look at it yourself,
12    if I didn't take a vacation time three to four
13    years, I go on vacation, they gave me thousand
14    dollars.  You calculate the one-week vacation
15    money and add up, you will see that the thousand
16    dollars for my vacation money.
17         Q      Now, let's talk about the cash in
18    your envelope.
19         A      Okay.
20         Q      What is your understanding of the
21    meaning of the word commission?
22              MR. DiCARLO:  Objection.  Asked and
23         answered.
24         A      As Coulibaly himself mentioned, every
25    work you do on the car, you have a commission.
```

```
 1                         Toure                    88

 2    Depending on the job, what kind of job you do on

 3    the car, you getting paid a commission every job,

 4    so that's what he told us.

 5         Q       I'm just asking you what you think

 6    the word means, not what anybody told you.

 7                 MR. DiCARLO:  Objection.  Asked and

 8         answered.

 9         A       So what I understand is that if you

10    work on a car, if you do some work, you get some

11    kind of money, that's what called a commission.

12         Q       And what does the word bonus mean?

13                 MR. DiCARLO:  Objection.

14         A       I don't know.  I don't know the bo-

15    nus.  I don't even know the difference between

16    bonus and commission.  What I know, in my enve-

17    lope I see the word commission.

18         Q       Well, we'll come back to that.  So

19    you don't know the difference between bonus and

20    commission.

21                 MR. DiCARLO:  Objection to form.

22         A       Commission is something you getting

23    because you do some work.

24         Q       I understand.

25         A       Bonus is like they give something to
```

1                          Toure                    89

2    you like a gift.

3        Q      Did you ever hear anyone refer to the

4    cash in your envelope as a bonus?

5        A      No, they didn't tell me that, nobody.

6    Nobody.

7        Q      When you kept track of the work you

8    did on the cars and what commission you thought

9    you would deserve, did the cash in your envelope

10   ever match the commission you thought you de-

11   served?

12            MR. DiCARLO:  Objection.  Asked and

13        answered.

14       A      So I find out getting paid from the

15   work I have done the commission.  They never pay

16   me over, they will never pay you over.

17       Q      I'm not sure that you're answering

18   the question.  So you said that you kept track of

19   the work that you did; correct?

20       A      Yes.

21       Q      And you gave us dollar amounts that

22   you thought you deserved each time you did a cer-

23   tain kind of work or sold a certain thing; cor-

24   rect?

25       A      I was writing down the job I was do-

```
 1                    Toure                    90
 2  ing and I know the amount of money that's paid
 3  per job, so when I do that -- at the end of the
 4  week, I find out I'm not getting paid the money I
 5  worked for.  They never paid me more money, they
 6  always paid me less.
 7       Q     Did they ever pay you the right
 8  amount that you thought you deserved as a commis-
 9  sion?
10             MR. DiCARLO:  Objection.  Asked and
11        answered.
12       A     Yeah, that's happened, because they
13  could pay you exactly the amount of money you owe
14  this week or two weeks in a row and the next week
15  you get short so that you don't pay attention to
16  it.
17       Q     So sometimes you felt it was correct.
18       A     Yes.  So it's not every time that
19  it's correct.  If they do it correct, they may do
20  next time they don't do it correct so that you
21  don't pay attention.
22       Q     So was it correct or incorrect most
23  often?
24       A     What is not correct is more.
25       Q     So more often than not it didn't add
```

```
 1                      Toure                    91
 2   up to what you thought you should have as a com-
 3   mission.
 4             MR. DiCARLO:  Objection.  Asked and
 5        answered.
 6        A     Yes.
 7        Q     And did you get cash every week or
 8   were there some weeks you didn't get cash?
 9             MR. DiCARLO:  Objection.  Asked and
10        answered.
11        A     When you say cash, what do you mean,
12   my commission or to say that they're adding some-
13   thing to my pay?
14        Q     I'm talking about the cash in your
15   envelope.
16        A     Every week I would get cash.
17        Q     And you just talked about cash added
18   to your pay.  What was that for?
19             MR. DiCARLO:  Objection to form.
20        A     That's the commission.
21        Q     So you got a check and cash every
22   week, and you understood that the cash was a com-
23   mission.
24        A     Yes, the commission.
25        Q     Now, are you aware that in the com-
```

```
 1                       Toure                    92
 2   plaint in this case, you allege that your commis-
 3   sion that you received was $300 every week?
 4               MR. DiCARLO:  Objection to form.
 5        A     Yes.
 6        Q     And was it really $300 every week?
 7        A     It could be 300 a week or 200 a week,
 8   it depends.  So it's not like I was getting 300
 9   every week, sometime they give 200, sometime they
10   give 300.
11               MS. MAYERSON:  So I'm going to show
12          you what has been Bates stamped as Plain-
13          tiff's Exhibits 000120 through 000121.
14               (2012 earnings statement was marked
15          Defendant's Exhibit 5 for Identification.)
16               THE WITNESS:  What is this?
17        Q     This is a record of the checks that
18   you received in 2012 and the cash that you
19   received in 2012.
20        A     Okay.
21        Q     So this shows week by week what your
22   paycheck was and what the cash in your envelope
23   was.
24               Now, according to this, in 2012, you
25   were on vacation from October 20th, 2012 until
```

```
 1                      Toure                    93
 2   January 13th, 2013.
 3        A      Yes.
 4        Q      Does that sound right?
 5        A      Yes.
 6        Q      And if you look at the last line on
 7   the second page, you got a thousand dollars vaca-
 8   tion pay.
 9        A      Yes.
10        Q      Now, for what period does that thou-
11   sand dollars cover?
12        A      Maybe three years.
13        Q      You took 12 weeks' vacation and your
14   testimony is you get one week of paid vacation a
15   year.
16        A      Yes.  I didn't take a vacation two to
17   three, four years.
18        Q      And does the cash look about right as
19   the cash that you received every week?
20        A      It could be true or not.  We don't
21   have a big sheet of paper like that with all the
22   information.  We get our pay, and after we take
23   the money and that's it, we don't, we don't get
24   something that's like mention everything.
25        Q      Well, in 2012, is this about the
```

```
 1                       Toure                    94
 2   amount of cash you were receiving every week?
 3               MR. DiCARLO:  Objection.  Asked and
 4          answered.
 5       A      I cannot recall that.
 6       Q      And you don't have any records that
 7   would show how much cash you got.
 8       A      I didn't add that together, because I
 9   was getting this money.  It's not like on my
10   check, it was inside the envelope, so I didn't
11   add the amount together.  I don't know.
12       Q      And did you claim the cash on your
13   tax returns?
14               MR. DiCARLO:  Note my objection.
15       A      No, I don't.
16               MS. MAYERSON:  We have asked for
17          copies of your tax returns and you haven't
18          produced them yet.  I would ask that you
19          supplement your discovery with copies of tax
20          returns.
21               MR. DiCARLO:  So noted.  We ask that
22          the request be followed up in writing.
23               MS. MAYERSON:  I'm going to show you
24          what has been Bates stamped 000122 through
25          000123.
```

```
 1                     Toure                    95

 2                (2013 earnings statement was marked

 3          Defendant's Exhibit 6 for Identification.)

 4          Q      Now, this is the same type of record

 5    for the year 2013, and it shows you didn't start

 6    work until the week of January 14th that year.

 7          A      2013?

 8          Q      Mm-hmm.  Is that correct?

 9          A      2013.  Yes, that may be, because I go

10    to Africa.  I don't remember.  I don't remember

11    now that.

12          Q      Do you have any idea whether the cash

13    amounts are correct or not?

14          A      I don't.  As I told you before, if

15    they were doing something like a printout of the

16    commission, I would be able to track it down.

17    They don't, they give you cash amount, so I don't

18    remember and I was not writing down the cash

19    amount.  I don't remember if this is correct or

20    not.

21          Q      So how much cash did you usually get

22    in your envelope?

23                MR. DiCARLO:  Objection.  Asked and

24          answered.

25          A      Sometimes 300, sometimes 200.
```

Case 1:17-cv-00657-DLI-PK   Document 36   Filed 04/19/18   Page 176 of 251 PageID #: 324

```
 1                      Toure                  96
 2       Q      Did you ever get more than 300?
 3       A      That's not -- not too many times, not
 4  too many.
 5       Q      And did the cash have anything to do
 6  with how well the business was doing?
 7       A      Yes.
 8       Q      What was the relationship between the
 9  cash and how the business was doing?
10       A      I don't understand.  I don't under-
11  stand what you mean.
12              MS. MAYERSON:  Okay.  I'm going to
13         show you what's been Bates stamped -- oh, it
14         hasn't been Bates stamped?
15              MR. HARTHEIMER:  I did Bates stamp it
16         but not this copy.
17              MS. MAYERSON:  All right, so I have
18         an un-Bates-stamped copy, I apologize.  I'm
19         going to show you the record for 2014, which
20         I'll have marked as an exhibit.
21              (2014 earnings statement was marked
22         Defendant's Exhibit 7 for Identification.)
23       Q      Now, these are the records for 2014,
24  and it shows that you took vacation from February
25  27 to March 25th that year; is that correct?
```

Case 1:17-cv-00657-DLI-PK   Document 36   Filed 04/19/18   Page 177 of 251 PageID #: 325

```
 1                      Toure                    97
 2                MR. DiCARLO:  March?
 3                MS. MAYERSON:  May 25th, I'm sorry.
 4        Thank you.
 5        Q      That you were gone for three months,
 6    from the end of February to the end of May; is
 7    that correct?
 8        A      Yes.
 9        Q      It also shows you took vacation from
10    December 15th to December 28th; is that correct?
11        A      February I went to Africa, but not
12    December, I didn't take vacation.
13        Q      You didn't take vacation over the
14    holidays?  Were you sick?
15        A      Every holiday we work.  I did not.
16        Q      Is it possible that you were sick?
17        A      I was sick maybe for three days, not,
18    not even a week.
19        Q      Is there any reason you wouldn't have
20    gotten a paycheck for the last two weeks of De-
21    cember 2014?
22        A      I don't know.  I don't know that.
23    It's a long time.  I don't know why.
24        Q      That's okay.  You're sure you weren't
25    sick during that period.
```

```
 1                     Toure                    98
 2              MR. DiCARLO:  Objection to form.
 3       A      I don't remember.  Maybe.  I don't
 4   remember.
 5              MS. MAYERSON:  I'm going to show you
 6       the same type of record for the year 2015.
 7              MR. HARTHEIMER:  Two pages, right?
 8              MS. MAYERSON:  Mm-hmm.
 9              (2015 earnings statement was marked
10       Defendant's Exhibit 8 for Identification.)
11       Q      Now, this shows that you didn't start
12   work that year until January 12th, so you took
13   the first two weeks off but didn't have any other
14   vacation that year.  Does that sound right to
15   you?
16              MR. DiCARLO:  I would just like to
17       note my objection in that the prior one for
18       2014 does extend into 2015 and into that
19       period that you're referring to.
20              MS. MAYERSON:  What?
21              MR. HARTHEIMER:  The exhibit for
22       2014 --
23              MR. DiCARLO:  The last entry on the
24       2014 --
25              MR. HARTHEIMER:  Goes into January.
```

Case 1:17-cv-00657-DLI-PK  Document 36  Filed 04/19/18  Page 179 of 251 PageID #: 327

```
 1                         Toure                    99
 2               MR. DiCARLO:  -- extends to January
 3          7th of 2015.
 4               MS. MAYERSON:  Oh, I see.  But
 5          there's still one week missing.  Or about
 6          five days missing.
 7               MR. DiCARLO:  Yes.
 8          Q     But you didn't take any long vaca-
 9     tions that year.
10          A     No.
11          Q     So just a few days off in the begin-
12     ning of the year.
13          A     So if I take a long vacation, I go to
14     Africa, but apart from that, to take one or two
15     weeks, no.
16               MS. MAYERSON:  Okay, I'm going to
17          show you the same record for 2016.
18               (2016 earnings statement was marked
19          Plaintiff's Exhibit 9 for Identification.)
20          Q     Now, this shows you took a three-
21     month vacation from September 12th through De-
22     cember 12th, 2016?
23          A     Yes.
24          Q     Is that correct?
25          A     Yes.
```

```
 1                        Toure                    100
 2        Q       And when you came back, you got a
 3   thousand dollars cash?
 4        A       I get a thousand dollar only once,
 5   one time.  The rest of the time they give me like
 6   500, not a thousand.
 7        Q       And when is the one time?
 8        A       2016, when I went on vacation in De-
 9   cember, when I came back, they give me a thousand
10   dollars.
11        Q       But you did take three months off, so
12   you weren't working.
13        A       So yes, I took two month, three
14   month.  When I came back, they gave me either 500
15   or 600, not one thousand.  One thousand was only
16   once.
17        Q       So a minute ago I thought you said
18   they did give you a thousand in 2016, now you're
19   saying they did not?
20        A       They give me thousand dollars only
21   once; after that, I have never received a thou-
22   sand dollars.
23        Q       When was it?
24        A       So it is in 2016, I went on vacation,
25   I came back in December, they gave me a thousand.
```

Case 1:17-cv-00657-DLI-PK   Document 36   Filed 04/19/18   Page 181 of 251 PageID #: 329

1                         Toure                    101

2    2012, I received 500 or $600.

3         Q       Now, 2016 was fairly recent, so can

4    you look at the cash figures and see if you be-

5    lieve they're what you received?

6         A       I cannot say that is correct, because

7    if you look at the amount, you have 400 twice,

8    and you have 343, and here, this is 382.  Even if

9    you look at it, you know that something is wrong.

10        Q       Why would something be wrong?

11        A       So if you look at it, they pay you

12   the amount as they want, because it's not based

13   on, as I told you, itemized things, so I cannot

14   tell if it's correct or not correct.

15        Q       So you're saying that the cash was

16   the amount that they wanted to pay you.

17        A       Yes.

18        Q       And you don't know if these are the

19   amounts you were paid or not.

20        A       So as I told you, I don't have print-

21   out of the cash amount based on the itemized

22   amount of the cash, so even if I received some-

23   thing like that, I don't know if it was correct,

24   so they just put the amount of money, cash in the

25   envelope, so that's what we get, and I don't know

```
 1                    Toure                    102
 2   if it's correct or not.
 3       Q       And you didn't keep records for tax
 4   purposes of the cash that you received?
 5       A       No.  So the check, the check is in-
 6   side the envelope, but the amount of the cash of
 7   the commission is written and written on the
 8   envelope.
 9       Q       And when you said they give you the
10   amount that they want to give you, who did you
11   mean by the word they?
12       A       So I don't know -- it's the company,
13   but the person I know and I could refer to if I
14   have a problem is Mr. Coulibaly, so he's the one
15   I always say is the one who take care of my pay.
16       Q       So are you saying that he's the one
17   who decided how much cash to put in your enve-
18   lope?
19               MR. DiCARLO:  Objection to form.
20       A       So he's the one who had the informa-
21   tion about the work we have done during the week
22   and he's the one who take the information to the
23   office, so if there is something, it's between
24   him and the office, so I don't know who I should
25   blame.
```

1                           Toure                    103

2        Q       Okay.  Or thank.

3                MS. MAYERSON:  I'm going to show you

4        the same type of record for the year 2017.

5                (2017 earnings statement was marked

6        Defendant's Exhibit 10 for Identification.)

7        Q       Now, according to this, you didn't

8    work after January 8th; is that correct?

9        A       Yes, I did not work.

10       Q       Is that the day that you say you were

11   fired?

12       A       Yes.

13       Q       And since this is fairly recent, do

14   these cash figures look correct?

15       A       Maybe it's correct.  But as I told

16   you, I want you to understand, I cannot recall

17   that, because there's no written part of that

18   amount.

19       Q       I understand that.  I just thought

20   maybe it was recent enough that you remember.

21       A       No.

22       Q       What?  No what?

23       A       (In English)  745?  For what?  For

24   the commission?

25       Q       For the cash in the envelopes.

```
 1                    Toure                    104

 2        A       No, no.

 3        Q       So you're saying you didn't get $745

 4   in January?

 5        A       No.

 6        Q       What do you think you got?

 7        A       When I came back, it looked like I

 8   work one week or two weeks maximum.  How can I

 9   get this kind of -- this amount?

10        Q       I don't know, how much did you get

11   each week normally in cash?

12        A       This is the amount of the whole week?

13   Whole week?

14        Q       How much cash did you normally get in

15   an envelope?

16              MR. DiCARLO:  Objection.  Asked and

17        answered.

18        A       I don't know.  I didn't check -- I

19   didn't check taking count.

20        Q       So you don't have any idea how much

21   you got paid.

22              MR. DiCARLO:  Objection to form.

23        A       So as I told you, when I start to

24   find that I'm losing money, that's the time I

25   complain to Mr. Coulibaly.  But as I told you
```

1                           Toure                    105

2    again, I tell him to give us a printout for the

3    amount of money we're getting for the commission;

4    they don't do that, so I cannot recall what, what

5    the amount -- about the amount.

6         Q     So then how do you know it's wrong?

7               MR. DiCARLO:  Objection to form.

8         A     So the reason how I find out, when I

9    start to have suspicion, I start writing down the

10   work I do, and --

11        Q     No, I'm not asking about that, I'm

12   asking, you said that you didn't receive $745 in

13   cash in January.  How do you know that when you

14   don't remember what you received?

15        A     So what I want to know, this is the

16   sum, the amount of different weeks or that's --

17   the 700 is a one-time payment?

18        Q     Neither.  This shows that for the

19   week of December 26, 2016 through January 1, 2017

20   you got a paycheck for $406.76 and in that same

21   envelope was cash of $320.

22        A     Yes.

23        Q     Is that correct?

24        A     It may be correct, but I don't know.

25        Q     And it shows the next week you got a

```
 1                    Toure                    106
 2   paycheck for $472 --
 3             MR. DiCARLO:  You have to let her
 4        finish.
 5        Q       -- and cash of $350; is that right?
 6        A       Yes.
 7        Q       That is right.
 8        A       Yes.
 9        Q       So these cash payments are correct.
10             MR. DiCARLO:  Objection to form.
11        A       It may be that one or it may be more.
12   I cannot tell, because I didn't see any paper.
13        Q       But this was just a few months ago.
14   You don't remember what you got?
15             MR. DiCARLO:  Objection.
16        A       I don't remember.
17        Q       Did the company or Dror ever loan you
18   money?
19        A       No.  I have worked with the company
20   so many years, I have never borrowed money from
21   the company.  If I have some money problem, I go
22   directly to Mr. Coulibaly and I tell him, he
23   could give me $200, and when I get paid, I'll
24   give him the money right away, but never with the
25   company.
```

```
 1                      Toure                    107
 2        Q      And did you give him the money back
 3   personally or was the money deducted from your
 4   paycheck?
 5        A      I go give him the cash money.
 6        Q      In your position, did you receive
 7   tips?
 8        A      Yes, I would get tips.  If you work
 9   on a car and the customer is happy, could give
10   you three dollars, four, five dollars.
11        Q      And was that usually in cash?
12        A      Yes, in cash.
13        Q      And did you get to keep all the tips?
14        A      Yeah.  That's for you to buy maybe
15   food with, yeah.
16        Q      But you didn't share the tips with
17   other technicians or pool the tips, you kept the
18   tips you got.
19        A      We share it only if you work in the
20   same car, two different persons work in the same
21   car.  If the person give you five dollars, you
22   divide it two fifty/two fifty.
23        Q      And did the company ever deduct a tip
24   credit from your pay?
25        A      They were doing that.
```

```
 1                         Toure                    108
 2        Q       When did they do that?
 3        A       Like two, three years, they were say-
 4   ing that they taking -- deducting the tip from
 5   your check.
 6        Q       And in the last six years, did they
 7   deduct the tip from your check?
 8        A       The worker complained about it so
 9   they stopped it, because the workers said that
10   they should not deduct the tip from our pay be-
11   cause the tips we're getting is not enough money,
12   so we just use it for food or something.
13        Q       So when did they stop doing it?
14        A       I don't recall.
15        Q       Was it more than three years ago?
16        A       Maybe, yes.  I didn't pay attention,
17   but maybe more than three years.  So I would
18   not -- I'm not -- I didn't go to school, I don't
19   look my paycheck item by item or deduction by
20   deduction.  When they give me my paycheck, I just
21   deposit the money, so I don't know exactly what
22   is on the paycheck.
23                MR. DiCARLO:  Off the record.
24                (Discussion off the record.)
25                   (Luncheon recess.)
```

```
 1                      Toure               109
 2              MS. MAYERSON:  We're back on the rec-
 3         ord at 3:21.
 4              MR. DiCARLO:  Do you want to read
 5         back the last two?
 6              MS. MAYERSON:  No, no, I'm okay, I
 7         just needed a minute.
 8              So I'm going to give you another ex-
 9         hibit.  I'm going to give you what has been
10         marked as -- Bates stamped as Plaintiff's
11         P001 through P038.
12              (Photocopies of envelopes were marked
13         Defendant's Exhibit 11 for Identification.)
14         Q     Now, Mr. Toure, you mentioned a few
15    times that your cash and paycheck were given to
16    you in an envelope.  Are these representative of
17    the envelopes that you received in your pay in?
18         A     Yes.
19         Q     And these are envelopes that you
20    saved that your pay came in?
21         A     Yes.
22         Q     Now, take a look at the page marked
23    P001.  Now, the envelope says New Hollywood Car
24    Wash.  Did you always get your pay in an envelope
25    from New Hollywood Car Wash?
```

```
 1                       Toure                    110
 2        A       Yes, it's the same company, yeah.
 3   That's the writing on it.
 4        Q       But you never worked for them, you
 5   worked for the lube company; correct?
 6        A       Sometimes they changing the name or
 7   the company -- it's the same company.  The com-
 8   pany is the same, they changed the name from time
 9   to time.
10        Q       What company is the same?
11        A       You want to know who owns the company
12   or --
13        Q       No, I didn't ask that.  You said the
14   companies are the same.  I want to know which
15   companies are the same.
16        A       Hollywood Car Wash and lube is the
17   same company.
18        Q       What makes you think that?
19        A       So I was working at the same place,
20   but I don't know if the name change has something
21   to do with a different company.  For me it's the
22   same company.
23        Q       But there was a car wash company and
24   there was a lube company; correct?
25        A       Yes.  I was working at the lube com-
```

```
 1                        Toure                      111
 2   pany.
 3        Q       Right, you worked for the lube com-
 4   pany.
 5        A       Yes.
 6        Q       But the lube company gave you their
 7   paycheck in the car wash envelopes; correct?
 8        A       Yes.
 9        Q       Now, when you got your envelope, did
10   it have your name handwritten on the front?
11        A       Yes.
12        Q       Now, take a look at the page marked
13   P001.  Do you know whose handwriting is on the
14   outside of the envelope?
15        A       I don't know the handwriting of the
16   person by the handwriting, but I know the person
17   who is in the office handling the check, the en-
18   velope, is Jessica.  I don't know if she's the
19   one who wrote this or not.
20        Q       Okay.  And look at the bottom half of
21   the page.  Is that handwriting that was on the
22   inside or the outside of the envelope?
23        A       Inside.  The top part is -- this one
24   is outside (indicating), this one is inside (in-
25   dicating).
```

```
 1                        Toure              112
 2       Q       So you pointed to the top half of the
 3  page when you said outside and you pointed to the
 4  bottom half of the page when you said inside;
 5  correct?
 6       A       Yes.
 7       Q       Do you know whose handwriting is on
 8  the bottom half of the page?
 9       A       I don't know.
10       Q       Is that something that was on the
11  envelope when you received it?
12       A       Yes, when I opened the envelope, I
13  see that.
14       Q       And what does it say?
15       A       They tell me that's the commission.
16       Q       So it says 354 plus 100 equals 454.
17  Does that mean you got $454 in cash in that enve-
18  lope?
19             MR. DiCARLO:  Just note an objection
20       to form.
21       A       Yes.
22       Q       And under the 354 it says COM.  Do
23  you know what that stands for?
24       A       I don't know.
25       Q       And do you know who put COM there?
```

```
 1                        Toure                  113

 2        A        No, I don't know.

 3        Q        And under the 100, it says Winner B,

 4   as in boy.  Do you know what that means?

 5        A        No, I don't know who wrote that.

 6        Q        Did you win anything?

 7        A        So it's like something -- the person

 8   who beats everybody in the week, by the commis-

 9   sion, they give you hundred dollars.

10        Q        So what do you mean by beats every-

11   body?

12        A        Who sells more than everybody.

13        Q        Take a look at the page marked P002

14   now.  Now, can you see that the outside of the

15   envelope has a different handwriting and a dif-

16   ferent spelling of your name than P001?

17        A        Even if there is a change, I don't

18   know who did it, but they'll give me the envelope

19   like that.

20        Q        I didn't ask that, I asked if you can

21   see that the spelling of the name is different

22   and the handwriting is different.

23        A        Yes.

24        Q        And which is the correct spelling of

25   your name?
```

```
 1                      Toure                114
 2       A       The spelling of my name is Bakary
 3  Toure.
 4       Q       How do you spell it?
 5       A       B-a-k-r-u.
 6       Q       B-a-k-r-u?  So neither of these are
 7  spelled correctly?
 8       A       There was a mistake on my ID before.
 9  Maybe that's why they have the spelling like
10  that.  So I went to change the mistake.
11       Q       So which one is correct?
12       A       This is the correct way (indicating).
13       Q       Okay.
14               And you don't recognize the handwrit-
15  ing on P002 either; correct?
16       A       No, I don't know.
17       Q       And on the inside of the envelope, it
18  says 280 plus 50 equals 330.  Does that mean that
19  you would get $330 in that envelope?
20       A       Yes.
21       Q       And when you got paid each week, was
22  there always a number on the -- written on the
23  inside of the envelope?
24       A       Every week.
25       Q       And was the number that was written
```

Case 1:17-cv-00657-DLI-PK   Document 36   Filed 04/19/18   Page 195 of 251 PageID #: 343

```
 1                    Toure                  115
 2   on the envelope always the amount of cash in the
 3   envelope?
 4        A     Yes.
 5        Q     And on P002, under the 280, it says
 6   COM.  Do you know what that means?
 7        A     I don't know.
 8        Q     And under the 50 it says B.  Do you
 9   know what that means?
10        A     No.
11        Q     Now, take a look at P006.  This says
12   360 plus 100 equals 460.  So you got $460 cash
13   that week; correct?
14        A     Yes.
15        Q     And under that it says B.  Do you
16   know what that B stands for?
17        A     No, I don't know.
18        Q     Could it stand for bonus?
19              MR. DiCARLO:  Objection.  Calls for
20        speculation.
21        A     No.
22        Q     There's no question on the table.
23              Take a look at P007.  This week you
24   got $427; correct?
25        A     Yes.
```

1                          Toure                    116

2          Q       And underneath that it says Bonus.

3     Does that mean the $427 was a bonus?

4          A       It's not a bonus, it's a commission.

5          Q       So even though it says Bonus, you

6     don't think it was a bonus.

7          A       That's not a bonus, that's my commis-

8     sion.  The work I do, they pay me for that, it's

9     not extra money they give me.

10         Q       And so why does it say Bonus?

11              MS. MAYERSON:  What did you want to

12         say?

13              MR. DiCARLO:  I would just like to

14         note my objection.  I'm not certain that it

15         actually does say Bonus because it's so

16         tiny.  I actually thought it said Downs.

17         I'm not entirely sure that that says Bonus.

18              MS. MAYERSON:  Look at the next page

19         where it very clearly says Bonus.

20              MR. DiCARLO:  But that's a separate

21         envelope.  I'm saying on this one that's not

22         clear that it says Bonus.

23         Q       So let's look at P008 which also says

24     Bonus.

25              MR. DiCARLO:  Objection to form.

```
 1                          Toure                    117
 2                 MS. MAYERSON:  Which says Bonus, how
 3          about that?
 4                 MR. DiCARLO:  Okay.
 5                 MR. HARTHEIMER:  What did you say be-
 6          fore?
 7                 MS. MAYERSON:  Also says Bonus.
 8                 MR. HARTHEIMER:  Okay.
 9          Q      So do you know whose handwriting that
10     is that says Bonus?
11          A      No.
12                 So I want to know if this is one of
13     my envelopes?  Because what I don't understand
14     is, it says 433 plus 100.  My envelope don't have
15     that.
16          Q      You gave this envelope to me.
17          A      Okay.
18          Q      So if your envelope didn't have this,
19     where did it come from?
20          A      My envelope says commission.  I don't
21     see bonus.  I don't know where the bonus is com-
22     ing from.
23          Q      So this is an envelope that you gave
24     us, so the envelope that you gave us said Bonus.
25          A      For me it's a commission, they're not
```

```
 1                        Toure                    118
 2   giving me any --
 3        Q      I understand you've been told to say
 4   that, but you admit it says Bonus; correct?
 5             MR. DiCARLO:  Please note my objec-
 6        tion to that.
 7        Q      But it is your position that even
 8   though it says Bonus, it's not a bonus.
 9        A      Yes.
10        Q      So take a look at all of the pages
11   from P009 through P025.
12        A      (Witness complying.)
13        Q      So all of those envelopes which you
14   gave us say either Bonus or B; is that correct?
15        A      Yes.
16        Q      And do any of them refer to a commis-
17   sion?
18        A      So I have -- I saw one.
19        Q      No, I'm talking about from P009.
20   There's no mention of commission in any of the
21   pages P009 through P025.
22             MR. DiCARLO:  Note my objection to
23        form.
24        Q      Can you answer yes or no?  You're not
25   allowed to talk to your lawyer, unless there's a
```

```
 1                      Toure                      119
 2   privilege issue.
 3             MR. DiCARLO:  Well, I mean, if
 4        there's --
 5             Did he answer the pending question?
 6             MS. MAYERSON:  No.
 7             MR. DiCARLO:  We can't say anything
 8        until you answer the question.
 9             MS. MAYERSON:  Can you read back the
10        question?
11                      (Record read.)
12        A     There's no commission mentioned.
13        Q     Now, take a look at P022.
14        A     Okay, yeah.
15        Q     Now, here there's a deduction of
16   $331, and it says the balance is $669, which
17   would mean there was a starting point of a thou-
18   sand dollars.  What was the thousand dollars?
19             MR. DiCARLO:  Just note an objection
20        to form.
21        A     They gave me one thousand in 2012.
22        Q     Okay, that's different from your pre-
23   vious testimony, but they were -- this looks like
24   they were paying back a thousand dollars.  Did
25   you have a thousand-dollar loan from the company?
```

```
 1                       Toure              120
 2                  MR. DiCARLO:  Just note an objection.
 3        A       I never borrowed money from the com-
 4   pany.
 5        Q       It says, "Car, Alain, 669."  Did you
 6   owe money for damaging a car?
 7        A       Even if that happened, they deduct
 8   money for me from that.  This is the first time
 9   I'm seeing that.  I didn't know anything about
10   that.
11        Q       Well, this can't be the first time
12   you're seeing it because you gave us this docu-
13   ment.
14                  MR. DiCARLO:  There's no question
15      pending.
16        Q       You understand that you gave us this
17   document, so you have seen it before; correct?
18                  MR. DiCARLO:  Just note my objection.
19        A       Yes.
20        Q       And take a look at P029 through P032.
21        A       (Witness complying.)
22        Q       Now, the inside of these envelopes
23   all have a number and underneath the number it
24   says COM.
25        A       Yes.
```

```
1                        Toure                    121

2        Q      Do you know what COM stands for?

3               MR. DiCARLO:  Objection.  Asked and

4        answered.

5        A      No.

6               MS. MAYERSON:  I want to show you an-

7        other exhibit.  I'm showing you what has

8        been Bates stamped M&H 000137 through 139.

9               (Arbitration agreement was marked

10       Defendant's Exhibit 12 for Identification.)

11       Q      If you would turn to the last page.

12       A      (Witness complying.)

13       Q      Unfortunately, it's not a great copy,

14  but is this your signature here (indicating)?

15       A      Yes.

16       Q      Do you recognize this document?

17       A      No, I don't.

18       Q      This is an arbitration agreement.  Do

19  you remember signing an agreement to arbitrate

20  all your disputes with the lube company?

21       A      No.

22       Q      You don't remember.

23       A      No, I don't.

24       Q      But it is your signature; correct?

25       A      (In English) Let me see this one.
```

```
 1                    Toure                    122
 2  Sorry about that.  Let me see this good.
 3              No, this is not for me.
 4      Q       A minute ago it was.
 5      A       The signature over there, that is not
 6  my signature.
 7      Q       When I first showed it to you you
 8  said it was your signature.
 9      A       I didn't look at it properly, but now
10  when I look at it, that's not my signature.
11  That's not my signature.
12      Q       Until you knew what it was, it was
13  your signature.
14              MR. DiCARLO:  Objection.
15      A       I have my signature on my paper.
16  That's not my signature.
17      Q       And why didn't you know immediately
18  it wasn't your signature?
19              MR. DiCARLO:  Objection.
20      A       So I saw Bakary Toure and I say yes,
21  but that's not my signature, because my signature
22  is B only.  That's not me.
23      Q       So you're stating under oath that
24  this is not your signature.
25              MR. DiCARLO:  Stop, stop.
```

```
 1                      Toure                  123
 2        A       That's not my signature.
 3                MR. DiCARLO:  This line over here
 4        (indicating).  Are you also referring to
 5        this line (indicating)?
 6                THE WITNESS:  (Indicating.)
 7                MR. DiCARLO:  What about this (indi-
 8        cating)?
 9        Q       We're only looking at this -- we're
10   not looking at this line (indicating), we're only
11   looking at this line (indicating).
12                MR. DiCARLO:  This one (indicating),
13        up here.
14        A       Oh, this one (indicating).  Yes, this
15   one for me; bottom, not me.
16        Q       No, that's somebody printing the name
17   that's signed.  So we're looking not at the bot-
18   tom line where somebody printed the name but the
19   line above it, is that your signature?
20        A       I thought you were referring to the
21   bottom line.
22        Q       I understand the confusion and I'm
23   sorry I was not clear but I'm referring to the
24   line where it's typed Undersigned, next to the
25   typed word Undersigned, is that your signature?
```

```
 1                    Toure              124
 2        A     I cannot see very well, so I cannot
 3   say if it's my signature.
 4             MS. MAYERSON:  Can you go get the
 5        original?  Do you know where it is?  We have
 6        the original.  You don't have any idea where
 7        it is?  See if you can find the original, or
 8        print a better copy.
 9             We'll try to find the original.  It's
10        here somewhere.
11             (Whereupon David Hartheimer exited
12        the deposition room.)
13        Q     In the meantime, would you say that
14   you were an honest employee at the lube?
15             MR. DiCARLO:  Objection.
16        A     So Mr. Coulibaly knows me since I
17   start working there 2007 up to now.  He could
18   tell if I'm an honest employee or not.  If I have
19   ever even stolen a penny from the company, he
20   will know.
21        Q     Have you ever lied to your manager?
22        A     So if Mr. Coulibaly is sitting here,
23   he knows me very well, I'm not inflating my ego,
24   so he could tell if I -- every time when he come,
25   I tell him something, he just trusts me, because
```

Case 1:17-cv-00657-DLI-PK  Document 36  Filed 04/19/18  Page 205 of 251 PageID #: 353

1                    Toure                    125

2  he knows I tell the truth.

3           MR. DiCARLO:  I want you to listen to

4       her question.  If she asks you a yes or no

5       question, answer yes or no.

6           MS. MAYERSON:  I would appreciate

7       that too.

8           THE WITNESS:  Okay.

9       Q     So could you answer the question, did

10  you ever lie to your manager?

11      A     I have never lied to my manager.

12      Q     Have you ever damaged any cars in the

13  course of conducting the business?

14      A     Yes.

15      Q     And when you damaged the cars, did

16  you sometimes deny that you had damaged them?

17           MR. DiCARLO:  Just objection to form.

18      A     How can you lie if you are the one

19  dealing with the car and there is a damage?  You

20  cannot lie.

21      Q     So you're stating that you never lied

22  about damaging a car.

23      A     So since I start working there up to

24  the time I left, if I recall, I may have damaged

25  a car twice.  Once I was trying to go backwards

```
 1                    Toure                126
 2   and then I touched something.  That's it.
 3        Q     Did Mr. Coulibaly ever have to go
 4   look at the videotape to see that you had damaged
 5   a car when you said you didn't?
 6              MR. DiCARLO:  Just note my objection.
 7        A     No.
 8        Q     Have you ever been arrested?
 9        A     Yes.
10        Q     How many times?
11              MR. DiCARLO:  Just note my objection.
12        A     Once.
13        Q     What were you arrested for?
14        A     I fought somebody.  It's not like I
15   damaged something, but I fought with somebody.
16        Q     Were you convicted of anything?
17        A     They let me go.  I was not.
18              (Whereupon David Hartheimer re-en-
19        tered the deposition room.)
20        Q     And when did the fight take place?
21        A     I don't remember exactly.  Maybe
22   2011.
23        Q     And where were you when the fight
24   took place?
25        A     I was working with Coulibaly.
```

```
 1                        Toure                    127
 2        Q        And you got into a fight with a cus-
 3   tomer or another worker?
 4        A        A co-worker, not a customer.
 5        Q        And who called the police?
 6        A        I don't know, because somebody men-
 7   tioned that there was a police officer doing oil
 8   change.  That person, police officer, called the
 9   police, the cops.
10        Q        Were you in any other fights at your
11   place of work?
12        A        No.
13        Q        And were police ever called more than
14   that one time?
15        A        No.
16             MS. MAYERSON:  We have a better copy
17        of the arbitration agreement.  Do you want
18        to see the better copy?
19             MR. DiCARLO:  Yes, please.
20             MS. MAYERSON:  (Handing.)
21             MR. DiCARLO:  Thank you.
22             (Arbitration agreement was marked De-
23        fendant's Exhibit 12A for Identification.)
24        Q        Now, looking at the last page of Ex-
25   hibit 12A, next to the typed word Undersigned, is
```

```
 1                      Toure                    128
 2    that your signature?
 3         A       Yes.
 4         Q       Yes, okay.
 5               Now, have you ever discussed the
 6    claims in this lawsuit with anyone other than
 7    your attorney?
 8         A       No, I did not tell anybody.
 9         Q       Your attorney has given us the check
10    stubs that I showed you earlier and the envelopes
11    that I showed you earlier.  Do you have any other
12    employment records in your possession?
13         A       What kind of -- you want paper or --
14         Q       Anything having to do with the time
15    that you were at the lube whatsoever.
16         A       The picture of the envelope here, I
17    have some envelope.
18         Q       Do you have more envelopes than what
19    you gave me?
20         A       No.
21         Q       And then do you have anything else
22    relating to your employment?
23         A       No, I don't have anything else.
24         Q       Now, in our document demand we asked
25    if you were aware of any documents which disprove
```

1                        Toure                    129
2       the allegations in your complaint.  Are you aware
3       of anything like that?
4                   MR. DiCARLO:  Just note my objection
5               to the extent it calls for a legal conclu-
6               sion.
7           A       I'm not aware of that.  I don't know.
8           Q       Do you have any documents showing the
9       commission structure that you testified to?
10                  MR. DiCARLO:  Objection.  Asked and
11              answered.
12          A       I don't have anything except the en-
13      velope I gave, because when I start working
14      there, Mr. Coulibaly told me commission.  That's
15      what I know about commission.
16          Q       Have you ever heard of a Mr. Weinreb.
17          A       No.
18          Q       Now, did there come a time when Dror
19      needed to write a letter for you to help you get
20      Medicare?
21          A       No, Dror did not write a letter for
22      me.  My Medicare, I got it through the doctor,
23      not him.  I asked them to write a letter for me,
24      they did not accept.
25          Q       You asked who to write a letter for

1                          Toure                    130

2    you?

3        A      Mr. Coulibaly.  Everything I do, I

4    tell Mr. Coulibaly.

5        Q      So you asked him to write what kind

6    of letter for you?

7        A      So I was looking for an apartment

8    where I could live, I asked them they could write

9    a letter for me, they said the company does not

10   do that.

11             MS. MAYERSON:  I think we may be

12        done.  Can we just take a five-minute break

13        so I can confer with my partner?

14             MR. DiCARLO:  Sure.

15             MS. MAYERSON:  It is 4:04.

16                   (Short recess.)

17             MS. MAYERSON:  We're back on the rec-

18        ord at 4:08.

19             Mr. Toure, thank you very much for

20        your time.  We don't have any further ques-

21        tions and we really appreciate your time and

22        patience.

23

24             (Continued on next page.)

25

```
 1                        Toure                    131
 2              MR. DiCARLO:  All right, thank you
 3         very much.
 4                   (Time noted: 4:08 p.m.)
 5
                            o0o
 6
                        _____
 7                        Bakary Toure
 8
 9    Sworn and subscribed to
10    before me this_____day
11    of_____, 2017
12
13    _____
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                                                    132
 2                      E X H I B I T S
 3
       DEFENDANT'S          DESCRIPTION          PAGE
 4
          1              Witness list            72
 5
          2              Photocopies of          78
 6                       posters
 7         3             Signature report        83
 8         4             Earnings statement      85
 9         5             2012 earnings           92
10         6             2013 earnings           95
11         7             2014 earnings           96
12         8             2015 earnings           98
13         9             2016 earnings           99
14        10             2017 earnings          103
15        11             Photcopies of          109
                         envelopes
16
          12             Arbitration agree-     121
17                       ment
18        12A            Arbitration agree-     127
                         ment
19
20
21
22
23
24
25
```

```
 1                                                    133

 2          Information Requested to be Supplied

 3    Page/Line

 4    55/6      Copy of paycheck.

 5    94/16     Copies of tax returns.

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                                                          134

2

3                    C E R T I F I C A T E

4

STATE OF NEW YORK   )

5                          ) ss

COUNTY OF NEW YORK )

6

7            I, MICHAEL T. REHFIELD, a Shorthand

8    Reporter and Notary Public within and for the

9    State of New York, do hereby certify:

10            That BAKARY TOURE, the witness whose

11   examination was held on December 28, 2017, as

12   hereinbefore set forth, was duly sworn by me, and

13   that this transcript of such examination is a

14   true record of the testimony given by such wit-

15   ness.

16            I further certify that I am not related

17   to any of the parties to this action by blood or

18   marriage, and that I am in no way interested in

19   the outcome of this matter.

20            IN WITNESS WHEREOF, I have hereunto set my

21   hand this 31st day of December, 2017.

22

23                    Michael T. Rehfield

24

25

**A**

**a.m (4)**
1:13 5:17 61:7
81:11
**ABDUL (1)**
2:6
**ability (4)**
74:18 77:5,9
77:16
**Abko (4)**
1:7 4:21 33:25
35:3
**able (4)**
50:20 67:21
77:20 95:16
**Abou (3)**
2:16 4:2 5:8
**absences (1)**
86:14
**accept (3)**
50:19 51:3
129:24
**accompanied...**
5:10
**Accompanyi...**
5:13
**Accord (3)**
69:2,3,5
**accurate (1)**
48:16
**accurately (1)**
8:6
**acknowledge...**
5:24
**action (2)**
5:2 134:17
**add (10)**
25:18 27:3
37:13 38:4
45:13 47:22
87:15 90:25
94:8,11
**added (3)**
42:16,17 91:17
**addi- (1)**
24:4

**adding (4)**
28:16 37:14
55:25 91:12
**addition (4)**
6:18 22:15
31:8 45:10
**address (2)**
4:13 54:7
**administer (1)**
3:12
**admit (1)**
118:4
**affect (1)**
10:3
**Africa (6)**
38:15 86:15,22
95:10 97:11
99:14
**afternoon (1)**
64:23
**against- (1)**
1:6
**agement (1)**
48:22
**ager (1)**
49:2
**aggressive (1)**
59:20
**ago (10)**
38:14 42:24
75:11,12,14
75:15 100:17
106:13
108:15 122:4
**agree (3)**
50:19,22,24
**agree- (2)**
132:16,18
**agreed (4)**
3:7,15,18
50:14
**agreement (5)**
121:9,18,19
127:17,22
**agrees (2)**
69:18 70:10

**air (3)**
40:22 66:22,25
**Alain (3)**
2:15 5:15
120:5
**alcohol (2)**
9:19,21
**allegations (1)**
129:2
**allege (1)**
92:2
**alleged (2)**
40:5 56:5
**allowed (2)**
17:5 118:25
**Amoco (17)**
20:17 21:16
22:5 23:11
24:13,14 27:7
27:19,22 28:3
28:6,20 29:3
29:16,21 30:2
60:16
**amount (34)**
26:24 31:16
41:25 44:15
44:21 45:8,25
47:21 49:6,15
62:3 90:2,8
90:13 94:2,11
95:17,19
101:7,12,16
101:21,22,24
102:6,10
103:18 104:9
104:12 105:3
105:5,5,16
115:2
**amounts (9)**
41:18 42:9,12
42:23 43:22
43:23 89:21
95:13 101:19
**an- (5)**
8:9,16 65:15
78:2 121:6

**answer (27)**
6:11,13,13,15
6:24 7:11,12
8:2 9:2 21:3
23:25 24:20
25:13 34:13
35:25 37:22
45:2 49:5,12
56:22 63:3
70:17 118:24
119:5,8 125:5
125:9
**answered (11)**
87:23 88:8
89:13 90:11
91:5,10 94:4
95:24 104:17
121:4 129:11
**answering (1)**
89:17
**answers (4)**
4:5 6:5 7:9 9:6
**antifreeze (1)**
40:22
**anybody (4)**
73:6 76:8 88:6
128:8
**anymore (3)**
56:20,20 58:14
**anyway (1)**
80:8
**apart (1)**
99:14
**apartment (2)**
4:16 130:7
**apologize (1)**
96:18
**appreciate (3)**
33:8 125:6
130:21
**approved (1)**
62:13
**approximatel...**
5:17
**arbitrate (1)**
121:19

**arbitration (7)**
62:19 121:9,18
127:17,22
132:16,18
**argue (1)**
52:25
**argument (2)**
38:10 56:9
**arrested (1)**
126:8,13
**arrived (1)**
35:12
**asked (23)**
5:21 44:16
50:23 63:15
73:3 87:22
88:7 89:12
90:10 91:4,9
94:3,16 95:23
104:16
113:20 121:3
128:24
129:10,23,25
130:5,8
**asking (8)**
7:9,23 34:25
44:10 54:8
88:5 105:11
105:12
**asks (1)**
125:4
**Associates (3)**
1:7 4:21 33:25
**at- (2)**
59:23 85:5
**attack (1)**
59:22
**attended (1)**
14:2
**attention (3)**
90:15,21
108:16
**attorney (6)**
2:6 10:24 11:3
54:25 128:7,9
**attorneys (4)**

2:10 3:8,19
3:21
**authori- (1)**
27:9
**authorizatio...**
16:19 19:24
20:2,5 27:12
27:17
**authorized (1)**
3:12
**Avenue (9)**
1:11 2:7,11
4:15 30:4,6
30:20 31:22
32:5
**aware (7)**
10:10 38:6
76:8 91:25
128:25 129:2
129:7

---

**B**

**B (8)**
4:7 113:3
115:8,15,16
118:14
122:22 132:2
**B-a-k-r-u (2)**
114:5,6
**back (24)**
7:19 17:16
38:15 40:2
47:3,20 49:21
63:13 80:25
86:16,21 87:6
88:18 100:2,9
100:14,25
104:7 107:2
109:2,5 119:9
119:24
130:17
**background ...**
11:13 63:16
**backwards (1)**
125:25
**BAKARAY (...**

1:4,15
**Bakary (7)**
4:15,20,20
114:2 122:20
131:7 134:10
**balance (1)**
119:16
**baly (1)**
44:13
**Bambara (9)**
2:16 4:5 5:7,21
5:25 6:14,14
6:18,22
**based (5)**
22:21 24:18
25:20 101:12
101:21
**basis (4)**
7:4 74:13
77:14,23
**Bates (10)**
78:3 82:24
84:22 92:12
94:24 96:13
96:14,15
109:10 121:8
**be- (7)**
5:3 6:21 39:23
58:17 101:4
108:10 117:5
**beats (2)**
113:8,10
**begin- (2)**
53:24 99:11
**beginning (1)**
35:16
**behalf (1)**
7:10
**believe (1)**
87:9
**ber (2)**
7:17 38:15
**better (3)**
124:8 127:16
127:18
**big (10)**

52:11,22 56:9
73:17,24 75:2
75:8,19,21
93:21
**biometric (1)**
79:25
**bit (1)**
11:12
**blade (1)**
41:2
**blame (1)**
102:25
**blank (1)**
53:16
**blood (2)**
80:15 134:17
**bo- (1)**
88:14
**board (1)**
78:17
**body (1)**
113:11
**bonus (34)**
16:23 25:20,23
39:20 45:17
45:18 88:12
88:16,19,25
89:4 115:18
116:2,3,4,5,6
116:7,10,15
116:17,19,22
116:24 117:2
117:7,10,21
117:21,24
118:4,8,8,14
**born (6)**
11:13,16,18,22
14:9,13
**borrowed (2)**
106:20 120:3
**boss (41)**
26:4,5,6,8
32:12 38:19
53:9,12,22
54:20,21 56:6
56:10,19

57:12,14,16
58:10 59:12
59:13,20,21
60:2,3,3,5,5
73:16,17,18
73:24,25 74:4
74:5,9,10,10
75:3,8,20,22
**boss's (1)**
58:8
**bosses (1)**
26:3
**bot- (1)**
123:17
**bottle (1)**
41:10
**bottom (5)**
111:20 112:4,8
123:15,21
**boy (2)**
63:25 113:4
**Boys (1)**
63:24
**brake (2)**
69:16,25
**brakes (1)**
69:23
**break (4)**
8:24,25 9:3
130:12
**Bronx (12)**
15:12 17:17,22
18:9,19,20
29:11,20 30:3
30:6,18 31:21
**Brooklyn (9)**
29:23,24 31:24
32:2,5,19
33:6 34:19,20
**brothers (1)**
15:4
**BT (1)**
71:8
**bulle- (1)**
78:16
**busi- (1)**

20:15
**business (7)**
18:12 34:9
76:12 77:24
96:6,9 125:13
**buy (1)**
107:14

---

**C**

**c (3)**
2:3 134:3,3
**calcu- (2)**
31:11 48:7
**calculate (2)**
40:4 87:14
**calculated (1)**
40:8
**calculating (1)**
26:23
**call (17)**
6:25 29:13
30:4 37:20
50:11 51:14
51:14,19,20
54:16 56:11
56:21 58:14
58:19 63:8
73:12 83:14
**called (14)**
29:23 30:18
32:3 33:25
34:4 51:21
52:4,9 60:18
73:8 88:11
127:5,8,13
**calling (6)**
24:25 34:5
52:20 54:3
59:11,13
**calls (3)**
39:21 115:19
129:5
**car (85)**
15:10,11,12,13
15:16,18,22
15:24,24,25

| | | | |
|---|---|---|---|
| 17:7,15,16,17 | 20:7 22:10,11 | **cer- (1)** | 42:6 45:7,25 | 22:2 28:20,23 |
| 17:22 18:2,11 | 22:15 24:4,8 | 89:22 | 46:5,14,15 | 28:24,25 29:5 |
| 18:13,17 | 24:10 27:5,9 | **cerning (1)** | 47:2,12 53:15 | 29:7,9,17,19 |
| 19:12,17,19 | 27:21,23 | 68:23 | 55:2,3,5,8,22 | 60:14,16 |
| 19:23 20:11 | 28:17 31:2,5 | **cerns (1)** | 55:23 56:2 | **closing (1)** |
| 20:18 23:2,6 | 37:16,18,20 | 69:10 | 78:15,18 79:4 | 61:17 |
| 25:5,11,16 | 43:7,16 45:10 | **certain (4)** | 79:5 84:9,10 | **cloths (1)** |
| 26:20 27:2 | 49:9 55:22,24 | 8:17 26:24 | 84:15,19 85:8 | 15:25 |
| 30:10,12 32:4 | 56:3 84:10,19 | 89:23 116:14 | 86:6 91:21 | **co-worker (1)** |
| 40:9 51:5 | 86:19,24,25 | **certification ...** | 94:10 102:5,5 | 127:4 |
| 55:17 64:25 | 87:17 89:4,9 | 3:10 | 104:18,19 | **code (9)** |
| 65:2,4 67:25 | 91:7,8,11,14 | **certify (2)** | 108:5,7 | 4:17 71:3,3,4,5 |
| 68:2,2,5,5,9 | 91:16,17,21 | 134:9,16 | 111:17 128:9 | 71:6,7,10,11 |
| 68:10,16,16 | 91:22 92:18 | **cess (1)** | **check- (1)** | **COM (5)** |
| 68:17,21,21 | 92:22 93:18 | 10:4 | 45:6 | 112:22,25 |
| 68:23,24 69:8 | 93:19 94:2,7 | **change (28)** | **checked (1)** | 115:6 120:24 |
| 69:10,13,22 | 94:12 95:12 | 17:9,14,20 | 38:16 | 121:2 |
| 70:2,25 71:14 | 95:17,18,21 | 18:23 19:8,10 | **checking (1)** | **com- (18)** |
| 71:21 74:4,8 | 96:5,9 100:3 | 19:13,15 21:9 | 45:6 | 10:11 16:23 |
| 87:25 88:3,10 | 101:4,15,21 | 21:11,13 | **checks (2)** | 25:6 31:14 |
| 107:9,20,21 | 101:22,24 | 30:13 35:6,14 | 54:22 92:17 | 46:19,24 |
| 109:23,25 | 102:4,6,17 | 35:15 41:6 | **children (1)** | 48:15 70:7,14 |
| 110:16,23 | 103:14,25 | 64:9,20,22,24 | 63:20 | 70:23 91:2,22 |
| 111:7 120:5,6 | 104:11,14 | 66:10,13,16 | **citizenship (1)** | 91:25 110:7 |
| 125:19,22,25 | 105:13,21 | 66:18 110:20 | 13:7 | 110:25 111:3 |
| 126:5 | 106:5,9 107:5 | 113:17 | **Civil (1)** | 117:21 120:3 |
| **card (13)** | 107:11,12 | 114:10 127:8 | 5:2 | **Combo (3)** |
| 13:6,8,11,14 | 109:15 | **changed (7)** | **claim (2)** | 70:20,20,20 |
| 20:5 27:10,12 | 112:17 115:2 | 21:18 34:10,14 | 61:13 94:12 | **come (34)** |
| 27:13,14,14 | 115:12 | 34:23 66:22 | **claims (1)** | 11:24 12:3,12 |
| 79:9,17,18 | **cashier (3)** | 66:22 110:8 | 128:6 | 12:17,20 13:4 |
| **cards (1)** | 67:3,6,8 | **changing (2)** | **clarify (2)** | 13:9 14:25 |
| 79:24 | **catch (2)** | 20:22 110:6 | 7:18 44:4 | 15:7 23:2 |
| **care (2)** | 80:25 81:11 | **characterize...** | **clean (1)** | 24:7 44:16 |
| 25:5 102:15 | **cating (1)** | 16:20 | 25:5 | 50:16,18 51:8 |
| **cars (4)** | 123:8 | **charge (2)** | **clear (3)** | 54:5 56:19,20 |
| 26:17 89:8 | **cation (2)** | 3:22 67:4 | 33:10 116:22 | 58:11,13 65:5 |
| 125:12,15 | 85:4 87:6 | **check (56)** | 123:23 | 68:11 75:13 |
| **case (6)** | **cause (3)** | 16:5 19:21,25 | **clearly (1)** | 75:14,25 |
| 4:20 7:11 | 39:24 58:18 | 22:10 24:7 | 116:19 | 76:16 77:8 |
| 34:24 62:8,11 | 108:11 | 26:19 27:18 | **clock (4)** | 80:14,25 87:6 |
| 92:2 | **ceived (1)** | 27:20,23 31:2 | 79:6,8,21,25 | 88:18 117:19 |
| **cash (86)** | 37:20 | 31:5 36:11,20 | **close (6)** | 124:24 |
| 16:5,6,10,14 | **cember (3)** | 36:22,23 | 29:2,4 61:4,6,7 | 129:18 |
| 16:17,20,22 | 97:21 99:22 | 37:13,14 38:4 | 61:11 | **comes (10)** |
| 16:23 19:22 | 100:9 | 38:11 39:2 | **closed (12)** | 15:24 64:20,21 |

| | | | | |
|---|---|---|---|---|
| 67:9,25 68:13 | 119:12 129:9 | **computer (11)** | **copy (10)** | 2:15 5:15 |
| 69:10 74:14 | 129:14,15 | 67:5,11,14,17 | 3:20 53:15 | 20:14 26:13 |
| 76:15,25 | **commissions ...** | 67:22,24 | 55:8 96:16,18 | 29:15 32:2,8 |
| **comfortable ...** | 71:18 | 68:23 69:7,21 | 121:13 124:8 | 33:11 44:13 |
| 8:22 | **companies (5)** | 69:24 70:6 | 127:16,18 | 46:7,10 50:8 |
| **coming (4)** | 34:8,17 35:7 | **con- (2)** | 133:4 | 51:9,11,19,21 |
| 10:18 14:11 | 110:14,15 | 68:22 69:9 | **cor- (3)** | 51:24 52:3,4 |
| 76:2,11 | **company (46)** | **concern (2)** | 17:22 85:10 | 52:7,8,15 |
| **Commercial ...** | 30:7 33:5,21 | 58:21 69:16 | 89:23 | 53:3,11 56:14 |
| 13:5,5 | 34:14,15,18 | **concerned (3)** | **correct (58)** | 56:16 57:2,5 |
| **commis- (15)** | 34:22 35:2,5 | 58:15,17,20 | 5:20 17:18 | 57:5,7,11,17 |
| 22:23 23:11 | 35:8,9,12,19 | **concerning (1)** | 19:19 27:18 | 58:23 59:3,17 |
| 24:2 25:16 | 52:20 53:14 | 68:17 | 28:20 34:11 | 59:23 73:11 |
| 26:6,9 37:17 | 54:17,19 | **concerns (1)** | 37:16 49:23 | 73:20 74:2,9 |
| 40:15 44:17 | 64:16 71:13 | 69:8 | 56:6 58:5 | 74:11,21,23 |
| 48:2 90:8 | 71:20 72:12 | **conclu- (1)** | 60:19 70:12 | 74:24 76:15 |
| 92:1 113:8 | 72:21 73:7,15 | 129:5 | 77:22 78:20 | 76:16,17,22 |
| 116:7 118:16 | 102:12 | **conducted (1)** | 84:19 85:13 | 76:24 77:23 |
| **commission (...** | 106:17,19,21 | 5:3 | 85:22 86:3,6 | 83:20 87:24 |
| 22:20,21,25 | 106:25 | **conducting (1)** | 89:19 90:17 | 102:14 |
| 23:4,9,14,21 | 107:23 110:2 | 125:13 | 90:19,19,20 | 104:25 |
| 23:22 24:7,15 | 110:5,7,7,10 | **confer (1)** | 90:22,24 95:8 | 106:22 |
| 24:23,24,25 | 110:11,17,21 | 130:13 | 95:13,19 | 124:16,22 |
| 25:8,9,19,24 | 110:22,23,24 | **confusion (1)** | 96:25 97:7,10 | 126:3,25 |
| 27:21 31:10 | 111:6 119:25 | 123:22 | 99:24 101:6 | 129:14 130:3 |
| 31:11 36:3,12 | 121:20 | **congratulati...** | 101:14,14,23 | 130:4 |
| 36:21 37:12 | 124:19 130:9 | 64:5 | 102:2 103:8 | **Coulibaly's (3)** |
| 37:14,15,20 | **compare (1)** | **consumed (1)** | 103:14,15 | 57:15 58:25 |
| 38:4,22,23,25 | 43:13 | 9:19 | 105:23,24 | 74:5 |
| 39:18,18,20 | **competence (1)** | **contact (1)** | 106:9 110:5 | **counsel (3)** |
| 39:23,25 40:3 | 9:16 | 72:23 | 110:24 111:7 | 2:8 5:11 8:14 |
| 40:5,7 42:13 | **complain (1)** | **continue (1)** | 112:5 113:24 | **count (2)** |
| 43:18 45:14 | 104:25 | 82:5 | 114:11,12,15 | 9:13 104:19 |
| 45:15 48:6 | **complained (2)** | **Continued (1)** | 115:13,24 | **country (1)** |
| 49:7 65:23 | 46:23 108:8 | 130:24 | 118:4,14 | 62:22 |
| 71:12 84:9,16 | **complaint (3)** | **contract (2)** | 120:17 | **COUNTY (1)** |
| 87:21,25 88:3 | 37:25 38:3 | 49:14,17 | 121:24 | 134:5 |
| 88:11,16,17 | 129:2 | **control (2)** | **correctly (2)** | **course (1)** |
| 88:20,22 89:8 | **complete (1)** | 27:3 46:3 | 10:8 114:7 | 125:13 |
| 89:10,15 | 81:3 | **convicted (1)** | **costs (1)** | **court (9)** |
| 91:12,20,24 | **completely (3)** | 126:16 | 65:7 | 1:2 3:14 4:23 |
| 95:16 102:7 | 9:11 10:8 | **copies (4)** | **Cou- (1)** | 5:4,19 7:18 |
| 103:24 105:3 | 78:10 | 78:10 94:17,19 | 32:5 | 8:5,10 62:14 |
| 112:15 116:4 | **complying (3)** | 133:5 | **Couli- (1)** | **cover (1)** |
| 117:20,25 | 118:12 120:21 | **cops (1)** | 44:12 | 93:11 |
| 118:20 | 121:12 | 127:9 | **Coulibaly (62)** | **credit (1)** |

107:24
**curity (1)**
19:19
**currently (1)**
4:22
**cus- (2)**
65:6 127:2
**customer (22)**
65:2,3,4,9,10
 65:13,22 66:3
 67:4,9,10,25
 68:7,8,9
 69:17,18,19
 70:4 107:9
 127:4
**customers (3)**
65:16,19,20

---

**D**

**D (1)**
5:8
**D-y-e (1)**
30:5
**damage (1)**
125:19
**damaged (6)**
125:12,15,16
 125:24 126:4
 126:15
**damaging (2)**
120:6 125:22
**dant's (1)**
83:3
**David (4)**
2:13 5:13
 124:11
 126:18
**day (17)**
50:19 52:12
 58:19 59:12
 59:14 61:6
 73:19 77:15
 79:10 80:16
 81:22,23
 83:22,24
 103:10

131:10
134:21
**day-to-day (4)**
7:4 74:12
 77:13,23
**days (8)**
80:20 81:8,13
 81:16,17
 97:17 99:6,11
**de- (6)**
78:7 89:10
 97:20 99:21
 100:8 127:22
**dealing (1)**
125:19
**December (10)**
1:13 5:16
 12:19 97:10
 97:10,12
 100:25
 105:19
 134:11,21
**decide (1)**
65:20
**decided (2)**
50:22 102:17
**deduct (4)**
107:23 108:7
 108:10 120:7
**deducted (1)**
107:3
**deducting (1)**
108:4
**deduction (3)**
108:19,20
 119:15
**deductions (2)**
85:22 86:3
**Defen- (1)**
83:2
**Defendant (1)**
1:16
**Defendant's ...**
72:2,3 78:5
 85:3 92:15
 95:3 96:22

98:10 103:6
 109:13
 121:10 132:3
**defendants (5)**
1:8 2:10 4:19
 5:15 7:10
**Deitz (1)**
5:5
**delivery (1)**
51:17
**demand (1)**
128:24
**deny (1)**
125:16
**denying (1)**
37:19
**department (1)**
74:10
**depend (1)**
40:8
**depending (3)**
70:8,20 88:2
**depends (2)**
25:15 92:8
**deposi- (1)**
11:6
**deposit (1)**
108:21
**deposition (12)**
3:10,11 4:18
 5:3 7:7 10:15
 10:24 11:4
 62:10 63:8
 124:12
 126:19
**describe (1)**
64:19
**descrip- (1)**
64:7
**DESCRIPTI...**
132:3
**deserve (1)**
89:9
**deserved (2)**
89:22 90:8
**design (1)**

70:19
**destroy (1)**
57:24
**devices (1)**
79:22
**Diallo (1)**
72:7
**DiCARLO (...**
2:8 5:11 6:23
 21:2 23:24
 24:19 25:3,12
 25:22 26:15
 26:21 31:18
 32:13,16
 34:12 35:24
 36:7 37:11,21
 39:21 40:6
 43:17 44:4,9
 44:25 47:16
 48:23 49:11
 49:20 52:24
 53:16 54:8,12
 55:9 60:12
 63:2 67:18
 70:16 71:15
 71:22 78:9
 80:9,22 86:12
 86:17 87:22
 88:7,13,21
 89:12 90:10
 91:4,9,19
 92:4 94:3,14
 94:21 95:23
 97:2 98:2,16
 98:23 99:2,7
 102:19
 104:16,22
 105:7 106:3
 106:10,15
 108:23 109:4
 112:19
 115:19
 116:13,20,25
 117:4 118:5
 118:22 119:3
 119:7,19

120:2,14,18
 121:3 122:14
 122:19,25
 123:3,7,12
 124:15 125:3
 125:17 126:6
 126:11
 127:19,21
 129:4,10
 130:14 131:2
**dicating (1)**
111:25
**dif- (2)**
16:8 113:15
**differ- (3)**
24:14 36:18
 38:9
**difference (9)**
24:17 26:22
 31:14 37:7
 38:8 41:22
 43:9 88:15,19
**different (22)**
18:2,5,12
 28:14 29:20
 34:8,17 35:7
 36:24 37:3,4
 40:13 41:21
 48:5 67:24
 105:16
 107:20
 110:21
 113:15,21,22
 119:22
**directly (1)**
106:22
**Dis- (1)**
4:23
**discovery (2)**
55:7 94:19
**discrepancy (...**
39:6,8,11
**discretion (2)**
48:21 49:9
**discussed (1)**
128:5

**Discussion (2)**
63:11 108:24
**disprove (1)**
128:25
**dispute (1)**
62:25
**disputes (1)**
121:20
**District (3)**
1:2,2 4:23
**divide (1)**
107:22
**do- (1)**
89:25
**doctor (1)**
129:22
**docu- (2)**
54:22 120:12
**document (9)**
10:16 55:7
71:25 83:4
84:17,22
120:17
121:16
128:24
**documents (4)**
10:14 54:14
128:25 129:8
**doing (18)**
14:14 21:21
26:25 35:15
38:5,12 41:6
41:20 48:6
64:9 72:10
80:17 95:15
96:6,9 107:25
108:13 127:7
**dol- (2)**
28:10 86:22
**dollar (13)**
25:6,7 26:25
27:2 40:23,24
41:2,2,4,11
41:12 89:21
100:4
**dollars (26)**

25:16 26:20
40:10,12,20
40:22,22 41:5
41:11,13 87:9
87:14,16 93:7
93:11 100:3
100:10,20,22
107:10,10,21
113:9 119:18
119:18,24
**Dora (1)**
4:24
**down- (2)**
19:12 30:15
**Downs (1)**
116:16
**downstairs (...**
20:24 21:5,7,8
21:15,17 23:8
30:17,22
64:10,13,14
64:18 66:7,8
66:15,23,24
71:4
**Drew (2)**
50:6,7
**dried (1)**
16:11
**drink (1)**
9:21
**Dror (47)**
13:13 50:9,9
50:11,18
51:10,12,14
51:14,14,23
51:25,25 52:3
52:6,9,12,18
52:23 53:11
56:9,12,14
57:3,4,8
58:19,24
59:11,17,17
59:20,25
73:23 74:3,4
74:5,7,10,12
74:17 76:7

77:13,23
106:17
129:18,21
**drugs (3)**
9:22,24 10:2
**dry (1)**
15:25
**duly (3)**
4:2,7 134:12
**duties (1)**
15:22
**duty (1)**
9:11
**Dye (3)**
30:4,5,6
**Dyre (3)**
30:20 31:22
32:5

—————————
**E**
**e (7)**
2:3,3,12 4:7
132:2 134:3,3
**earlier (4)**
24:19 67:20
128:10,11
**early (5)**
80:7,20,25
82:7,19
**earnings (14)**
85:2 92:14
95:2 96:21
98:9 99:18
103:5 132:8,9
132:10,11,12
132:13,14
**Eastern (2)**
1:2 4:23
**educated (1)**
13:17
**education (2)**
13:16,20
**effect (1)**
3:13
**ego (1)**
124:23

**Eiber (1)**
5:7
**eight (2)**
81:7,23
**either (3)**
100:14 114:15
118:14
**employ- (1)**
14:4
**employee (3)**
70:24 124:14
124:18
**employer (10)**
13:10 54:23
55:4 58:16
60:11 62:16
62:19,23,24
86:11
**employment ...**
49:21,22
128:12,22
**en- (5)**
6:10,11 83:14
111:17
129:12
**ence (3)**
24:15 36:19
38:10
**ended (1)**
49:22
**engine (5)**
40:9,11,12,20
66:2
**English (14)**
4:5 6:13,22
7:14,24 11:23
12:2 33:14
54:21 65:14
65:15 75:11
103:23
121:25
**entire (1)**
40:15
**entirely (1)**
116:17
**entitled (3)**

23:12 45:20
47:23
**entry (1)**
98:23
**enve- (5)**
23:14 83:16
88:16 102:17
112:17
**envelope (47)**
23:13 39:24
83:19,21 84:3
84:6,8,11,14
84:18 85:7
87:18 89:4,9
91:15 92:22
94:10 95:22
101:25 102:6
102:8 104:15
105:21
109:16,23,24
111:9,14,22
112:11,12
113:15,18
114:17,19,23
115:2,3
116:21
117:14,16,18
117:20,23,24
128:16,17
**envelopes (11)**
103:25 109:12
109:17,19
111:7 117:13
118:13
120:22
128:10,18
132:15
**equals (3)**
112:16 114:18
115:12
**er (2)**
8:6 18:10
**ers (2)**
76:20,23
**ESQ (4)**
2:6,8,12,13

eter (1)
5:7
evaluate (2)
65:4 70:3
eventually (1)
12:16
every- (1)
113:10
everybody (4)
50:19 62:3
113:8,12
ex- (3)
49:2 109:8
127:24
exact (4)
22:3 38:23,25
45:15
exactly (10)
25:14 28:22
38:15 44:22
48:7 60:5
82:10 90:13
108:21
126:21
examination ...
1:15 3:20 4:11
134:11,13
examined (1)
4:9
example (1)
39:12
Exceptionall...
82:12
exclusively (2)
24:10 30:9
exhibit (20)
72:2,4 78:3,8
82:23,25 83:3
85:3 92:15
95:3 96:20,22
98:10,21
99:19 103:6
109:13 121:7
121:10
127:23
Exhibits (1)

92:13
exited (1)
124:11
expected (1)
8:16
explain (2)
16:21 24:3
extend (1)
98:18
extends (1)
99:2
extent (1)
129:5
extra (3)
43:16 81:3
116:9

_____
F
F (1)
134:3
fair (1)
32:15
fairly (2)
101:3 103:13
family (1)
63:16
February (5)
58:6 59:9
96:24 97:6,11
felt (3)
25:11 47:22
90:17
fendant's (2)
78:8 127:23
ference (1)
16:9
ferent (1)
113:16
fifty (1)
107:22
fifty/two (1)
107:22
fight (5)
52:11,23
126:20,23
127:2

fights (1)
127:10
figures (2)
101:4 103:14
filing (2)
3:9 16:19
filter (3)
40:22 66:22
67:2
find (18)
41:19 42:6
43:10,22,25
46:18 47:11
47:17 48:9
53:4 58:18
61:22 89:14
90:4 104:24
105:8 124:7,9
finding (1)
45:5
finish (3)
7:23,25 106:4
finished (3)
18:15 19:12
67:4
fire (14)
50:9 53:8,9,22
56:6 57:20
58:20 74:18
76:5,7 77:9
77:12,20,21
fired (20)
18:25 50:4,5
51:5,10,23,25
52:3,5,10,13
52:17,18,19
53:2 74:20
76:7,9 77:18
103:11
firm (1)
5:12
first (24)
14:5,13,15
15:9,10 29:25
36:17,24 37:2
37:10 56:16

57:11,14 58:4
59:10 60:10
60:13,13
62:20 63:7
98:13 120:8
120:11 122:7
first-time (1)
68:8
five (12)
25:6,16 26:20
27:2 28:10
62:5,7 80:24
81:10 99:6
107:10,21
five-minute (1)
130:12
fix (3)
18:5 49:3
51:18
flect (1)
26:13
Floor (1)
2:11
flush (5)
40:9,12,12,20
66:2
follow (1)
29:13
followed (2)
55:10 94:22
follows (1)
4:10
fond (1)
46:4
food (3)
15:6 107:15
108:12
force (1)
3:13
fore (2)
5:4 117:6
form (42)
3:16 6:24 21:3
23:24 25:3,12
25:22 26:21
31:18 34:12

36:7 37:11,21
40:6 43:17
44:25 47:16
48:23 49:11
49:20 52:24
60:12 63:2
67:18 70:16
71:15,22 80:9
80:22 88:21
91:19 92:4
98:2 102:19
104:22 105:7
106:10
112:20
116:25
118:23
119:20
125:17
formal (1)
62:25
former (1)
58:16
forth (1)
134:12
fought (2)
126:14,15
found (5)
38:11,16 43:21
46:13 53:6
four (4)
28:10 87:12
93:17 107:10
France (1)
15:5
free (1)
43:19
French (1)
6:19
Friday (3)
81:9,20,24
friend (2)
54:4 61:23
front (1)
111:10
fuck (1)
59:19

full (1)
80:4
furnished (1)
3:21
further (4)
3:15,18 130:20
  134:16
_____
          G
gas (3)
20:18 30:10
  55:18
gen- (1)
53:6
generally (3)
20:23 23:7
  76:25
get- (1)
42:19
getting (25)
19:16,17,18,25
  22:11 27:8,20
  28:10 41:23
  42:8,19 44:2
  45:20 46:13
  46:19,21
  55:23 88:3,22
  89:14 90:4
  92:8 94:9
  105:3 108:11
gift (1)
89:2
girls (2)
63:24,25
give (36)
16:25 22:19
  36:11 49:14
  54:7 62:10
  68:22 83:15
  86:15,18,20
  86:22 87:7
  88:25 92:9,10
  95:17 100:5,9
  100:18,20
  102:9,10
  105:2 106:23

106:24 107:2
107:5,9,21
108:20 109:8
109:9 113:9
113:18 116:9
given (3)
109:15 128:9
  134:14
gives (1)
83:20
giving (8)
22:17 36:20
  37:17 38:22
  43:16,19,20
  118:2
glish (1)
6:11
go (52)
12:11 13:22
  17:16,20
  18:23 19:8,9
  19:12 20:12
  29:9,13 30:18
  32:5 46:13
  47:12 48:15
  49:2,21 51:4
  51:6,13 52:14
  52:16,19
  56:20 58:13
  64:22 69:19
  75:25 80:21
  80:23,24
  81:10,14,24
  81:25 82:13
  82:15,17
  86:15,19 87:6
  87:13 95:9
  99:13 106:21
  107:5 108:18
  124:4 125:25
  126:3,17
go- (1)
59:5
goes (4)
29:12 65:3
  67:7 98:25

going (34)
44:2 45:13
  47:19 50:15
  50:20 51:12
  51:13,19
  57:19,24 59:6
  59:18 61:6,7
  61:11 64:25
  70:9,9,11,21
  71:25 81:12
  82:2,22 84:21
  92:11 94:23
  96:12,19 98:5
  99:16 103:3
  109:8,9
good (9)
32:11,14 64:22
  64:22 65:15
  76:25 77:2
  86:11 122:2
gotten (1)
97:20
great (1)
121:13
green (6)
13:6,8,10,14
  27:14,14
greet (1)
67:10
grocery (1)
14:21
gross (2)
85:20 86:3
guard (5)
18:6,8,14 19:5
  19:19
guy (1)
53:13
guys (1)
50:19
_____
          H
H (1)
132:2
Hagay (7)
1:7 4:22 73:17

73:22,24 75:2
  76:9
half (4)
111:20 112:2,4
  112:8
hand (3)
83:16,19
  134:21
handicap (1)
10:7
Handing (2)
53:20 127:20
handling (1)
111:17
handwrit- (1)
114:14
handwriting ...
111:13,15,16
  111:21 112:7
  113:15,22
  117:9
handwritten ...
111:10
hanging (1)
78:14
hap- (1)
64:19
happened (8)
20:3 38:8
  46:24 49:7
  57:18 80:10
  90:12 120:7
happening (1)
47:15
happy (2)
6:7 107:9
hard (1)
8:5
Hartheimer (...
2:10,13 5:12
  5:14 96:15
  98:7,21,25
  117:5,8
  124:11
  126:18
HASSAN (1)

2:6
head (2)
8:8,11
hear (1)
89:3
heard (2)
77:19 129:16
hearing (2)
68:25 69:2
held (2)
4:19 134:11
hello (1)
64:22
help (3)
13:14 67:17
  129:19
helping (2)
51:17 67:19
hereinbefore ...
134:12
hereto (1)
3:20
hereunto (1)
134:20
Hershowitz (1)
13:13
hibit (2)
109:9 127:25
higher (1)
37:5
Hillside (1)
2:7
hire (5)
74:22 77:5,12
  77:16,21
hired (4)
22:9 74:23,24
  77:7
holiday (1)
97:15
holidays (1)
97:14
Hollywood (3)
109:23,25
  110:16
home (11)

51:6,18,20
52:14,16,19
52:23 82:13
82:15,17,19
**Honda (5)**
69:2,3,5,5,6
**honest (2)**
124:14,18
**honestly (1)**
9:11
**Honorable (2)**
4:24,25
**hospi- (2)**
80:23 81:14
**hospital (6)**
80:16,21 81:10
81:12,25 82:3
**hour (14)**
16:2,10,12,22
20:9 22:12,14
24:22 28:9,11
80:18 81:3
82:8,18
**hourly (11)**
24:5,6 27:20
27:23 28:13
28:14 31:6,9
31:14 36:19
49:15
**hours (47)**
9:20,23 22:16
28:5,7,13,15
36:6,8,9,13
36:14,15,16
36:16,17,24
36:25 37:3,3
37:5,10,10
39:9 51:2,2
51:16,16
61:18 78:20
78:22,24 79:3
79:12,16 80:4
80:8,11 81:2
81:3,6 82:11
82:14,16,20
85:13,18

**hundred (1)**
113:9

**I**

**ID (1)**
114:8
**idea (4)**
43:8 95:12
104:20 124:6
**Identifi- (1)**
85:3
**Identificatio...**
72:4 78:8 83:3
92:15 95:3
96:22 98:10
99:19 103:6
109:13
121:10
127:23
**III (1)**
2:8
**illegible (1)**
78:11
**immediate (2)**
73:16,18
**immediately ...**
122:17
**impor- (2)**
7:7 46:8
**important (4)**
6:3 7:22 8:9
9:17
**in- (4)**
7:25 49:25
102:5 111:24
**incorrect (1)**
90:22
**indi- (1)**
123:7
**Indian (1)**
53:13
**indicated (1)**
78:19
**indicating (14)**
22:9 26:8
44:14 83:7

111:24
114:12
121:14 123:4
123:5,6,10,11
123:12,14
**inflating (1)**
124:23
**informa- (1)**
102:20
**information (...**
67:14,17 68:11
68:13,17,18
68:22 69:6,10
69:14 71:21
93:22 102:22
133:2
**ing (9)**
45:7 55:14
57:25 59:6
77:2 90:2
108:4 114:15
117:22
**initially (1)**
13:17
**input (1)**
70:11
**inside (14)**
25:6 59:19
64:25 66:20
69:19 83:14
94:10 111:22
111:23,24
112:4 114:17
114:23
120:22
**instructions (...**
65:18
**interact (2)**
76:19,22
**interacts (1)**
76:24
**interested (1)**
134:18
**interpre- (1)**
5:6
**interpret (1)**

6:8
**interpreted (1)**
6:12
**interpreter (...**
2:16 4:2 5:18
5:21,25 6:7
6:15 7:25
20:4 73:9
**interpreter's ...**
5:8
**investigate (1)**
43:25
**involve (1)**
41:7
**involved (2)**
8:18 62:25
**Irizarry (1)**
4:25
**issue (1)**
119:2
**item (4)**
40:17 48:8
108:19,19
**itemized (2)**
101:13,21
**items (1)**
41:25

**J**

**James (2)**
2:8 5:11
**January (18)**
33:20 49:22
50:10,11
55:14 57:22
58:4,6 86:21
93:2 95:6
98:12,25 99:2
103:8 104:4
105:13,19
**Jessica (1)**
111:18
**job (41)**
14:6,13,15
15:9,10,22
16:7 17:8

20:21 21:12
23:6 30:8,13
35:13 46:2
48:5 53:5,6,7
53:22,25
55:12,16
57:25 59:7
64:7 69:18,20
70:9,10,11,21
72:10 73:25
75:24 77:2
88:2,2,3
89:25 90:3
**join (2)**
29:23 32:3
**Judge (1)**
3:14

**K**

**K (2)**
2:6 4:7
**keep (8)**
17:5 26:16
47:5,7,8
68:25 102:3
107:13
**keeps (1)**
57:19
**kept (4)**
79:12 89:7,18
107:17
**Keren (2)**
1:7 4:22
**kind (19)**
13:4 14:19
18:12 21:11
23:3 26:25
30:7 40:13
41:8,21 44:20
58:17 70:19
88:2,11 89:23
104:9 128:13
130:5
**knew (1)**
122:12
**know (124)**

4:16 11:21,21
15:18,21 16:8
22:5,7,8,22
23:16,18 24:2
24:3 25:14,23
25:24,25
26:22,23
28:22 31:13
33:4,5 36:11
36:18 37:7
38:8 39:23
40:4,13 41:23
44:24 45:3,4
47:15 52:6
54:18,18
58:21 59:5,25
60:4 61:19,23
62:14,15,20
67:3 69:21
72:7,8,16,18
74:5,6,11,11
74:19 75:5,6
76:6,10,14
78:15,18 83:5
88:14,14,15
88:16,19 90:2
94:11 97:22
97:22,23
101:9,18,23
101:25
102:12,13,24
104:10,18
105:6,13,15
105:24
108:21
110:11,14,20
111:13,15,16
111:18 112:7
112:9,23,24
112:25 113:2
113:4,5,18
114:16 115:6
115:7,9,16,17
117:9,12,21
120:9 121:2
122:17 124:5

124:20 127:6
129:7,15
**knows (4)**
50:8 124:16,23
125:2
**Kuo (1)**
4:25

———————

**L**

**L (1)**
3:4
**language (3)**
7:2,3 65:12
**languages (1)**
6:21
**lars (2)**
28:11 86:23
**lated (2)**
31:12 48:8
**law- (1)**
60:7
**lawsuit (5)**
35:23 61:24
72:25 73:4
128:6
**lawyer (5)**
61:20,21,22,23
118:25
**learn (5)**
17:14 19:8,9
19:13 42:24
**learned (3)**
43:3 44:10
45:19
**learner (1)**
17:11
**learning (1)**
19:15
**leave (10)**
12:16 18:21,24
31:20 49:25
50:3 53:16
80:7,20 82:7
**leaves (1)**
86:14
**left (22)**

11:25 12:3,5
12:10,17
14:22 17:7,17
17:20 18:22
19:2 20:11
28:24 31:23
32:4 34:3
72:12,21,22
73:7,8 125:24
**legal (1)**
129:5
**let's (10)**
7:6 11:12
13:16 14:4
17:16 49:21
53:24 64:6
87:17 116:23
**let- (1)**
13:13
**letter (7)**
13:10 129:19
129:21,23,25
130:6,9
**libaly (1)**
32:6
**license (5)**
68:5,11,15,21
69:13
**lie (3)**
125:10,18,20
**lied (3)**
124:21 125:11
125:21
**lieve (1)**
101:5
**life (2)**
57:25 59:6
**line (12)**
66:25 83:6,8
93:6 123:3,5
123:10,11,18
123:19,21,24
**list (3)**
72:3,5 132:4
**listen (1)**
125:3

**little (4)**
7:6 11:12
13:23,23
**live (6)**
11:15,17,20
12:14,25
130:8
**lived (3)**
12:7,23 15:3
**living (1)**
15:4
**loan (2)**
106:17 119:25
**located (1)**
54:9
**location (4)**
18:4,5 19:4
20:14
**long (17)**
7:16 11:15,20
11:21 12:14
18:18 21:24
21:25 29:12
30:23 32:9
33:19 46:18
63:18 97:23
99:8,13
**look (29)**
14:25 39:4
53:18 69:16
70:2 75:25
87:11 93:6,18
101:4,7,9,11
103:14
108:19
109:22
111:12,20
113:13
115:11,23
116:18,23
118:10
119:13
120:20 122:9
122:10 126:4
**looked (1)**
104:7

**looking (8)**
58:11 76:11
123:9,10,11
123:17
127:24 130:7
**looks (1)**
119:23
**lope (5)**
23:15 83:17
88:17 102:18
112:18
**Lopez (1)**
72:14
**lose (1)**
81:12
**losing (6)**
43:24 45:4,5
46:22 51:3
104:24
**lot (2)**
8:9 46:22
**loud (1)**
85:14
**Louis (1)**
85:14
**lube (46)**
1:7 4:21 20:19
20:20,21,23
23:6 30:9,10
30:11,12
32:20,22,23
32:24 33:2,3
33:4 34:5,6,7
35:4 55:17,19
60:18,20,21
60:24 64:7
72:6 74:8,10
74:13,18
77:13 86:8,11
110:5,16,24
110:25 111:3
111:6 121:20
124:14
128:15
**Luncheon (1)**
108:25

**M**

**M&H (1)**
121:8
**making (1)**
45:8
**Mali (13)**
11:14,15,16,25
12:4,5,8,10
13:18,21
14:14,17,22
**Malick (2)**
72:7 75:9
**man- (2)**
48:21,25
**management...**
49:10
**manager (10)**
32:3 50:17
51:7 53:8
74:8,17 79:15
124:21
125:10,11
**marathon (1)**
8:23
**March (2)**
96:25 97:2
**mark (8)**
68:16,20,24
69:12 71:25
78:5 82:25
84:24
**marked (18)**
72:3 78:7 83:2
85:3 92:14
95:2 96:20,21
98:9 99:18
103:5 109:10
109:12,22
111:12
113:13 121:9
127:22
**marriage (1)**
134:18
**married (4)**
13:12,12 63:16
63:18

**match (1)**
89:10
**matter (1)**
134:19
**maximum (1)**
104:8
**Mayer- (1)**
5:11
**Mayerson (45)**
2:10,12 4:12
4:18 5:12
14:12 26:12
44:7 53:18
55:6 63:10,13
68:25 71:24
78:2 82:22
84:21 92:11
94:16,23
96:12,17 97:3
98:5,8,20
99:4,16 103:3
109:2,6
116:11,18
117:2,7 119:6
119:9 121:6
124:4 125:6
127:16,20
130:11,15,17
**mean (14)**
9:17 35:10
68:5 86:25
88:12 91:11
96:11 102:11
112:17
113:10
114:18 116:3
119:3,17
**meaning (1)**
87:21
**means (5)**
23:23 88:6
113:4 115:6,9
**Medicare (2)**
129:20,22
**member (1)**
41:16

**memory (3)**
10:3 53:19
54:15
**men- (1)**
127:6
**ment (4)**
14:5 120:13
132:17,18
**mental (1)**
10:6
**mention (3)**
24:22 93:24
118:20
**mentioned (6)**
42:13 48:4
75:9 87:24
109:14
119:12
**ments (1)**
54:23
**Michael (4)**
4:3 5:4 134:7
134:23
**mine (1)**
54:4
**minute (3)**
100:17 109:7
122:4
**miserable (1)**
59:6
**missing (2)**
99:5,6
**mission (5)**
16:24 25:7
31:15 91:3,23
**mistake (2)**
114:8,10
**Mm-hmm (5)**
6:9 20:8 85:12
95:8 98:8
**Monday (6)**
81:9,9,18,24
81:24 82:7
**money (69)**
15:6 22:18,19
23:3 25:18,19

26:25 31:16
38:17,18,20
38:22 39:10
41:9 43:13,19
43:24 44:21
45:4,5,13
46:2,22 47:18
47:20,22 48:7
48:12,14,16
48:19 49:6
51:3 61:24
62:4 84:16,16
86:15,18,19
86:24 87:2,7
87:8,15,16
88:11 90:2,4
90:5,13 93:23
94:9 101:24
104:24 105:3
106:18,20,21
106:24 107:2
107:3,5
108:11,21
116:9 120:3,6
120:8
**month (7)**
28:22 30:23,24
57:22 99:21
100:13,14
**months (6)**
12:15 15:3
47:14 97:5
100:11
106:13
**morn- (1)**
76:25
**morning (5)**
19:7 50:16
64:22 77:2
81:7
**move (1)**
64:25

**N**

**n (2)**
2:3 3:4

**name (33)**
4:13 5:8 15:13
15:21 18:16
20:15 22:3
26:4 32:18,21
32:23 34:15
34:23 35:6,10
54:17,18,19
54:20,21,23
55:4 69:5
110:6,8,20
111:10
113:16,21,25
114:2 123:16
123:18
**names (2)**
33:9 46:8
**need (6)**
8:23,24 9:5
66:2 77:3
78:12
**needed (5)**
13:9 66:21
80:15 109:7
129:19
**needs (2)**
65:5,5
**neither (2)**
105:18 114:6
**ness (2)**
20:16 134:15
**nesses (1)**
73:4
**net (1)**
85:24
**never (23)**
11:8,11 14:2
21:21 34:16
35:2 46:14
47:3,21 63:7
63:15 64:13
80:10 89:15
89:16 90:5
100:21
106:20,24
110:4 120:3

125:11,21
**new (34)**
1:2,12,12,17
2:7,11,11 4:4
4:9,16,16,24
12:22,23
18:13,17 53:7
53:8,12,22,25
55:11 56:10
56:13,15
57:25,25 59:7
68:7 109:23
109:25 134:4
134:5,9
**nice (1)**
64:5
**Niger (7)**
12:12,14,16,17
14:22,23 15:3
**night (1)**
19:7
**nine (4)**
12:15 15:3
40:21,22
**ning (2)**
53:25 99:12
**nod (1)**
85:14
**nodding (2)**
8:8,11
**normal (1)**
81:5
**normally (6)**
7:3 48:24
50:21 81:14
104:11,14
**Notary (4)**
1:17 4:3,8
134:8
**note (18)**
6:23 21:2
24:19 35:24
78:9 86:17
94:14 98:17
112:19
116:14 118:5

118:22
119:19 120:2
120:18 126:6
126:11 129:4
**noted (4)**
8:16 55:9
94:21 131:4
**notice (2)**
1:18 4:19
**number (9)**
26:16 39:8
68:2,4 69:13
114:22,25
120:23,23
**numbers (1)**
47:23
**nus (1)**
88:15

―――――――――
**O**
―――――――――
**O (2)**
3:4 4:7
**o0o (3)**
2:20 4:6 131:5
**oath (3)**
3:13 9:8
122:23
**objec- (2)**
24:19 118:5
**object (1)**
8:14
**objection (74)**
6:23 8:15,18
21:2 23:24
25:3,12,22
26:21 31:18
32:13,16
34:12 35:24
36:7 37:11,21
39:21 40:6
43:17 44:25
47:16 48:23
49:11,20
52:24 60:12
63:2 67:18
70:16 71:15

71:22 80:9,22
86:12,17
87:22 88:7,13
88:21 89:12
90:10 91:4,9
91:19 92:4
94:3,14 95:23
98:2,17
102:19
104:16,22
105:7 106:10
106:15
112:19
115:19
116:14,25
118:22
119:19 120:2
120:18 121:3
122:14,19
124:15
125:17 126:6
126:11 129:4
129:10
**objections (1)**
3:16
**occasions (1)**
57:10
**October (1)**
92:25
**offend (1)**
9:17
**office (7)**
49:2 59:22
65:3 69:19
102:23,24
111:17
**officer (3)**
3:12 127:7,8
**official (1)**
5:6
**oh (5)**
44:12 64:5
96:13 99:4
123:14
**oil (36)**
17:9,14,20

18:23 19:8,9
19:13,15
20:22 21:18
30:13 35:14
35:15 41:4,6
41:7,8,8,10
41:11,12,12
51:17 64:9,20
64:21,24 66:9
66:10,10,13
66:15,16,19
66:20 127:7
**okay (37)**
6:6 7:13,20 8:3
8:7,13,19
27:11 33:15
35:10,11 40:2
44:12,12 51:4
53:24 54:11
64:19,25 65:8
66:3 87:19
92:20 96:12
97:24 99:16
103:2 109:6
111:20
114:13 117:4
117:8,17
119:14,22
125:8 128:4
**old (3)**
14:5,7 64:2
**once (14)**
56:7 57:3,5,8
67:6,24 68:9
70:21 76:12
100:4,16,21
125:25
126:12
**ond (1)**
19:4
**one- (1)**
87:3
**one-time (1)**
105:17
**one-week (1)**
87:14

**ones (1)**
15:5
**open (1)**
66:15
**opened (1)**
112:12
**opens (1)**
66:25
**operate (1)**
23:18
**operation (1)**
20:19
**ord (3)**
63:14 109:3
130:18
**original (4)**
124:5,6,7,9
**outcome (1)**
134:19
**outside (6)**
76:18 111:14
111:22,24
112:3 113:14
**over- (1)**
28:17
**overtime (13)**
16:7 28:2 36:2
36:4 37:9,25
38:3 50:12,21
61:14,17
85:16,18
**owe (2)**
90:13 120:6
**own- (1)**
18:9
**owned (2)**
15:18 22:7
**owner (4)**
18:4 19:6,11
22:8
**owns (1)**
110:11

―――――――――
**P**
―――――――――
**p (3)**
2:3,3 3:4

**p.m (4)**
61:8 81:7,11
131:4
**P001 (4)**
109:11,23
111:13
113:16
**P002 (3)**
113:13 114:15
115:5
**P006 (1)**
115:11
**P007 (1)**
115:23
**P008 (1)**
116:23
**P009 (3)**
118:11,19,21
**P022 (1)**
119:13
**P025 (2)**
118:11,21
**P029 (1)**
120:20
**P032 (1)**
120:20
**P038 (1)**
109:11
**page (13)**
93:7 109:22
111:12,21
112:3,4,8
113:13
116:18
121:11
127:24
130:24 132:3
**Page/Line (1)**
133:3
**pages (3)**
98:7 118:10,21
**paid (59)**
16:2,12 19:14
19:16,17,18
19:21,25 20:6
20:9 22:10,11

22:12 24:10
25:2 27:8,17
28:10,12 31:2
36:6,9,13,15
36:16,17,23
37:9,25 40:17
41:23 42:2,22
43:4,13 44:2
46:13 47:9
48:3 55:22,23
78:19,24 80:5
80:8,19 82:16
82:20 88:3
89:14 90:2,4
90:5,6 93:14
101:19
104:21
106:23
114:21
**pany (4)**
110:8 111:2,4
120:4
**paper (14)**
39:3 40:11
42:4,5 43:11
45:7 47:4,6
47:13 67:24
93:21 106:12
122:15
128:13
**part (9)**
21:14 23:20
25:7 61:15,16
61:19 69:25
103:17
111:23
**parties (3)**
3:9,19 134:17
**partner (2)**
5:13 130:13
**patience (1)**
130:22
**pause (1)**
6:14
**pay (76)**
15:6 16:7,12

17:2 23:17,20
24:5,7,15,17
24:22 25:6,16
27:21,23 28:2
28:8 31:14
36:3,14,20
37:9 38:10,17
38:18,20 39:5
39:7,13,17
40:10 44:2
45:14 47:11
47:25 50:11
50:12,13,20
50:25 51:2
61:13 80:12
80:12,18
82:17 83:12
84:13 85:6,10
85:16,20,24
86:3 87:3,10
89:15,16 90:7
90:13,15,21
91:13,18 93:8
93:22 101:11
101:16
102:15
107:24
108:10,16
109:17,20,24
116:8
**paycheck (13)**
45:11 84:15
92:22 97:20
105:20 106:2
107:4 108:19
108:20,22
109:15 111:7
133:4
**paying (17)**
17:10,11,13
25:4,11 26:20
31:4 36:2,4
36:19 37:2,12
38:3,7 42:7
46:2 119:24
**payment (2)**

16:22 105:17
**payments (2)**
22:16 106:9
**Peggy (1)**
4:25
**pending (4)**
4:22 9:2 119:5
120:15
**penny (1)**
124:19
**pens (1)**
64:20
**peo- (2)**
66:6 77:5
**people (14)**
8:4 20:24
50:14 56:5
62:4,5 65:7,8
66:23 72:5
76:5 77:10,17
77:21
**per- (1)**
23:7
**period (3)**
93:10 97:25
98:19
**person (17)**
15:20 23:5,8
32:15 64:23
66:8,24 67:2
70:10 71:3
73:24 102:13
107:21
111:16,16
113:7 127:8
**Personal (1)**
85:2
**personally (1)**
107:3
**persons (2)**
23:7 107:20
**phone (8)**
51:14,15,22
52:4,7,21
54:3 73:12
**Photcopies (1)**

132:15
**Photocopies ...**
109:12 132:5
**Photocopy (1)**
78:7
**physical (1)**
10:7
**physically (1)**
66:18
**pick (3)**
51:15 52:20
73:11
**picking (2)**
51:22 54:3
**picture (1)**
128:16
**piece (5)**
39:2 40:11
42:4 43:11
45:7
**pieces (2)**
47:4,5
**place (29)**
18:6,7 22:2,4,5
24:11 29:19
29:22,25
32:18 54:5,6
56:13,15
60:14,15 61:4
61:8 64:12
72:22 73:8,25
74:15 75:8,25
110:19
126:20,24
127:11
**plain (2)**
48:16 49:3
**Plain- (1)**
92:12
**plained (2)**
46:20,25
**plaint (1)**
92:2
**plaintiff (4)**
1:5,16 2:6 4:20
**plaintiff's (6)**

5:6 78:4
82:24 84:23
99:19 109:10
**planning (1)**
61:4
**plate (5)**
68:5,11,15,22
69:13
**ple (2)**
66:7 77:6
**please (7)**
4:14 7:12,17
40:19 46:8
118:5 127:19
**pletely (1)**
10:12
**PLLC (1)**
2:10
**plus (4)**
112:16 114:18
115:12
117:14
**point (1)**
119:17
**pointed (3)**
26:13 112:2,3
**pointing (1)**
83:7
**police (8)**
56:11,21 58:14
127:5,7,8,9
127:13
**pool (1)**
107:17
**Portuguese (1)**
15:20
**posed (1)**
40:17
**position (2)**
107:6 118:7
**possession (1)**
128:12
**possible (2)**
39:19 97:16
**posters (3)**
78:7,13 132:6

**power (2)**
77:19,20
**pre- (1)**
119:22
**preparation (...**
10:15,24
**prescrip- (1)**
9:22
**prescription ...**
9:25
**present (2)**
2:14 5:22
**pretty (1)**
32:11
**prevent (3)**
10:7,11 59:23
**previous (1)**
62:23
**previously (2)**
17:21 27:16
**price (1)**
70:8
**print (1)**
124:8
**print- (1)**
101:20
**printed (1)**
123:18
**printing (1)**
123:16
**printout (2)**
95:15 105:2
**prior (3)**
6:12 11:4
98:17
**privilege (1)**
119:2
**privileges (1)**
8:17
**pro- (1)**
10:3
**problem (16)**
38:7 45:23,24
46:4 47:12
48:25 49:3
65:25 69:17

69:22 70:3,6
71:14 79:23
102:14
106:21
**problems (1)**
46:11
**process (2)**
7:7 47:24
**produced (1)**
94:18
**properly (4)**
38:12 41:23
42:7 122:9
**provided (2)**
5:7 85:6
**providing (1)**
15:5
**Public (4)**
1:17 4:3,8
134:8
**pump (1)**
41:9
**punch (6)**
79:6,8,9,24
80:3,11
**punched (2)**
79:17,18
**purpose (2)**
57:15 71:9
**purposes (1)**
102:4
**pursuant (1)**
1:18
**put (30)**
23:19,20 24:14
24:24 40:12
66:16,20 67:7
67:11,17,22
67:25 68:10
68:15,20,23
69:6,12 70:5
70:7,23,24
71:3,4,4,11
84:16 101:24
102:17
112:25

**puter (3)**
70:8,15,24
**putting (4)**
23:14 24:21
67:13 71:9

———————
**Q**
———————
**Queens (1)**
2:7
**ques- (3)**
9:15,17 130:20
**question (26)**
6:10 7:12,13
7:15,16,18,19
7:23 8:2,17
8:25 9:2
28:12 44:5,6
49:5 56:22
89:18 115:22
119:5,8,10
120:14 125:4
125:5,9
**questions (6)**
4:4 6:4 7:8,10
8:15 65:16
**quite (1)**
58:7

———————
**R**
———————
**r (4)**
2:3 4:7,7 134:3
**rain (1)**
82:12
**raise (1)**
50:11
**ran (1)**
77:24
**rate (8)**
28:13,14 36:23
36:24 37:3,4
37:6 50:13
**re- (3)**
26:12 37:19
41:15
**re-en- (1)**
126:18

**reaction (2)**
58:8,10
**read (8)**
7:19 13:24
67:21 70:15
78:12 109:4
119:9,11
**reading (1)**
67:23
**ready (1)**
51:3
**really (4)**
26:20 33:8
92:6 130:21
**reason (5)**
8:24 43:25
74:20 97:19
105:8
**rec- (3)**
63:13 109:2
130:17
**recall (6)**
78:16 94:5
103:16 105:4
108:14
125:24
**receive (7)**
22:15,23 37:15
41:18 83:12
105:12 107:6
**received (23)**
13:6 16:10,17
31:6 43:6
47:21 49:9
83:13 84:3,6
84:18 92:3,18
92:19 93:19
100:21 101:2
101:5,22
102:4 105:14
109:17
112:11
**receiving (1)**
94:2
**recess (3)**
63:12 108:25

130:16
**recognize (4)**
83:4,6 114:14
121:16
**record (24)**
4:14 5:24 8:6
8:10 9:18
26:12 33:10
43:2 44:8
47:8 53:17
63:10,11 79:3
92:17 95:4
96:19 98:6
99:17 103:4
108:23,24
119:11
134:14
**recording (1)**
42:4
**records (4)**
94:6 96:23
102:3 128:12
**rect (3)**
17:23 85:11
89:24
**refer (3)**
89:3 102:13
118:16
**referring (5)**
60:16 98:19
123:4,20,23
**refresh (2)**
53:19 54:15
**regular (4)**
41:10,12 51:2
85:10
**regularly (1)**
10:2
**Rehfield (4)**
4:3 5:4 134:7
134:23
**related (1)**
134:16
**relating (1)**
128:22
**relationship (...**

96:8
**rely (2)**
7:9 9:5
**remem- (2)**
7:16 38:14
**remember (19)**
15:13 18:16
22:3 54:9,10
54:13 95:10
95:10,18,19
98:3,4 103:20
105:14
106:14,16
121:19,22
126:21
**repeat (1)**
7:17
**report (6)**
71:17 83:2
84:5 85:7
86:5 132:7
**report- (1)**
8:5
**reporter (5)**
5:4,19 7:18
8:10 134:8
**Reporting (1)**
5:5
**representativ...**
5:14 109:16
**request (2)**
5:6 94:22
**Requested (1)**
133:2
**requests (1)**
55:10
**required (2)**
7:11 9:15
**reserved (1)**
3:16
**respective (2)**
3:8,19
**responsibiliti...**
21:12 75:23
76:13
**rest (5)**

27:24 48:12,14
50:14 100:5
**retunrs (1)**
133:5
**returns (3)**
94:13,17,20
**review (1)**
10:16
**reviewed (1)**
10:14
**right (17)**
30:21 33:17
35:20 59:5
64:6 86:9
90:7 93:4,18
96:17 98:7,14
106:5,7,24
111:3 131:2
**room (2)**
124:12 126:19
**row (1)**
90:14

---

**S**

**s (4)**
2:3 3:4,4 132:2
**S-p-i-l-l (1)**
32:25
**Sakou (1)**
54:21
**salary (5)**
16:20 17:2
31:6,9 39:15
**sale (1)**
66:4
**sand (3)**
93:11 100:22
119:18
**Sandra (2)**
2:12 5:11
**Sarakole (3)**
6:25 7:2,5
**sat (4)**
52:15 53:3
57:17 74:20
**Saturday (5)**

80:25 81:2,10
81:20 82:9
**saved (1)**
109:20
**saw (3)**
57:13 118:18
122:20
**say- (1)**
108:3
**saying (15)**
16:17 22:20
33:9 36:5
37:8 38:2,21
39:16 58:18
69:3 100:19
101:15
102:16 104:3
116:21
**says (25)**
109:23 112:16
112:22 113:3
114:18 115:5
115:8,11,15
116:2,5,17,19
116:22,23
117:2,7,10,14
117:20 118:4
118:8 119:16
120:5,24
**schedule (1)**
44:11
**school (3)**
13:22 14:2
108:18
**se- (1)**
19:18
**sealing (1)**
3:9
**sec- (1)**
19:3
**second (10)**
50:24 56:17
57:12,23
58:22,25 59:3
59:11 83:8
93:7

**security (5)**
18:6,8,14 19:5
27:13
**see (31)**
8:8 38:9 39:5
39:14 41:22
45:22 57:9
71:13,18,21
74:12,14
75:12,12,14
76:15 87:15
88:17 99:4
101:4 106:12
112:13
113:14,21
117:21
121:25 122:2
124:2,7 126:4
127:18
**seeing (2)**
120:9,12
**seen (4)**
49:16 75:18
76:4 120:17
**sell (4)**
41:4 65:19,22
65:23
**selling (2)**
14:18,20
**sells (1)**
113:12
**send (1)**
18:5
**separate (1)**
116:20
**September (1)**
99:21
**served (1)**
89:11
**set (2)**
134:12,20
**settlement (1)**
62:13
**seven (5)**
25:7,17 40:10
40:12,20

Seventh (1)
4:15
share (2)
107:16,19
sheet (1)
93:21
shop (2)
20:23 78:17
short (3)
63:12 90:15
130:16
Shorthand (1)
134:7
show (25)
54:23,25 55:2
55:4,5 56:10
66:8,10,12
68:3 70:8
71:24 75:10
78:2 82:22
84:21 92:11
94:7,23 96:13
96:19 98:5
99:17 103:3
121:6
showed (4)
75:6 122:7
128:10,11
showing (2)
121:7 129:8
shows (14)
70:22 85:10,20
85:22,24 86:2
92:21 95:5
96:24 97:9
98:11 99:20
105:18,25
sic (2)
30:4 50:6
sick (5)
80:15 97:14,16
97:17,25
side (2)
36:21 102:6
sides (1)
6:22

Sienna (1)
69:6
sign (1)
83:15
signature (23)
83:2,7,10
121:14,24
122:5,6,8,10
122:11,13,15
122:16,18,21
122:21,24
123:2,19,25
124:3 128:2
132:7
signed (6)
3:11,13 84:3,6
84:17 123:17
signing (2)
84:18 121:19
sion (16)
22:24 23:12
24:3 25:17
26:7,10 37:18
40:16 44:18
48:3 90:9
92:3 113:9
116:8 118:17
129:6
sit (4)
52:19 63:8
65:3 69:19
sitting (3)
50:17 74:15
124:22
situation (1)
20:25
six (5)
81:7,16,17,23
108:6
Social (1)
27:13
sold (1)
89:23
some- (5)
8:11 13:22
67:16 91:12

101:22
somebody (9)
38:11 54:16
64:21 77:11
123:16,18
126:14,15
127:6
someplace (1)
29:20
son (2)
5:12 23:8
Soninke (2)
7:2,5
sorry (5)
12:2 33:14
97:3 122:2
123:23
sound (2)
93:4 98:14
soup (1)
14:21
speak (9)
6:19,21,25 7:3
7:5 10:23
11:3,12 65:12
specified (1)
44:20
speculation (2)
39:22 115:20
spell (1)
114:4
spelled (1)
114:7
spelling (5)
113:16,21,24
114:2,9
spending (1)
55:13
spent (1)
19:15
Spill (2)
32:24 33:3
spread (1)
61:18
ss (1)
134:5

stairs (4)
19:13 30:16
66:14,17
stamp (1)
96:15
stamped (9)
78:3 82:24
84:22 92:12
94:24 96:13
96:14 109:10
121:8
stand (4)
6:5 7:13 96:11
115:18
standing (2)
41:18 42:22
stands (3)
112:23 115:16
121:2
start (19)
23:20 30:17
42:25 43:25
45:5,6 50:16
53:24 55:11
64:10,14 95:5
98:11 104:23
105:9,9
124:17
125:23
129:13
started (8)
19:3 21:21
29:2 33:24
55:14 64:11
64:12 82:4
starting (1)
119:17
State (6)
1:17 4:4,8,13
134:4,9
statement (9)
16:16 85:2
92:14 95:2
96:21 98:9
99:18 103:5
132:8

States (3)
1:2 13:2,7
stating (2)
122:23 125:21
station (3)
20:18 30:10
55:18
stay (4)
18:18 21:25
30:23 46:16
stayed (1)
72:20
STIPULATE...
3:7,15,18
stolen (1)
124:19
stop (5)
51:6 76:2
108:13
122:25,25
stopped (1)
108:9
store (2)
14:20,21
stories (1)
58:13
straight (2)
59:4,18
structure (2)
40:16 129:9
stub (1)
84:13
stubs (2)
85:6 128:10
study (1)
13:21
stuff (2)
67:22 70:23
styled (1)
5:2
subscribed (1)
131:9
sue (4)
60:24 61:2,9
62:16
sued (4)

60:10,21
61:10 62:23
**suffer (1)**
10:6
**sugar (1)**
14:20
**suing (6)**
33:22 35:19
53:23 57:18
58:16 60:4
**suit (3)**
60:8 61:16,20
**sum (1)**
105:16
**Sunday (2)**
81:2,21
**sup- (1)**
40:16
**supplement (2)**
55:7 94:19
**Supplied (1)**
133:2
**support (3)**
14:8,16 15:2
**supposed (7)**
37:13 38:3
39:12 42:22
43:9 48:10
49:2
**sure (6)**
58:7,21 89:17
97:24 116:17
130:14
**suspicion (1)**
105:9
**suspicions (1)**
42:3
**sweep (1)**
74:15
**swer (2)**
8:17 65:16
**swers (1)**
8:10
**sworn (7)**
3:11,14 4:3,8
5:19 131:9

134:12
**synthetic (2)**
41:11,12
**system (2)**
67:5,7

———————
**T**

**T (9)**
3:4,4 4:3,7
132:2 134:3,3
134:7,23
**table (1)**
115:22
**tacking (1)**
59:24
**tain (1)**
89:23
**take (30)**
8:24,25 9:3,24
10:2 25:5
65:2,4 87:4
87:12 93:16
93:22 97:12
97:13 99:8,13
99:14 100:11
102:15,22
109:22
111:12
113:13
115:11,23
118:10
119:13
120:20
126:20
130:12
**taken (2)**
1:16 9:22
**tal (2)**
80:24 81:15
**talk (17)**
7:6 13:16 14:4
35:8 48:25
54:4 59:20,21
60:15 63:9
64:6 73:19,21
73:23 76:16

87:17 118:25
**talked (6)**
51:10,24 72:24
73:6,13 91:17
**talking (17)**
8:4 14:10
24:11,13 27:7
30:20 33:22
34:19,20
36:22 39:18
42:14 58:3
73:22 76:15
91:14 118:19
**talks (2)**
76:15,17
**tant (2)**
7:8 46:9
**tax (5)**
94:13,17,19
102:3 133:5
**taxes (1)**
16:19
**technicians (1)**
107:17
**tell (55)**
26:24 35:22
40:15,19
45:10,23
46:14 47:12
47:19 48:2
50:22 52:9,13
52:16,17 53:8
53:8,22 54:5
54:10,16
57:15 58:13
58:19 61:11
64:7 65:5,6,9
65:10 66:3,11
67:10 68:8,10
68:19 69:17
69:19 70:3,4
76:17 77:3
82:13 89:5
101:14 105:2
106:12,22
112:15

124:18,24,25
125:2 128:8
130:4
**telling (3)**
69:4,24 73:9
**tells (1)**
47:2
**ten (1)**
62:4
**ter (1)**
13:14
**tered (1)**
126:19
**terpreting (1)**
8:2
**tested (1)**
80:15
**testified (7)**
4:9 11:6,9 24:9
27:16 67:20
129:9
**testify (2)**
9:11,16
**testifying (2)**
10:8,11
**testimony (8)**
27:11 41:24
56:12 57:4
74:7 93:14
119:23
134:14
**thank (7)**
26:15 33:13
97:4 103:2
127:21
130:19 131:2
**themself (1)**
39:24
**thing (11)**
8:12 26:24
31:13 57:20
68:3 70:9,22
80:2 89:23
91:13 101:23
**things (3)**
14:18,19

101:13
**think (16)**
32:11 37:24
38:24 43:7
44:5 47:9
50:15 59:9
67:20 75:19
77:11 88:5
104:6 110:18
116:6 130:11
**third (7)**
1:11 2:11
56:18,23
58:24 59:15
59:16
**thou- (3)**
93:10 100:21
119:17
**thought (12)**
10:3 40:16
43:15 89:8,10
89:22 90:8
91:2 100:17
103:19
116:16
123:20
**thousand (20)**
62:4,5,7 86:22
87:9,13,15
93:7 100:3,4
100:6,9,15,15
100:18,20,25
119:18,21,24
**thousand-dol...**
119:25
**three (25)**
15:4 51:20
52:19 53:4,7
53:21,21 54:2
55:13 56:24
57:2,9 87:5,5
87:12 93:12
93:17 97:5,17
100:11,13
107:10 108:3
108:15,17

**three- (1)**
99:20
**throw (1)**
47:13
**Thunder (8)**
1:7 4:21 34:6,7
35:3 64:6
86:8,11
**Thursday (4)**
5:16 80:24
81:19,20
**tiff's (1)**
92:13
**time (85)**
3:17 5:17 8:5
8:23 10:21
11:24 12:3
13:9,23 14:9
14:12 16:8,18
17:10,12 19:3
19:5,14,23
21:16,18
27:10,22
28:18 29:12
31:4 32:9
35:2,2,10
45:24 46:12
46:18 47:2,17
50:24 53:7
56:8,10,16,17
56:18,23 57:2
57:11,13,14
57:23 58:4,24
59:3,16 60:10
60:13 62:21
63:7 74:14
75:21 79:6,8
79:21,25
80:14 81:12
87:12 89:22
90:18,20
97:23 100:5,5
100:7 104:24
110:8,9 120:8
120:11
124:24

125:24
127:14
128:14
129:18
130:20,21
131:4
**times (10)**
53:21,21 56:24
57:6 62:24
63:5,6 96:3
109:15
126:10
**tin (1)**
78:17
**ting (1)**
42:20
**tiny (1)**
116:16
**tion (9)**
9:23 11:7 24:5
24:20 64:8
86:20 93:8
102:21 118:6
**tioned (1)**
127:7
**tions (5)**
5:8 9:16,18
99:9 130:21
**tip (5)**
16:23 107:23
108:4,7,10
**tips (9)**
17:3,5 107:7,8
107:13,16,17
107:18
108:11
**titled (1)**
6:12
**tlemen (1)**
53:7
**today (11)**
5:5,10,13,16
5:22 9:8
10:12,15,25
11:4 65:8
**told (55)**

25:15 26:9
44:13,15,17
44:22,23
45:12,12,16
45:22 46:4,10
48:4 50:14,18
50:23 51:4,6
51:10,12,12
51:25 52:5,8
52:13,18 53:2
56:6,10 57:12
57:16,17,24
58:20 59:4,13
60:3,5,5,6
61:5 74:20
77:8 82:15
88:4,6 95:14
101:13,20
103:15
104:23,25
118:3 129:14
**tom (1)**
123:18
**tomer (2)**
65:7 127:3
**top (2)**
111:23 112:2
**torney (1)**
85:6
**total (4)**
24:17 25:8,19
48:5
**touch (3)**
70:21 72:11,20
**touched (1)**
126:2
**Toure (142)**
1:4,15 4:15,20
4:21 5:1,10
5:20 6:1,3 7:1
8:1 9:1 10:1
11:1 12:1
13:1 14:1
15:1 16:1
17:1 18:1
19:1 20:1

21:1 22:1
23:1 24:1
25:1 26:1
27:1 28:1
29:1 30:1
31:1 32:1
33:1 34:1
35:1 36:1
37:1 38:1
39:1 40:1
41:1 42:1
43:1 44:1
45:1 46:1
47:1 48:1
49:1 50:1
51:1 52:1
53:1 54:1
55:1 56:1
57:1 58:1
59:1 60:1
61:1 62:1
63:1,15 64:1
65:1 66:1
67:1 68:1
69:1 70:1
71:1 72:1
73:1 74:1
75:1 76:1
77:1 78:1
79:1 80:1
81:1 82:1
83:1 84:1
85:1 86:1
87:1 88:1
89:1 90:1
91:1 92:1
93:1 94:1
95:1 96:1
97:1 98:1
99:1 100:1
101:1 102:1
103:1 104:1
105:1 106:1
107:1 108:1
109:1,14
110:1 111:1

112:1 113:1
114:1,3 115:1
116:1 117:1
118:1 119:1
120:1 121:1
122:1,20
123:1 124:1
125:1 126:1
127:1 128:1
129:1 130:1
130:19 131:1
131:7 134:10
**track (6)**
23:11 26:16
79:12 89:7,18
95:16
**trade (1)**
14:14
**trained (1)**
64:13
**training (1)**
17:11
**transcript (1)**
134:13
**Transla- (1)**
5:7
**translate (1)**
4:4
**translates (1)**
6:15
**transmission ...**
40:21 66:2,21
66:25 69:15
69:15
**Traore (3)**
2:16 4:2 5:9
**treatment (1)**
48:18
**trial (4)**
1:15 3:17 11:9
62:8
**trict (1)**
4:24
**tried (2)**
13:22 59:23
**trouble (2)**

67:13 79:20
**true (3)**
52:22 93:20
134:14
**trust (1)**
45:3
**trusts (1)**
124:25
**truth (1)**
125:2
**truthfully (1)**
10:11
**try (7)**
12:12 15:25
43:11 65:18
65:22 81:2
124:9
**trying (4)**
18:13 42:25
44:4 125:25
**Tuesday (1)**
81:18
**Tuesdays (1)**
83:25
**turn (1)**
121:11
**twice (4)**
57:7 58:23
101:7 125:25
**two (35)**
8:4 23:7 34:8
34:16 35:7
41:5,8,11,13
42:24 51:16
51:16 53:6
57:6 62:24
63:5,6,23
64:3 75:12,17
79:22 87:5
90:14 93:16
97:20 98:7,13
99:14 100:13
104:8 107:20
107:22 108:3
109:5
**type (3)**

95:4 98:6
103:4
**typed (3)**
123:24,25
127:25

———————
**U**
———————
**U (2)**
3:4 4:7
**U.S (9)**
4:23 12:13,19
12:20 14:10
14:15,25 15:7
15:8
**un-Bates-sta...**
96:18
**under- (5)**
6:4 7:12 41:17
42:21 96:10
**underneath (2)**
116:2 120:23
**Undersigned ...**
123:24,25
127:25
**understand (...**
6:4,10,16,17
7:8,15,20,21
8:20,21 9:3,4
9:7,10 21:14
35:9 52:2
88:9,24 96:10
103:16,19
117:13 118:3
120:16
123:22
**understandi...**
23:23 24:16
44:6 87:20
**understood (2)**
27:11 91:22
**Unfortunatel...**
121:13
**United (3)**
1:2 13:2,7
**up- (2)**
66:13,16

**upstairs (14)**
20:24 21:6
23:8 30:15,19
35:15,17
64:12,18
66:11,12,16
67:2 71:4
**Uptown (4)**
60:18,20,21,24
**use (7)**
9:24 45:17
46:8 56:25
67:6 79:23
108:12
**usually (3)**
67:16 95:21
107:11

———————
**V**
———————
**v (1)**
4:21
**va- (1)**
87:5
**vaca- (3)**
86:19 93:7
99:8
**vacation (21)**
87:4,6,7,10,12
87:13,14,16
92:25 93:13
93:14,16
96:24 97:9,12
97:13 98:14
99:13,21
100:8,24
**velope (3)**
83:15 111:18
129:13
**verbal (1)**
8:10
**videotape (1)**
126:4
**Village (1)**
2:7
**vious (1)**
119:23

**visa (6)**
13:4,5,11,14
14:25 15:7
**visit (8)**
57:15 58:9,18
58:22 59:2,10
59:11,15
**voluntarily (7)**
18:24 19:2
20:12 32:4
49:25 50:2,3

———————
**W**
———————
**W-2 (1)**
16:16
**wait (2)**
52:15 74:21
**waiting (4)**
50:17 51:7,15
53:3
**waived (1)**
3:10
**want (24)**
8:22 47:15
55:5 59:22
65:21 67:11
71:24 78:2,5
78:13 84:24
101:12
102:10
103:16
105:15 109:4
110:11,14
116:11
117:12 121:6
125:3 127:17
128:13
**wanted (2)**
18:4 101:16
**wash (36)**
15:10,11,12,14
15:16,19,23
15:25 16:3
17:3,7,15,16
17:17,22 18:2
18:11,14,17

19:12,17,19
19:23 20:12
20:18 30:10
30:12 32:4
55:17 74:5,8
109:24,25
110:16,23
111:7
**wasn't (4)**
39:19 48:7
74:17 122:18
**way (11)**
22:13 23:2
24:6,21 25:4
26:19 40:8
47:25 79:13
114:12
134:18
**we'll (3)**
40:2 88:18
124:9
**we're (18)**
24:13 27:7
30:20 33:22
58:3 59:5
63:13 64:25
71:25 74:15
105:3 108:11
109:2 123:9,9
123:10,17
130:17
**Wednes- (1)**
81:22
**Wednesday (2)**
81:18,19
**week (74)**
16:13 23:19
24:23 25:8,9
25:18,19
26:17 27:2,5
28:6,7 36:6,8
39:4,4,13
40:13 41:20
41:22 42:6
43:12,14
47:10,18 48:4

75:13,14,24
76:3,12 78:20
78:22,25
81:13,16
82:14 83:22
83:23,24 86:6
86:19 87:4
90:4,14,14
91:7,16,22
92:3,6,7,7,9
92:21,21
93:14,19 94:2
95:6 97:18
99:5 102:21
104:8,11,12
104:13
105:19,25
113:8 114:21
114:24
115:13,23
**weekly (1)**
84:5
**weeks (12)**
51:20 52:19
53:4 54:2
55:13 90:14
91:8 97:20
98:13 99:15
104:8 105:16
**weeks' (1)**
93:13
**Weinreb (1)**
129:16
**welcome (1)**
6:11
**went (51)**
12:12 14:22,24
17:9 18:2
20:13 29:11
29:19,20,21
29:22,23 30:2
30:3 32:2,19
33:16 38:11
38:15 45:23
51:9,18,18,20
51:24 52:23

53:7,10,11,11
53:21 56:7,16
56:17,24 57:2
57:2,7,8,11
57:23 58:23
58:24 59:19
59:21 60:4
82:19 97:11
100:8,24
114:10
**weren't (3)**
87:5 97:24
100:12
**whatsoever (1)**
128:15
**WHEREOF ...**
134:20
**whichever (1)**
35:10
**win (1)**
113:6
**Winner (1)**
113:3
**Wiper (1)**
41:2
**wit- (2)**
73:3 134:14
**witness (16)**
3:21 5:18
44:12 53:20
54:7,11 72:3
92:16 118:12
120:21
121:12 123:6
125:8 132:4
134:10,20
**word (11)**
23:23 45:15,17
56:25 87:21
88:6,12,17
102:11
123:25
127:25
**words (1)**
35:22
**work (87)**

14:15,23,24
15:16 16:18
17:25 18:15
19:4,24,25
20:4,12,24
21:15,24
25:15,21
26:23,25 27:6
27:9,12,17
28:5 29:10,11
33:19 35:7
36:8,20 39:3
40:14 41:21
42:5 43:12
44:16,20,24
45:7,9 46:2
48:3 51:2
52:4,8 55:14
55:20 58:11
61:6 66:7
67:7 71:12
72:6,6 77:8
78:22 80:4,18
81:11,13,19
81:20,20,20
81:22 82:14
87:25 88:10
88:10,23 89:7
89:15,19,23
95:6 97:15
98:12 102:21
103:8,9 104:8
105:10 107:8
107:19,20
116:8 127:11
**work- (4)**
55:13 57:24
76:19,22
**worked (28)**
13:2 16:11
17:19,21 21:9
21:13,16,19
26:17 28:24
30:15 32:8
34:9,10 36:5
70:24 71:14

71:21 82:10
82:18 85:13
85:18 86:8
90:5 106:19
110:4,5 111:3
**worker (4)**
71:2,2 108:8
127:3
**workers (6)**
48:24 60:23
61:8 76:18,25
108:9
**working (52)**
17:15 18:6,8
19:6,23 20:13
21:5,7,8,17
22:25 24:12
27:8,19 28:7
29:3,6,16
30:17,19,22
31:23 33:7,11
33:24 34:16
34:17,25 35:3
35:5,14,17
46:16,17
50:16 51:5,7
54:4 58:12
61:3 64:17,18
71:7 75:9
81:5 100:12
110:19,25
124:17
125:23
126:25
129:13
**workplace (2)**
75:7 78:14
**works (1)**
23:6
**wouldn't (1)**
97:19
**write (17)**
13:13,24 39:24
40:10 43:11
48:4 67:21
70:14,15,18

79:15 129:19
129:21,23,25
130:5,8
**writing (10)**
23:13 39:3
41:19 55:10
67:23 89:25
94:22 95:18
105:9 110:3
**written (7)**
48:18 49:16
102:7,7
103:17
114:22,25
**wrong (5)**
40:4 69:25
101:9,10
105:6
**wrote (4)**
39:5 47:5
111:19 113:5

---

**X**

**x (3)**
1:3,9 132:2

---

**Y**

**Y (1)**
4:7
**yeah (21)**
14:18 18:20
31:10 33:2
34:7 40:25
45:12 46:17
58:17 61:12
71:2 72:17,19
75:15 77:18
79:19 90:12
107:14,15
110:2 119:14
**year (32)**
11:22 12:5
16:17 22:2
38:9,13 50:10
64:4 68:9,10
68:16,21

69:13 75:11
75:12,14,15
75:17,18 76:4
82:2 87:4
93:15 95:5,6
96:25 98:6,12
98:14 99:9,12
103:4
**year-to-date ...**
86:2
**years (19)**
14:7 21:13
38:14 42:24
58:12 61:4
64:3 75:12
86:9 87:5,10
87:13 93:12
93:17 106:20
108:3,6,15,17
**York (20)**
1:2,12,12,17
2:7,11,11 4:4
4:9,16,16,24
12:22,23
57:25 58:2
59:7 134:4,5
134:9

_____
**Z**
**zation (1)**
27:10
**zip (1)**
4:17

_____
**0**
**000120 (1)**
92:13
**000121 (1)**
92:13
**000122 (1)**
94:24
**000123 (1)**
94:25
**000137 (1)**
121:8
**001 (1)**

78:4
**002 (1)**
78:4
**008 (1)**
82:24
**041 (1)**
84:23

_____
**1**
**1 (6)**
1:1 70:20 72:2
72:4 105:19
132:4
**1:13 (1)**
63:14
**10 (4)**
10:1 86:9
103:6 132:14
**100 (6)**
39:14 100:1
112:16 113:3
115:12
117:14
**10022 (1)**
2:11
**101 (1)**
101:1
**102 (1)**
102:1
**103 (2)**
103:1 132:14
**104 (1)**
104:1
**105 (1)**
105:1
**106 (1)**
106:1
**107 (1)**
107:1
**108 (1)**
108:1
**109 (2)**
109:1 132:15
**11 (4)**
11:1 61:7
109:13

132:15
**11:03 (1)**
1:13
**11:06 (1)**
5:17
**110 (1)**
110:1
**111 (1)**
111:1
**112 (1)**
112:1
**113 (1)**
113:1
**114 (1)**
114:1
**11427 (1)**
2:7
**115 (1)**
115:1
**116 (1)**
116:1
**117 (1)**
117:1
**118 (1)**
118:1
**119 (1)**
119:1
**11th (1)**
2:11
**12 (4)**
12:1 93:13
121:10
132:16
**120 (1)**
120:1
**121 (2)**
121:1 132:16
**122 (1)**
122:1
**123 (1)**
123:1
**124 (1)**
124:1
**125 (1)**
125:1
**126 (1)**

126:1
**127 (2)**
127:1 132:18
**128 (1)**
128:1
**129 (1)**
129:1
**12A (3)**
127:23,25
132:18
**12th (3)**
98:12 99:21,22
**13 (1)**
13:1
**130 (1)**
130:1
**131 (1)**
131:1
**132 (1)**
132:1
**133 (1)**
133:1
**134 (1)**
134:1
**139 (1)**
121:8
**13th (1)**
93:2
**14 (1)**
14:1
**14th (1)**
95:6
**15 (1)**
15:1
**15th (1)**
97:10
**16 (1)**
16:1
**17 (1)**
17:1
**17-CV-00657...**
5:2
**18 (1)**
18:1
**19 (1)**
19:1

**1971 (3)**
12:2,2,7
**1991 (1)**
11:23
**1998 (6)**
12:6,7,10,18
12:19,24
**1999 (1)**
12:18

_____
**2**
**2 (6)**
2:1 61:8 70:20
78:6,8 132:5
**20 (5)**
20:1 36:25
37:3,5,9
**200 (9)**
24:23,24 39:13
39:16 48:10
92:7,9 95:25
106:23
**2000 (2)**
15:17 17:22
**2001 (7)**
15:17 17:7,17
17:19,22 18:2
19:4
**2003 (3)**
17:19,25 18:3
**2004 (17)**
17:20 18:22
19:4 20:2,3,5
20:11 21:7
27:12,14,17
28:21,23 29:2
29:3 64:14,16
**2007 (9)**
29:5,17 33:16
33:20 43:6
44:24 45:9
64:11 124:17
**2011 (1)**
126:22
**2012 (12)**
27:15 63:19

82:4 92:14,18
92:19,24,25
93:25 101:2
119:21 132:9
**2013 (6)**
93:2 95:2,5,7,9
132:10
**2014 (8)**
96:19,21,23
97:21 98:18
98:22,24
132:11
**2015 (14)**
43:3,6,8,10,15
43:22 44:24
46:10,12 98:6
98:9,18 99:3
132:12
**2016 (9)**
99:17,18,22
100:8,18,24
101:3 105:19
132:13
**2017 (15)**
1:13 5:17
33:20 49:22
50:11 55:14
58:4 86:21
103:4,5
105:19
131:11
132:14
134:11,21
**20th (1)**
92:25
**21 (1)**
21:1
**215-28 (1)**
2:7
**22 (1)**
22:1
**23 (1)**
23:1
**24 (3)**
9:20,23 24:1
**25 (3)**

14:7,9 25:1
**250 (1)**
48:11
**2546 (1)**
4:15
**25th (2)**
96:25 97:3
**26 (2)**
26:1 105:19
**27 (2)**
27:1 96:25
**28 (3)**
1:13 28:1
134:11
**280 (2)**
114:18 115:5
**28th (2)**
5:16 97:10
**29 (1)**
29:1

———————
**3**
———————
**3 (5)**
3:1 70:20
82:25 83:3
132:7
**3:21 (1)**
109:3
**30 (1)**
30:1
**300 (11)**
39:13,15 48:10
48:11 92:3,6
92:7,8,10
95:25 96:2
**31 (1)**
31:1
**31st (1)**
134:21
**32 (1)**
32:1
**320 (1)**
105:21
**33 (1)**
33:1
**330 (2)**

114:18,19
**331 (1)**
119:16
**34 (1)**
34:1
**343 (1)**
101:8
**35 (1)**
35:1
**350 (1)**
106:5
**354 (2)**
112:16,22
**36 (1)**
36:1
**360 (1)**
115:12
**37 (1)**
37:1
**38 (1)**
38:1
**382 (1)**
101:8
**39 (1)**
39:1

———————
**4**
———————
**4 (3)**
4:1 85:3 132:8
**4:04 (1)**
130:15
**4:08 (2)**
130:18 131:4
**40 (10)**
28:5,14 36:6,8
36:16,17,24
37:2,10 40:1
**400 (1)**
101:7
**406.76 (1)**
105:20
**41 (1)**
41:1
**42 (1)**
42:1
**427 (2)**

115:24 116:3
**43 (1)**
43:1
**433 (1)**
117:14
**44 (1)**
44:1
**45 (1)**
45:1
**454 (2)**
112:16,17
**46 (1)**
46:1
**460 (2)**
115:12,12
**47 (1)**
47:1
**472 (1)**
106:2
**48 (1)**
48:1
**49 (1)**
49:1

———————
**5**
———————
**5 (3)**
5:1 92:15
132:9
**50 (3)**
50:1 114:18
115:8
**500 (3)**
100:6,14 101:2
**51 (1)**
51:1
**52 (1)**
52:1
**53 (1)**
53:1
**54 (1)**
54:1
**55 (1)**
55:1
**55/6 (1)**
133:4
**56 (1)**

56:1
**57 (1)**
57:1
**58 (1)**
58:1
**59 (1)**
59:1

———————
**6**
———————
**6 (3)**
6:1 95:3
132:10
**60 (19)**
28:7,13 36:8
36:14,15 51:2
51:2 60:1
78:20,22,24
80:4,8 81:2,4
82:10,14,16
82:20
**600 (2)**
100:15 101:2
**61 (1)**
61:1
**62 (1)**
62:1
**63 (1)**
63:1
**64 (1)**
64:1
**65 (1)**
65:1
**66 (1)**
66:1
**669 (2)**
119:16 120:5
**67 (1)**
67:1
**68 (1)**
68:1
**69 (1)**
69:1

———————
**7**
———————
**7 (4)**
4:16 7:1 96:22

132:11
**70 (1)**
70:1
**700 (1)**
105:17
**71 (1)**
71:1
**72 (2)**
72:1 132:4
**73 (1)**
73:1
**74 (1)**
74:1
**745 (3)**
103:23 104:3
105:12
**75 (1)**
75:1
**76 (1)**
76:1
**77 (1)**
77:1
**78 (2)**
78:1 132:5
**79 (1)**
79:1
**7th (1)**
99:3

---
**8**

**8 (5)**
8:1 81:11,11
98:10 132:12
**80 (1)**
80:1
**81 (1)**
81:1
**82 (1)**
82:1
**83 (2)**
83:1 132:7
**84 (1)**
84:1
**845 (2)**
1:11 2:11
**85 (2)**

85:1 132:8
**86 (1)**
86:1
**87 (1)**
87:1
**88 (1)**
88:1
**89 (1)**
89:1
**8th (1)**
103:8

---
**9**

**9 (3)**
9:1 99:19
132:13
**90 (1)**
90:1
**91 (1)**
91:1
**92 (2)**
92:1 132:9
**92nd (2)**
20:13 22:6
**93 (1)**
93:1
**94 (1)**
94:1
**94/16 (1)**
133:5
**95 (2)**
95:1 132:10
**96 (2)**
96:1 132:11
**97 (1)**
97:1
**98 (2)**
98:1 132:12
**99 (2)**
99:1 132:13

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____

|  |  |  |
|---|---|---|
| Bakary Toure, | ) | |
| | ) | |
| Plaintiff | ) | Civ. Action #: 17-CV-00657 |
| | ) | (DLI) (PK) |
| -v- | ) | |
| | ) | |
| Thunder Lube Inc., | ) | |
| Abko Associates Inc., and | ) | |
| Hagay Keren, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

_____)

## DECLARATION OF DROR HERSHOWITZ

I, Dror Hershowitz, declare as follows under penalty of perjury:

1. I am a minority shareholder of both Defendant Abko Associates Inc. ("Abko") and Defendant Thunder Lube Inc. ("Thunder Lube", and together with Abko, the "Corporate Defendants" ), and I make this Declaration in support of Defendants' Motion to Compel Arbitration, Dismiss Complaint and to Dismiss Defendant Hagay Keren ("Dismissal Motion"). Unless noted otherwise, I am aware of all the facts set forth below from my own personal knowledge. For the purpose of this Declaration, I have only referred to facts that are part of the record in the above-captioned case, either through pleadings, depositions, or discovery that I have produced to the other side. To the best of my knowledge, I have not mentioned any facts which are not part of the record of this case.

2. I manage the operations of Thunder Lube, and when Abko was in operation, I was the manager of Abko.

3. Thunder Lube was incorporated in July 2015. Thunder Lube was incorporated for the purpose of acquiring the business of Abko.

4. Thunder Lube, since its incorporation, has operated a lube shop on Coney Island Avenue in Brooklyn, New York. The lube shop employs approximately 20 people.

5. Prior to July 2015, this business was operated by Abko. Abko has neither operated any business, nor had any employees, since approximately July 2015.

6. Plaintiff Bakary Toure ("Plaintiff") worked in the lube shop, first for Abko, and subsequently for Thunder Lube, from approximately 2007 through January 2017.

7. During his employment, Plaintiff typically worked more than 40 hours per week. Each week, he received minimum wage for his first 40 hours of work ("Base Pay") and overtime pay consisting of 1.5 times his hourly Base Pay for each hour of overtime worked ("Overtime Pay", and together with his Base Pay, his "Compensation").

8. Compensation was paid to Plaintiff by check on a weekly basis on Monday or Tuesday of each week. Plaintiff also received with his Compensation a pay stub delineating: hours worked, rate of hourly pay for Base Pay, rate of hourly pay for Overtime Pay, year-to-date Base Pay, year-to-date Overtime Pay, and other such information.

9. I do not dispute that in most weeks, Plaintiff also received a cash payment in addition to his Compensation. Plaintiff alleges that this supplementary payment was in the amount of $300 per week, but actually the amount varied widely from payment to payment. I kept records of all of the cash payments and have supplied those records to Plaintiff as part of this litigation.

10. Plaintiff asserts that the cash payment above was a commission, but fails to allege the basis for this commission payment, how it was supposedly calculated, or any other facts

indicating the existence of a commission structure. In fact, there was no commission structure in place at either of the Corporate Defendants.

11. Rather, the cash payment was a voluntary bonus which I chose to pay at my sole discretion. The timing and the amount of the cash bonuses was entirely up to me and dependent on how I felt about the business and the Plaintiff at the time of the payment. There was no agreement with Plaintiff requiring me to make any cash payments.

12. In or about April 2015, I asked all of Abko's non-exempt employees to enter into an arbitration agreement (the "Arbitration Agreement") which would require the employee to arbitrate all claims arising out of his/her work or performance of services for Abko. It had been suggested at a meeting of a car wash owners' trade association that this would be a good business practice. The claims subject to arbitration would encompass any disputes or controversies concerning employment involving Abko, and/or Abko's successors, among others.  It also covers disputes, controversies and claims concerning shareholders of Abko and its successors.

13. Abko's successors include Defendant Thunder Lube. Defendant Hagay Keren is a shareholder of both Defendant Abko and Defendant Thunder Lube. I, therefore, believe that all of the Defendants are covered by the Arbitration Agreement.

14. A copy of the Arbitration Agreement was given to each employee, and they were told they could take them home, study them, and return them to the office at Abko if signed.

15. Some employees signed the Arbitration Agreement immediately, some took them home and later returned signed copies, and some did not sign. Plaintiff chose to execute the Arbitration Agreement on or about April 1, 2015 and return it to Abko.

16. A true and correct copy of the Arbitration Agreement kept in the business records of Thunder Lube, as successor to Abko, is attached to this Declaration as Exhibit I.

17. I am advised that Plaintiff acknowledged in his deposition that it is his signature on the Arbitration Agreement. Plaintiff, along with many of Abko's employees, voluntarily entered into the binding Arbitration Agreement which requires all claims arising from any employment with Abko and its successor, Thunder Lube, to be arbitrated.

18. Plaintiff followed none of the procedures provided in the Arbitration Agreement in the instant case. Instead, Plaintiff ambushed the Corporate Defendants by filing the instant complaint in the Eastern District of New York on February 5, 2017, without any warning.

19. I understand that the complaint alleges that the Corporate Defendants violated federal and New York labor laws by failing to include commissions in Plaintiff's Base Pay for purposes of calculating Plaintiff's Overtime Pay, which I do not understand because Plaintiff was never paid any commissions.

20. I hired Stephen Hans as Defendants' counsel, and he filed an answer on April 28, 2017.

21. I am advised that the initial case conference was held on June 22, 2017. I have since learned from reading the transcript that at that conference, Mr. Hans made several unauthorized statements which were adverse to Defendants and blatantly untrue. I was apoplectic when I read Mr. Hans' remarks. Counsel subsequently recanted his remarks. A true and correct copy of the affidavit filed by Mr. Hans to recant his remarks is attached hereto as Exhibit II.

22. Although I was unaware of Mr. Hans' statements at the end of August, 2017, based on his description of the tenor of the initial case conference and his subsequent actions, I perceived that he was not acting in the Defendants' best interests.

23. As a result, I replaced Attorney Hans with Defendants' current counsel, Mayerson &
Hartheimer, PLLC ("M&H") at the end of August 2017.

24. I have reviewed the Declaration of Hagay Keren filed in connection with this Dismissal
Motion. Said Declaration correctly describes the role of Hagay Keren at Abko and
Thunder Lube. I am the manager of said Corporate Defendants, and I am not aware of
any responsibilities that Mr. Keren has at either of the Corporate Defendants. He has no
interaction with the employees and has no responsibility for hiring and firing.

I declare under penalty of perjury under the laws of the United States that the foregoing is
true and correct to the best of my knowledge and understanding.

Dated: 3/8/18

Dror Hershowitz

# EXHIBIT I

Bakari

# ARBITRATION AGREEMENT

## THIS ARBITRATION AGREEMENT SUPERCEDES ANY AND ALL ARBITRATION AGREEMENTS

THIS IS AN AGREEMENT TO ARBITRATE ALL CLAIMS. READ THE FOLLOWING ARBITRATION PROVISIONS CAREFULLY. IT LIMITS YOUR RIGHTS, INCLUDING THE RIGHT TO MAINTAIN A COURT ACTION OR ADMINISTRATIVE PROCEEDING.

1. I, the undersigned ("UNDERSIGNED"), hereby agrees to arbitrate any and all claims, disputes and or controversies, including but not limited to, all statutory claims and any and all state and or federal claims, that may arise out of or relate in any way to my work and or performance of services for **ABKO ASSOCIATES INC. ("Abko" or "Company")** and any other existing corporation, including but not limited to claims, disputes and or controversies involving their predecessors, successors, assigns, parents, subsidiaries, affiliates, officers, trustees, directors, shareholders, partners, employees, agents, heirs, administrators, executors and attorneys, past and present. ["UNDERSIGNED" as defined herein shall include any and all persons who worked or performed services for **Abko**, including but not limited to part-time employees, full-time employees, temporary employees, independent contractors, and or seasonal employees].

2. By agreeing to arbitration, UNDERSIGNED understands and agrees that they are waiving their rights to maintain other available resolution processes, such as a court action or administrative proceedings, to resolve their disputes. The UNDERSIGNED also agrees to (i) waive any right to pursue any claims arising under this agreement including statutory, state and or federal claims, as a class action or class action arbitration, or (ii) to have an arbitration under this agreement consolidated with any other arbitration or proceeding.

3. In the event of a dispute, controversy or claim arising out of or relating in any way to UNDERSIGNED's work or performance of any services for **Abko** the UNDERSIGNED must first notify **Abko** in writing thereof, explaining in detail the nature of their claim. Within thirty (30) days of such notice, both Parties shall meet at **Abko** (or a location selected by Abko) in an initial attempt to resolve the dispute in good faith. Should the dispute not be resolved within thirty (30) days after such meeting, the UNDERSIGNED ("Complaining Party") shall seek remedies exclusively through arbitration as provided for herein. A written demand for arbitration must be made within sixty (60) days of the Complaining Party's first notification, and in no event shall it be made after one (1) year from when the Complaining Party knew or should have known of the controversy, claim, dispute or breach. UNDERSIGNED's failure to specifically adhere to these notice provisions and procedures as provided for herein, hereby results in a waiver by UNDERSIGNED of any and all claims against **Abko**, and their predecessors, successors, assigns, parents, subsidiaries, affiliates, officers, trustees, directors, shareholders, partners, employees, agents, heirs, administrators, executors and attorneys, past and present. All notices should be sent to: **ABKO ASSOCIATES INC., 488 CONEY ISLAND AVE., BROOKLYN, NEW YORK 11218** via regular and certified mail return receipt requested.

4. This agreement to arbitrate shall be specifically enforceable. **Abko** may apply to any court with jurisdiction for interim or conservatory relief, including without limitation a proceeding to compel arbitration. If **Abko** prevails, it shall be entitled to reasonable attorney's fees and costs.

5. The arbitration shall be conducted by one (1) arbitrator. If the Parties are not able to agree upon the selection of the arbitrator, within thirty (30) days of commencement of an arbitration proceeding by service of a demand for arbitration, the arbitrator shall be selected by **Abko** from: (a) the list of arbitrators provided by the U.S. District Court for the Southern District of New York, the State Court of New York, or the New York State Bar Association if the arbitration is held in New York; or (b) from the list of arbitrators provided by the U.S. District Court of New Jersey, the State Court of New Jersey, or the New Jersey State Bar Association if the arbitration is held in New Jersey; or (c) a retired Judge. The arbitrator shall have at least ten (10) years of legal experience and be either an attorney or retired Judge, within a fifty (50) mile radius of **Abko**. The arbitrator shall have no authority to award punitive, consequential, special, or indirect damages. The arbitrator shall not be entitled to issue injunctive and other equitable relief. The arbitration will be held at **Abko**'s attorney's office or a location chosen by **Abko**.

1

6. The laws of the State of New York shall be applied if the arbitration proceedings are held in New York, without regard to principles of conflict of laws. The laws of the State of New Jersey shall be applied if the arbitration proceedings are held in New Jersey, without regard to principles of conflict of laws. Company reserves the exclusive right to select the location of the arbitration proceedings and choice of law applied. Barring extraordinary circumstances, arbitration proceedings will be concluded within one hundred and twenty (120) days from the date the arbitrator is appointed. The arbitrator may reasonably extend this time limit in the interests of justice. Failure to adhere to this time limit shall not constitute a basis for challenging the award.

7. Except as may be required by law, UNDERSIGNED nor its representatives, assigns and or heirs cannot disclose the existence and content of this arbitration agreement, or results of this arbitration agreement and or any arbitration hereunder without the prior written consent of **Abko**. This confidentiality provision is a *material clause* of this agreement. Breach of this confidentiality provision by UNDERSIGNED or their representatives, attorneys, assigns and or heirs, will subject the breaching party to forfeiture of any and all damages (including all fees, costs and expenses) or award, if any, that the breaching party may have received, along with reasonable attorney's fees and costs incurred by the non-breaching party in seeking to enforce this confidentiality provision, including court costs and fees, and all arbitration costs and fees incurred by Company.

8. The Parties shall be entitled to discovery in the arbitration. Each Party shall be entitled to request no more than 500 pages of documents and to take three (3) depositions not to exceed eight (8) hours for each such deposition. Each Party shall be entitled to depose any expert who will testify in the arbitration proceeding. In addition to the foregoing, any Party shall be entitled to take the deposition of any witness who will testify at the arbitration. The Parties shall exchange a copy of all exhibits for the arbitration hearing and shall identify each witness who will testify at the arbitration, with a summary of the anticipated testimony of such witness fourteen (14) days before the arbitration hearing

9. Each party shall bear its own costs and their own attorney, expert, and other fees and costs. The cost of any proceeding in court to confirm or to vacate any arbitration award, as applicable (including, without limitation, reasonable attorneys' fees and costs), shall be the responsibility of the unsuccessful party. It is specifically understood and agreed that any party may enforce any award rendered pursuant to the arbitration provisions herein by bringing suit in any court of competent jurisdiction, as identified in paragraph 10. Each party shall pay its own proportionate share of arbitrator fees and expenses, plus the fees and expenses of the arbitrator designated, and the arbitration fees and expenses of the arbitrator designated.

10. The jurisdiction for all disputes involving this agreement to arbitrate shall be: (1) the U.S. District Court - Eastern District of New York or State of New York courts if the arbitration proceedings are held in New York, without regard to principles of conflict of laws; or (2) the U.S. District Court of New Jersey or State of New Jersey courts if the arbitration proceedings are held in New Jersey, without regard to principles of conflict of laws. **Abko** reserves the exclusive right to select either jurisdiction and court in New York or New Jersey for all court proceedings relating to this arbitration agreement. If UNDERSIGNED seeks to proceed with court proceedings in relation to this arbitration agreement, UNDERSIGNED must first request permission from **Abko** as to the jurisdiction, court and venue for all court proceedings.

11. If any part of this arbitration agreement is found to be unenforceable for any reason, the remaining provisions shall remain enforceable. This Arbitration Agreement replaces any and all other arbitration agreements, and shall govern and control. This agreement shall not be construed against the drafter. By signing this agreement, UNDERSIGNED represents that they have read this agreement, and fully understands the provisions provided for herein.

[THIS SECTION IS INTENTIONALLY LEFT BLANK]

THIS ARBITRATION PROVISION LIMITS YOUR RIGHTS, INCLUDING YOUR RIGHT TO MAINTAIN A
COURT ACTION OR ADMINISTRATIVE PROCEEDING AGAINST **ABKO ASSOCIATES**. PLEASE READ
IT CAREFULLY, PRIOR TO SIGNING. UNDERSIGNED MAY SEEK INDEPENDENT LEGAL COUNSEL
PRIOR TO SIGNING THIS AGREEMENT.

Accepted By: _____

                 Authorized Representative of **ABKO ASSOCIATES INC.**

Date: 4|1|15

Undersigned _____

Undersigned Print Name: Bakari Towe                                Date: 4/1/15

# EXHIBIT II

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------X

BAKARY TOURE,

                           **17-cv-00657 (DLI) (PK)**

                    Plaintiff,

        -against-                          **<u>DECLARATION OF</u>**
                                             **<u>STEPHEN D. HANS, ESQ.</u>**

THUNDER LUBE, INC., ABKO ASSOCIATES,
INC., and HAGAY KEREN,
                         Defendants.
--------------------------------------------------------------X


      **STEPHEN D. HANS, ESQ. declares, upon personal knowledge and under the penalties of perjury pursuant to 28 USC 1746, that the following is true and correct:**


1. My office was retained in April 2017 by Mr. Hershowitz, who manages Thunder Lube, Inc., for all three defendants in the above captioned case. I was retained by telephone and we did not meet at my office nor at the businesses which with he is associated.


2. The reason for this Declaration is that I was presented with the minutes of the Initial Conference, dated June 22, 2017, in which I appeared for the defendants. After reviewing those minutes, it was clear to me that I misspoke without authorization of the client and I was wholly incorrect in what I said to the Court.


3. The corporate defendant is located very close to another client. When I discussed "commissions" at the conference, I realized that I was not thinking of Thunder Lube. I had not even had any conversations with Mr. Hershowitz concerning defendants Thunder Lube or Abco


4. My recollection at the Initial Conference was incorrect. Frankly, I may have been thinking of a different client. I did not engage in any due diligence with the clients, nor did I have all of the facts.


5. When I said to the Court that "I told the client a long time ago that if you're going to pay commissions for non-exempt employees, someday you're going to get caught." (transcript; p. 2 L 11-13), I was not referring to this client. I had not met with any of the individuals who operate Thunder Lube or Abko.


1

6. Rule 26 Disclosures – Neither party had made any disclosures as to witnesses or who may have knowledge of this matter prior to the Initial Conference. I had never received any Rule 26 disclosures from Mr. Hassan and I never served him with any. Consequently, neither of us had any idea of who would support these allegations.

7. I cannot overstate that I completely and unequivocally misspoke on the issue of "commissions." I have no knowledge regarding this. In fact, when Thunder Lube, Inc. realized that I was moving to settle this case, because of that fact, I was discharged as counsel since the client lost any confidence in my representation.

8. As I look back, I realize that I did not have any direct knowledge of commissions that were paid by Thunder Lube or Abko and I spoke of such without knowledge of or authorization by the client.

Dated: Long Island City, New York
        December 4, 2017

           /s/ Stephen D. Hans
        Stephen D. Hans (SH-0798)
        45-18 Court Square, Suite 403
        Long Island City, New York 11101
        Tel: 718.275.6700 x 204
        Fax: 718.275.6704
        Email: shans@hansassociates.com

2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

Bakary Toure,                                        )
                                                     )
                        Plaintiff                    )        Civ. Action #: 17-CV-00657
                                                     )                (DLI) (PK)
                        -v-                           )
                                                     )
Thunder Lube Inc.,                                   )
Abko Associates Inc., and                            )
Hagay Keren,                                         )
                                                     )
                        Defendants.                  )
                                                     )
_____)

**DECLARATION OF HAGAY KEREN**

**DECLARATION OF HAGAY KEREN**

I, Hagay Keren, under penalty of perjury, declare as follows:

1. I am a minority shareholder of both Defendant Abko Associates Inc. ("Abko") and Defendant Thunder Lube Inc. ("Thunder Lube", and together with Abko, the "Corporate Defendants"), and I make this Declaration in support of Defendants' Motion to Compel Arbitration, Dismiss Complaint and to Dismiss Defendant Hagay Keren. Unless noted otherwise, I am aware of all the facts set forth below from my own personal knowledge.
   For the purpose of this Declaration, I have tried to refer only to facts that are part of the record in the above-captioned case, either through pleadings, depositions, or discovery  that Defendants have produced to the other side.

2. I have no operational responsibilities and no day-to-day responsibilities at the lube shop operated by either of the Corporate Defendants.

3. I have no contact with employees of the Corporate Defendants, other than my fellow shareholders with whom I may socialize from time to time. Furthermore, I have no responsibilities with respect to the employees of the Corporate Defendants, and I do not hire or fire employees for either of the Corporate Defendants.

4. I do not remember the last time I physically visited the lube shop operated by either of the Corporate Defendants, but I believe the most recent occasion of my visit to have been more than one year ago.

5. I have not attended any shareholder meetings of either of the Corporate Defendants.

6. I testified to the above facts at the deposition taken by Mr. Abdul Hassan on December 7, 2017.

7. I am neither an officer nor a director of either of the Corporate Defendants.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge and understanding.

_____
Hagay Keren

Dated:

3 /8/18